## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID A. ZUBIK, BISHOP OF
PITTSBURGH, AS TRUSTEE, ROMAN
CATHOLIC DIOCESE OF PITTSBURGH, A
PENNSYLVANIA CHARITABLE TRUST
AND SAINT MARY OF THE MOUNT
PARISH, A PENNSYLVANIA
CHARITABLE TRUST,

          Plaintiffs,

      v.

CITY OF PITTSBURGH AND SARAH
QUINN,

          Defendants.

Civil Docket No. 2:20-cv-1809-WSH

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, the Most Reverend David A. Zubik, Bishop of Pittsburgh ("Bishop Zubik"), the Roman Catholic Diocese of Pittsburgh (the "Diocese"), and the Saint Mary of the Mount Parish ("Saint Mary Parish") (collectively, the "Diocese"), by and through their undersigned counsel, Clark Hill PLC, submit this Memorandum of Law in Support of their Motion for Summary Judgment against Defendants, City of Pittsburgh ("City") and Sarah Quinn ("Quinn") (collectively, the "City").

## I.    INTRODUCTION

This is an action for declaratory, injunctive, and compensatory relief under the First, Fifth, and Fourteenth Amendments to the United States Constitution; the Pennsylvania Constitution; the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.* ("RLUIPA"); United States' civil rights law, 42 U.S.C. § 1983; the laws of the Commonwealth of

Pennsylvania, including 53 Pa.C.S.A. § 2962 and 10 P.S. § 81; and the City of Pittsburgh Historic Designation Ordinance, City of Pittsburgh, Pennsylvania Code of Ordinances § 1101.01, *et seq*.

St. John Vianney is a church building owned (held in trust), under the dictates of Canon Law, by the Bishop of the Diocese of Pittsburgh. The City of Pittsburgh and Sarah Quinn seek to have the Church Building designated as a "historic structure" under the City's historical preservation ordinance, found at City of Pittsburgh Historic Designation Ordinance, City of Pittsburgh, Pennsylvania Code of Ordinances § 1101.01, *et seq.* (the "Ordinance"). The City's attempt to wrest control of a church building and its relics and artifacts violates the United States and Pennsylvania Constitutions, positive law of the Commonwealth of Pennsylvania and City of Pittsburgh, and Canon Law recognized as controlling the appropriate designee over church property. As applied, the Ordinance is unconstitutional and the Diocese seeks a declaration to that effect from this Court, in addition to a permanent injunction enjoining the City from any further attempts to apply or enforce the Ordinance against the Diocese.

## II.    CONCISE STATEMENT OF MATERIAL FACTS

The parties' Joint Stipulation of Facts ("SOF") are hereby incorporated into this Memorandum in accordance with this Court's Order dated December 2, 2021 at ECF Doc. No. 52.

## III.    LEGAL ARGUMENT

### A.    Legal standard governing motions for summary judgment.

Summary judgment may be entered in a civil case if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden

2

of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987).

In the present case, the parties have jointly submitted stipulated facts for this Court to consider; thus, all of the material facts are uncontroverted. Consequently, the material issues for decision are of pure law, and this case is an appropriate one for summary disposition in all respects.

**B.    This matter is ripe for adjudication and this Court can and should provide declaratory and permanent injunctive relief in favor of the Diocese.**

This Court is authorized to provide declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.* ("DJA"), providing, in part: "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.* § 2201(a). Additionally, the Court may issue a permanent injunction where the moving party demonstrates: "(1) the exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded on the merits of its claim; and (3) the balance of the equities favors the grant of injunctive relief." *Chao v. Rothermel,* 327 F.3d 223, 228 (3d Cir. 2003) (citation omitted).

To satisfy both Article III, Section 2 of the Constitution and the DJA's "case or controversy requirement," an action must present "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995) (citation omitted). Federal jurisdiction is also limited by the doctrine of "ripeness," which parameters "are especially difficult to define within the context of declaratory judgment actions." *Id.* (citing *Step–Saver Data Systems, Inc. v. Wyse Technology,* 912 F.2d 643, 646 (3d Cir. 1990)). This difficulty "is due, in large measure, to the fact that declaratory judgments are, of necessity, rendered before

3

an 'accomplished' injury has been suffered." *Travelers Ins.,* 72 F.3d at 1154 (citing *Step–Saver,* 912 F.2d at 647). Nonetheless, the Third Circuit has developed a "method of analysis that focuses upon three factors to aid in determining if and when a declaratory judgment action is ripe": (1) adversity of the interests of the parties; (2) the conclusiveness of the judicial judgment; and (3) the practical help, or utility, of that judgment. 72 F.3d at 1154. If all three elements are present, the declaratory judgment action is ripe. *Id.* Notably, the inquiry into the "case or controversy requirement" can be satisfied as part of a court's inquiry into "ripeness," *see id.*, which is the case in the instant matter.[1] The Third Circuit has applied these same three factors in determining the justiciability of an action for permanent injunctive relief. *Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 593 (E.D. Pa. 2009), *aff'd,* 410 F. App'x 506 (3d Cir. 2011).

Moreover, RLUIPA establishes that a "person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). The phrase "appropriate relief against a government" has been interpreted broadly to include declaratory, injunctive, and other relief. *See Williams v. Bitner*, 455 F.3d 186, 194 (3rd. Cir. 2006). Traditional notions of ripeness are the appropriate mode of analysis where the act of designating religious property "historic" causes injury to a party. *See Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1357-58 (11th Cir. 2013). "The mere existence of [a discriminatory] Ordinance creates a ripe controversy." *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92 (1st Cir. 2013).

---

[1] In addition, this matter includes a First Amendment challenge, which is subject to a relaxed ripeness standard. *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1458 (3d Cir. 1994); *see also Pa. Prison Soc'y v. Cortes,* 508 F.3d 156, 169 (3d Cir. 2007) (courts have "repeatedly shown solicitude for First Amendment claims because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression").

4

In this matter, it first cannot be disputed that there is a palpable adverse interest between the parties. The threat of enforcement of the Ordinance against the Diocese demonstrates both the parties' adversity of interests and the immediacy of the Diocese's actual injury. *See Travelers,* 72 F.3d at 1154; *Armstrong World Industries, Inc. v. Adams,* 961 F.2d 405, 412 (3d Cir. 1992); *Le Cabaret 481, Inc. v. Municipality of Kingston,* 2005 WL 114171, at *4 (M.D. Pa. 2005) ("An ordinance need not be enforced against a plaintiff to give rise to a case in controversy so long as the plaintiff can establish that the defendant intends to enforce the statute and the plaintiff's concern is not 'chimeral.'") (quoting *Steffel v. Thompson*, 415 U.S. 452, 459, 460 (1974)).

Next, with respect to conclusiveness, meaning "the legal status of the parties must be changed or clarified by the declaration [or injunction]," *Travelers*, 72 F.3d at 1155 (citing *Step-Saver*, 912 F.2d at 648), the Third Circuit explained that the "contest must be based on a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." 912 F.2d at 649. An integral part of the conclusiveness inquiry is the necessity that the court be presented with a set of facts from which it can make findings. *Travelers*, 72 F.3d at 1155. "When the question presented is predominately legal, the factual record is not as important, and the questions may be appropriate for judicial resolution even without a fully developed factual record." *Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 593 (E.D. Pa. 2009) (quoting *Armstrong*, 961 F.2d at 412), *aff'd,* 410 F. App'x 506 (3d Cir. 2011). This case presents predominately legal questions regarding the application of the Ordinance as against the Diocese. This Court's decision on the issues will indisputably end the disagreement between the parties. No further factual

ClarkHill\55770\416825\266377978.v1-4/5/22

development would change the "substance or clarity" of the issues. Accordingly, the second factor of the *Step-Saver* analysis is satisfied.[2]

Finally, the granting of a declaratory judgment would terminate the dispute between the parties. A grant or denial of relief will both affect the Diocese's ability to use the Church Building and the City's ability to enforce the Ordinance against the Diocese. In *Le Cabaret, supra*, the court determined that a ruling as to whether the zoning ordinance was constitutional would be useful because it would affect the plaintiff's willingness to open an adult business in Kingston as well as the municipality's willingness to enforce the ordinance if it were deemed unconstitutional. 2005 WL 114171, at *16. And, in *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1470 (3d Cir. 1994), the court determined that "a grant or denial of relief... would materially affect the parties." There, a church and its pastor challenged an amendment to the New Jersey Law Against Discrimination that would prohibit the right to speak out against male and female homosexual acts. *Id*. at 1457. The court explained that "[a] declaration of [the pastor's] rights and those of all others who would seek to engage in similar activity would permit a person to speak without fear of governmental sanction or regulations of their activities." *Id*. at 1470.

---

[2] For example, in *Le Cabaret,* the plaintiff filed suit against a municipality of claiming that a zoning ordinance was unconstitutional because it unreasonably restricted the locations available for adult businesses. 2005 WL 114171, at *3. The municipality filed for summary judgment, claiming that there was no case or controversy because the plaintiff had not sought a building permit or special exemption from the municipality's zoning board. *Id*. at * 5. The court disagreed, holding that the plaintiff had presented a ripe case and controversy based on the *Step-Saver* factors. *Id*. at *7. With respect to conclusiveness, the court held: "We find that a decision rendered in the present case would be sufficiently conclusive without requiring [the plaintiff] to submit an application to the zoning board." *Id*. at 15. The court explained that the plaintiff "intends to run a business ... and asserts that the ordinance unconstitutionally restricts it from doing so." *Id*. (internal quotations omitted). The court continued that "no further factual development would change the substance or clarity of the challenge." *Id*. (internal quotations omitted).

6

Simply, the mere existence of the Ordinance creates a controversy ripe for adjudication by this Court because the requirement that the Diocese subjugate its religious exercise and use of church property to governmental authority raises constitutional implications and uncertainty on behalf of the Diocese. If the City were permitted to designate the Church Building as a historic structure, the Diocese faces an endless future of seeking governmental approval to modify or improve the Church Building and its artifacts. Pittsburgh Code, Title 11, Ch.1101 § 1101.05. Because all three factors in *Step-Saver* have been met, this matter is ripe for adjudication and the issuance of declaratory and/or injunctive relief. Thus, summary judgment should be granted in favor of the Diocese for the reasons that follow.

>   **C.    The Ordinance, and the City's actions, including any designation of the Church Building as a historic structure pursuant to the Ordinance, are unconstitutional as a matter of law and in derogation of positive law.**
>
>>   1.    <u>The Ordinance Conflicts with Positive Law and Violates Both the Establishment Clause and the Free Exercise Clause of the First Amendment of the United States Constitution, as well as Article I, Section 3 of the Pennsylvania Constitution.</u>[3]

The First Amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, § 1.[4] The right for religious associations to resolve questions of religious doctrine and exercise by their own tribunals and their own ecclesiastical governments has long been respected and unquestioned. *See, e.g., Watson v. Jones*, 80 U.S. 679, 728-29 (1871) ("The right to organize voluntary religious associations to assist in the expression and dissemination of any

---

[3] The Pennsylvania counterpart to the First Amendment of the United States Constitution is Article I, Section 3 of the Pennsylvania Constitution. The United States Supreme Court's holdings on the First Amendment are "equally apposite" to the analysis under the Pennsylvania Constitution. *Wiest v. Mt. Lebanon Sch. Dist.*, 320 A.2d 362, 367 (Pa. 1974).

[4] These guarantees apply to state governments through the Fourteenth Amendment. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162 (2015).

7

religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned.").

### a.     The Ordinance is subject to strict scrutiny.

"Depending on the nature of the challenged law or government action, a free exercise claim can prompt either strict scrutiny or rational basis review." *Ali v. Sponaugle*, 2019 WL 2295952, at \*6 (E.D. Pa. May 30, 2019) (quoting *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002)).   While rational basis applies to neutral laws of general applicability, *see Employment Div. v. Smith,* 494 U.S. 872, 879 (1990), there is an exception[5] where a court must apply strict scrutiny when a state's facially neutral rule contains a system of individualized exemptions.  *Blackhawk v. Pennsylvania,* 381 F.3d 202, 208 (3d Cir. 2004); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294-95 (10th Cir. 2004).

Strict scrutiny applies to the instant matter for two distinct reasons: (1) the Ordinance facially is not a neutral law of general applicability; and (2) even if it were, the individualized exemption exception applies.  First, "in situations where government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002).  Thus, strict scrutiny is triggered when a system of individualized exemptions or governmental assessment,

---

[5] There also exists a "hybrid rights" exception.  The United States Court of Appeals for the Third Circuit has not explicitly decided that it would apply heightened scrutiny to "hybrid rights" challenges, but has suggested, in dictum, that a form of strict scrutiny analysis might be appropriate in a "hybrid rights" situation.  *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144 (3d Cir. 2002).  Thus, the Diocese submits that the hybrid rights challenge would form another basis for application of strict scrutiny herein.

ClarkHill\55770\416825\266377978.v1-4/5/22

including categorical exceptions, gives governmental officials discretion. *Id.* As the First Circuit Court of Appeals has held, where statutes, such as the Ordinance, vest the government with discretion to decide when and how to act, such "strictures imposed as a result of historic district status do not apply automatically by statute to the general population, but apply once certain officials of the City decide that they will apply." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 98 (1st Cir. 2013). Thus, "[h]istoric district or landmark ordinances are different from other types of zoning rules in that their entire purpose is to prevent only particular property owners in limited areas from changing the appearance of particular properties." *Id.*

It is undisputed that the Ordinance in the matter before this Court is a land use regulation. (SOF 36.) The Ordinance provides that the "Council of the City of Pittsburgh may designate Historic Structures, Historic Districts, Historic Sites and Historic Objects upon request or upon its own initiative." (SOF 17.) Chapter 11 of the Ordinance sets forth the review procedures for historical nominations and subsequent alterations of historic properties. (SOF 18.) Pursuant to the Ordinance, once a structure is nominated for designation as a "Historic Structure," no exterior alterations may be undertaken until a final determination of the designation has been made by Council, or until 120 days after Council's receipt of the recommendations of the HRC and Planning Commission, without the review and approval by the HRC and the issuance of a Certificate of Appropriateness. (SOF 29.) Once a nomination for designation is accepted, the Historic Review Commission must make a recommendation to City Council after holding a public hearing, subject to specified criteria and procedures. (SOF 31.) The Ordinance requires the Historic Review Commission to schedule a public hearing on a nomination for designation of a building as a "Historic Structure" within three months of the completed nomination form. (SOF 33.) Under Section 1101.04 of the Ordinance, the Commission must determine that ***one of ten*** unique criteria

9

is satisfied in making a designation. Pittsburgh Code, Title 11, Ch.1101, §1101.04. Moreover, the Ordinance expressly provides for exemptions to the bar on exterior alterations after designation is made. *Id.* at §§1101.03, 1101.06. The Ordinance further provides eight factors which "shall" be considered by the Commission "when reviewing proposed exterior alteration" after a structure has been deemed "historic." *Id.* at §1101.08.

The Ordinance unavoidably requires that individualized assessments be made to determine historic designations, and further permits discretionary exemptions. The inherent nature of historic district designations renders the Ordinance neither neutral nor of general application. In this sense, it can be said that the Ordinance is not "generally applicable." *See City of Springfield, supra.* Consequently, the Ordinance is not a "neutral law of general applicability" in the sense that the Supreme Court has used the term in *Smith*.

Second, even if the Ordinance were deemed a "neutral law of general applicability," which it is not, it nevertheless triggers strict scrutiny as it contains a system of individualized exemptions. The Supreme Court recognizes that where the government enacts a system of exemptions, and thereby acknowledges that its interest in enforcement is not paramount, then the government "may not refuse to extend that system [of exemptions] to cases of 'religious hardship' without compelling reason." *Smith*, 494 U.S. at 884, (quoting *Bowen v. Roy,* 476 U.S. 693, 708 (1986)). Explaining further, the Tenth Circuit Court of Appeals has stated that "such a system is one in which case-by-case inquiries are routinely made, such that there is an 'individualized governmental assessment of the reasons for the relevant conduct' that invites considerations of the particular circumstances' involved in the particular case." *Axson-Flynn*, 356 F.3d at 127 (citing *Smith,* 494 U.S. at 884); *see also Tenafly*, 309 F.3d at 165.

10

In a case that is similar to the instant dispute, the United States District Court for the District of Maryland held that a city's historic preservation ordinance violated a church's right to the free exercise of religion protected by the First Amendment. *Keeler v. Cumberland*, 940 F.Supp. 879 (D. Md. 1996). Relying on Canon Law that dictated that "[p]roperty may not be amassed for its own sake or to serve purely secular goals, but must be used to serve in meeting the spiritual needs of the people..." and that "[p]astors are religiously obligated to make substantive administrative and financial decisions based on the principles of worship, doctrine, and governance..." the Church sought to replace the old monastery and chapel, both of which were in disrepair, with smaller, modern facilities, and to add gardens and a parking lot. *Id*. at 880, 884. However, because the church buildings were part of a historic district, the Church had to seek permission from the historic preservation commission before proceeding with demolition, which required the commission to consider all relevant factors. *Id*. As such, both the Cumberland ordinance and the Ordinance embody "a legislative judgment that the City's interest in historic preservation should, under certain circumstances, give way to other interests..." *Id.* at 866. Therefore, the *Keeler* court determined that the ordinance employed a system of individualized exemptions and, accordingly, it must "advance interest of the highest order and be narrowly tailored in pursuit of those interests." *Id.* Following the *Keeler* decision, federal courts have consistently found that burdens imposed through land use restrictions are imposed pursuant to systems of "individualized assessments."[6]

---

[6] Courts reached this conclusion several times under the Free Exercise Clause after the Supreme Court's decision in *Smith* - but before the enactment of RLUIPA. *See, e.g., Alpine Christian Fellowship v. Cy. Comm'rs of Pitkin*, 870 F. Supp. 991, 994-95 (D. Colo. 1994) (special use permit denial triggered strict scrutiny because decision made under discretionary "appropriate[ness]" standard); *Korean Buddhist Dae Won Sa Temple v. Sullivan*, 953 P.2d 1315, 1344-45 n.31 (Haw. 1998) ("The City's variance law clearly creates a 'system of individualized exceptions' from the general zoning law."); *First Covenant Church v. Seattle*, 840 P.2d 174, 181 (Wash. 1992) (landmark ordinances "invite individualized assessments of the subject property and the owner's use of such property, and contain mechanisms for individualized exceptions"). Now that RLUIPA

11

*See, e.g.,  Freedom Baptist Church v. Township of Middletown*, 204 F.Supp.2d 857, 868 (E.D.Pa. 2002) ("no one contests" that land use laws "by their nature impose individualized assessment regimes").[7]

The Ordinance's discretionary system of making individualized case-by-case determinations regarding who should receive designation as a "Historic Structure" and attendant exemptions from the Ordinance when a property is in fact designated as such is the very type of individualized exemptions and/or assessments envisioned by the *Smith* Court.  Per the Ordinance, such historic designations and exemptions require the owner to petition the City for issuance of "certificates" of "appropriateness" or "hardship," before allowing the owner to make changes to the external appearance of the regulated structure.  Without such certificates, those alterations would not otherwise be permitted.  The Ordinance's "guidelines" have no defined objective

---

has codified the standard "for greater visibility and easier enforceability," 146 Cong. Rec. S7775, courts routinely reach that conclusion.

[7] *See also Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 456 F.3d 978, 985 (9th Cir. 2006) (holding conditional use permit decision was an "individualized assessment"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004) (finding individualized assessments where zoning "officials may use their authority to individually evaluate and either approve or disapprove of churches and synagogues in potentially discriminatory ways"), *cert. denied*, 543 U.S. 1146 (2005); *Church of Scientology v. City of Sandy Springs*, 843 F.Supp.2d 1328, 1352 (N.D. Ga. 2012) ("the City made an individualized assessment of the Church's proposed use of the property by taking into account the particular details of Plaintiff's proposed use of the property"); *Castle Hills First Baptist Church v. City of Castle Hills*, 2004 WL 546792, at *15 (W.D. Tex. 2004) (special use permit application is a system of individualized assessments); *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1222 (C.D.Cal. 2002) (holding that City's "land-use decisions...are not generally applicable laws," and that refusal to grant church's "CUP 'invite[s] individualized assessments of the subject property and the owner's use of such property, and contain mechanisms for individualized exceptions.'"); *Al-Salam Mosque Fdn. v. Palos Heights*, 2001 WL 204772, at *2 (N.D.Ill. 2001) ("[F]ree exercise clause prohibits local governments from making discretionary (*i.e.*, not neutral, not generally applicable) decisions that burden the free exercise of religion, absent some compelling governmental interest.... Land use regulation often involves 'individualized governmental assessment of the reasons for the relevant conduct'").

ClarkHill\55770\416825\266377978.v1-4/5/22

criteria, other than what the individual members of the government deem appropriate on a case-by-case basis. A clearer example of "individualized assessment" would be difficult to find.

Accordingly, strict scrutiny is the appropriate standard of review in the case *sub judice*. As a "law restrictive of religious practice," the Ordinance must "advance interests of the highest order and be narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546 (1993). Said differently, to sustain claims under the First Amendment, the Diocese must demonstrate that the Ordinance imposes a substantial burden on its religious conduct. *See Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 361 (3d Cir. 1999). Then, the burden shifts to the City to show that the Ordinance is "justified by a compelling government interest." *Church of Lukumi Babalu Aye,* 508 U.S. at 531 (1993); *see also Fraternal Order of Police*, 170 F.3d at 361. This is a burden that the City cannot overcome, as set forth *infra*.

### b. The Ordinance violates the Establishment Clause.

"The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (U.S. 2020) (internal citations omitted). The government should not involve itself in quintessentially religious questions, *especially ones pending before or already resolved by ecclesiastical tribunals*. *See Hosanna-Tabor Evangelical Luthern Church and School v. E.E.O.C.*, 565 U.S. 171, 187 (2012) (evaluating ministerial exception and concluding that it prohibits government interference with internal, quintessentially religious controversies). Establishment Clause violations are governed by the three-prong test set forth in *Lemon v. Kurtzman,* 403 U.S. 602 (1971). Under the *Lemon* test, the government's conduct must have a secular purpose; the principal or primary effect of the conduct must be neither to advance nor inhibit religion; and the government's conduct may not

13

foster an excessive entanglement between government and religion. *Id.* A state actor can avoid a finding of an Establishment violation only if its conduct satisfies all three prongs of the test. *Id.*

Additionally, "[t]he state may not directly regulate the 'internal organization' of religious organizations." *Wiley Mission v. New Jersey*, 2011 WL 3841437, at *8 (D.N.J. Aug. 25, 2011) (quoting *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713 (1976)). To reiterate, "such laws are unconstitutional unless they are 'narrowly tailored' to 'advance' a 'compelling governmental interest.'" *Wiley Mission*, 2011 WL 3841437, at *8 (quoting *Church of Lukumi Babalu Aye,* 508 U.S. at 531–32).

The City's conduct amounts to an Establishment Clause violation because it fails at least two of the *Lemon* prongs: (1) the City cannot establish that the primary effect of its actions neither advanced nor inhibited religion; and (2) if allowed to stand, the Ordinance fosters an excessive entanglement between government and religion. As discussed *infra*, the Ordinance prohibits designating a religious structure as a historic structure except by nomination of the building's owner(s). (SOF 23-26.) No such nomination was made and, in fact, vehement opposition to the designation has been voiced by the owner repeatedly. (SOF 63-73, 77-81, 84-86.) Moreover, a Canonical appeal to the Supreme Tribunal of the Apostolic Signatura of the Holy See, located in the Vatican City-State, is pending as of the date of this filing. (SOF 52-53.) The United States recognizes the Holy See as the supreme body of government of the Catholic Church. (SOF 54.)

The City's interference with the operation of the Catholic Church clearly causes the Diocese irreparable harm in this matter. The Church Building is a place of worship – whether it is opened to the public as such or not. Even without Catholic mass being held in the Church Building, the Building itself, and the objects within it and affixed thereto, are sacred objects, which Bishop Zubik has decreed should be removed. (SOF 40.) For example, pursuant to the above-

14

cited Canon Law, the stained-glass windows and the statues on the exterior of the Church Building are blessed by the Bishop and are therefore holy objects, central to the practice of the Catholic faith. The Church Building itself is a consecrated structure and is holy property. The Ordinance's requirement of Commission approval prior to making changes to the external structure directly contravenes Canon Law's mandates that sacred objects like statues and stained-glass windows be removed. Designating the Church Building as a "historic structure" would therefore require the Diocese to seek approval from the government in the exercise and performance of its faith. Such an intrusion is suffered immediately upon the imposition of this historic designation.

Thus, it cannot be disputed by the City that application of the Ordinance to the Diocese's use of the Church Building substantially burdens its rights. The City's use of the Ordinance to tell the Diocese what to do with its religious property replaces the Diocese's judgment with that of the government, particularly where a decision as to what to do with the Church Building is presently pending before the Church's governmental body. Such actions are a violation of the First Amendment's Establishment Clause for the foregoing reasons and those discussed in greater detail *infra*, and the Diocese submits that the City cannot show a compelling governmental interest.

### c.    *The Ordinance violates the Free Exercise Clause.*

"The Free Exercise Clause protects against even indirect coercion." *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2256 2020) (finding rule excluding religiously affiliated private schools from a state scholarship program to be unconstitutional). The Third Circuit has reaffirmed the Supreme Court's rulings on free exercise issues:

> The First Amendment 'severely circumscribes' the role that civil courts may play in resolving disputes touching on matters of faith. Civil courts encroach on the autonomy of religious institutions when they inquire into ecclesiastical law and governance. The non-entanglement principle, anchored in First Amendment values, thus 'requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization.' …
> There bedrock principles, recently reaffirmed by the Supreme Court, derive from

15

both Religion Clauses of the First Amendment. Civil court review of doctrinal matters inhibits free exercise of religion and usurps the power of religious authorities to resolve intrachurch matters purely of ecclesiastical concern. And it improperly cloaks the State with authority to 'intervene on behalf of groups espousing particular doctrinal beliefs.' The Religion Clauses guard against such 'government interference with … internal church decision[s] that affect[] the faith and mission of the church itself.'

*Askew v. Trustees of General Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 418 (3d Cir. 2012) (internal citations omitted).

As an initial matter, it cannot be refuted that the Ordinance creates a substantial burden on the Diocese. The Church Building continuously has been owned since the 1800s by the successive Bishops of Pittsburgh as Trustee pursuant to Canon Law and as recognized by 10 P.S. § 81. (SOF 7.) The Church Building is currently owned by the Bishop of Pittsburgh in his role as Trustee for the Diocese and Saint Mary Parish. (SOF 8.) The Diocese is part of the Roman Catholic Church, which is subject to Canon Law, procedures, and doctrines. (SOF 10.) On or about January 23, 2016, Bishop Zubik decreed that the stained-glass windows, sacred items, non-sacred artifacts, and any work of some significance be removed from the Church Building to the extent possible for reuse at parishes receiving territory from St. John Vianney Parish. (SOF 40.) On or about June 16, 2017, Bishop Zubik issued a second Canonical Decree closing the Church Building for worship pursuant to Canon Law and procedures. (SOF 44.)

The very existence of the Ordinance itself burdens the Diocese's religious practices and undermines its religious freedom. It is undisputed that the Commission recommended that City Council approve the Church Building as a "Historic Structure" pursuant to the Ordinance. (SOF 87-88.) The sole reason the final vote to designate the Church Building was halted was due to the Diocese resorting to the filing of the Complaint in this action. (SOF 100.) Thus, there is no doubt that the City intended, and intends, to impose the Ordinance and City oversight on the Bishop and his disposition of the Church Building and its relics and artifacts. Thus, the Diocese is being forced

16

to choose between following Canon Law dictates setting forth limitations on how the property can be managed or complying with the Ordinance. Additionally, the Diocese faces delay, uncertainty and expense because it must either submit to the Ordinance or face continual litigation. Thus, the Diocese's recourse is to: (1) abandon the responsibilities imposed by Canon Law; (2) be burdened by filing innumerable repeated applications with the government seeking exemptions, not knowing whether they will be granted or denied, or what criteria will be applied; and/or (3) routinely seek injunctive relief.

The Ordinance imposes significant restrictions and substantially burdens the Diocese's free exercise of religion in that the City would usurp the decision-making of the Diocese as it relates to its place of worship, which extends far beyond just the control of the appearance, placement, substance and subject matter of the religious symbols and sacred items on the exterior of the Church Building. The Ordinance, by its express terms, prevents the Church's demolition or substantial redesign. On or about June 16, 2017, Bishop Zubik issued a second Canonical Decree closing the Church Building for worship pursuant to Canon Law and procedures. (SOF 44.) Upon issuing the June 16, 2017 Canonical Decree, Bishop Zubik noted that significant repairs were needed to make the Church Building safe for use and suitable for divine worship, and the lack of funds to pay for such necessary repairs. (SOF 46.) Thus, by designating the Church Building as a "Historic Structure," the Diocese loses all rights to any use of the Church Building, as it can no longer repair it without Commission approval or use it for worship in light of safety concerns. This is in derogation of the best interest of the public, as well as the Diocese's rights, because allowing the Church to dispose of its property as required by Commonwealth statute and Canon Law will allow the Church to invest its resources to fulfill its mission.

17

Furthermore, the Church Building, and its external symbols, rooted in the sacred scriptures that provide the basis of the Roman Catholic faith, will be frozen in place indefinitely under government control. This is a profound, oppressive, and substantial burden that further impedes the Bishop's exercise of his religious responsibilities under express Canon Law set forth above. Pointedly, this exercise of governmental control prevents the Bishop's exercise of his religious obligations to protect religious property from inappropriate use, and to continue their use elsewhere if possible.

Moreover, the Diocese is being forced to comply with the Ordinance or else run afoul of it and be subjected to criminal penalties. Pittsburgh Code, Title 11, Ch.1101, § 1101.10. Therefore, the government is putting substantial pressure on the Diocese to substantially modify its behavior, violate its religious beliefs, and essentially relinquish control of the Church Building and its artifacts to the government. When government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs" it creates a substantial burden. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981).

Simply, the Ordinance violates the Diocese's rights because it requires the Diocese to seek the permission of a secular authority before it can make any decisions with respect to the Church Building. Such a burden on the Diocese's religious exercise is indeed substantial.

Next, the City has not, and cannot, assert that historic preservation is a compelling interest of the government. While the issue apparently has not been settled by the United States Supreme Court, other state and lower federal courts have held that government interest in historical preservation is *not* a compelling state interest sufficient to justify a burden on the free exercise of religion and speech. *See, e.g., Mount St. Scholastica v. City of Atchison, Kansas*, 482 F. Supp. 2d 1281 (D. Kan. 2007) ("No court has found historic preservation to be a compelling government

18

interest.") (citing *Keeler v. Mayor & City Council of Cumberland*, 940 F. Supp. 879, 886 (D. Md. 1996) ("Courts and commentator are apparently unanimous in opining that [historic preservation] is not [a compelling government interest].")); *First Covenant Church v. City of Seattle,* 840 P.2d 174, 185 (Wash. 1992) (government's "interest in preservation of esthetic and historic structures is not compelling"); *Society of Jesus of New England v. Boston Landmarks Comm'n,* 564 N.E.2d 571 (Mass. 1990) ("[t]he governmental interest in historic preservation, though worthy, is not sufficiently compelling to justify restraints on the free exercise of religion, a right of primary importance").

There is no compelling government interest in the historic designation of the Church Building, as it is indisputably not done for the safety, health, or welfare of the residents of the City of Pittsburgh (SOF 105), nor is it the least restrictive means of furthering any legitimate government interest. As the interest pursued by this designation and process are contrary to the laws of the City of Pittsburgh and the laws and Constitutions of both the United States and of the Commonwealth of Pennsylvania, there can be no conceivable legitimate or compelling governmental interest. Moreover, there is no harm to the City if the Church Building is not designated historic. On the contrary, allowing the Diocese to dispose of its property will open the path for new and innovative development that will serve the community better than having a deteriorating, empty building.

In sum, the requirement of subjecting its religious decisions to secular government oversight creates a substantial burden on the Diocese's free exercise of religion. In light of this, coupled with the fact that historic preservation is not a compelling government interest, it is irrefutable that the Ordinance cannot withstand strict scrutiny. The Church Building has affixed to it objects that are holy, and the building itself is holy - a status that is fundamentally intertwined

19

with the Catholic faith and worship.  Designating the Church Building as a "Historic Structure"
has free flowing consequences that solely serve to inhibit the Diocese's First Amendment rights,
including decisions regarding the use, movement, and care of these holy objects.  Requiring the
Diocese to seek governmental permission to use, care for, or otherwise interact with holy property
indisputably within the Diocese's ownership and faith unquestionably entangles the City in the
resolution of issues of religious doctrine.  Moreover, it coerces the Diocese in that if it were to
alter the Church property without City approval, it would face criminal penalties.  This is an
impermissible infringement on the Diocese's right to freely exercise religion; consequently,
summary judgment must be granted in favor of the Diocese.[8]

---

[8] In the alternative, if this Court were to find that the Ordinance is constitutional, which is fervently disputed, the City must be enjoined from designating the Church Building in light of the rule of comity.  Under the doctrine of international comity, a United States court "normally will give effect to executive, legislative, and judicial acts of a foreign nation." *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.,* 44 F.3d 187, 191 (3d Cir. 1994) (internal quotations and citations omitted).  Moreover, "judicial acts need not always be final judgments to be granted comity." *Remington Rand Corp-Del. v. Business Systems, Inc.* 830 F.2d 1260, 1266 (3d Cir. 1987) (citing *In re Colorado Corp.,* 531 F.2d 463, 469 (10th Cir. 1976)).  The criteria for dismissal on international comity grounds are present.  The Diocese belongs to a separate government, the Holy See.  The United States recognizes the Holy See as the supreme body of government of the Catholic Church.  (SOF 54.)  The Holy See is a sovereign judicial entity under international law.  (SOF 55.) An appeal of Bishop Zubik's Canonical Decree is currently pending before the Supreme Tribunal of the Apostolic Signatura of the Holy See.  (SOF 53.)  The Canonical appeal of the June 16, 2017 decree is pending before a legitimate and recognized judicial body.  (SOF 56.)  The rule of comity requires that the United States and the Holy See mutually recognize each other's legislative, executive, and judicial acts.  (SOF 57.)  As such, the Roman Catholic Church has an established judicial process for reviewing these appeals and is far better placed to determine when a church building is, or is not, used for worship.  The City's disdain of this pending appeal is not only an impermissible invasion of the Diocese's religious exercise but also amounts to the City disregarding the established rule of comity.  If the City is not enjoined from voting to designate the Church Building as historic, it would be usurping the Catholic Church's authority under Canon Law, causing a chilling effect on any action taken by the Bishop regarding properties in its trusts and conflicting with Canon Law and established principles of international comity. For this Court to allow the City to move forward with the proposed historic designation, it would have to ignore, and thus in effect overrule, the Canon Law which mandates that the Holy See is the supreme government for decisions relating to the Church Building.  It would also have to ignore the Holy See's forthcoming decision on the appeal.

ClarkHill\55770\416825\266377978.v1-4/5/22

2.    Canon Law serves as the governing law for ownership and disposition of Church property.

The manner in which entities within the Roman Catholic Church (the "Church") acquire and hold property finds its origins in the "historical perspective of the Church." *See* Bernard C. Huger, Diocesan Real Estate Transactions—Canon and Civil Law Implications, *The Catholic Lawyer*, Number 3 Volume 27, Summer 1982, Number 3, at 213. Given a history of societal oppression, "the leaders of the Church in Rome … created the concept that the Church is a separate moral person independent of any state." *Id.* at 213. As a result, the Church maintained Church ownership of property through Bishops who held title to the Church's properties for the benefit of the Church, with title passing directly to each respective Bishop's successors. *Id.* at 214. This theory of ownership of Church property is codified in Canon Law.[9] Entities that participate in the spiritual and religious mission of the Church (*i.e.*, a parish or diocese) are referred to as "juridic persons." Canon 113, § 2. All temporal goods which belong to the universal Church, the Apostolic See, or other public juridic persons in the Church are "ecclesiastical goods and are regulated by" Canon Law. Canon 1257, § 1. "By virtue of his primacy of governance, the Roman Pontiff [Pope] is the supreme administrator and steward of all ecclesiastical goods." Canon 1273. Subject to, among others, Canon 1273, a diocesan bishop, referred to as the "ordinary" in Canon Law, is entrusted with the care and administration of ecclesiastical goods of the public juridic persons subject to him. Canon 1276, § 1. "According to Roman Catholic canon law, when a church goes out of service for religious worship, the Bishop comes under an obligation to protect

---

[9]  A complete set of the Code of Canon Law is publicly available at https://www.vatican.va/archive/cod-iuris-canonici/cic_index_en.html.

21

the religious ornamentation in and on the building so that it is not put to 'sordid' use."[10]  *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 84 (1st Cir. 2013).

It is undisputed in this matter that decisions concerning control and disposition for any property owned by a religious organization and used for religious worship is vested in the Trustee for the Diocese pursuant to 10 P.S. § 81.  (SOF 9.)  This is only further confirmed by the various limitations imposed upon Bishops and pastors—namely, their roles are solely to administer property within their territorial sphere (*i.e.*, a diocese or a parish, respectively) for the benefit of the Church and subject to the Pope's supreme authority. *See, e.g.*, Canon 1292, §§ 1–2 (requiring permission to alienate ecclesiastical property); Canon 1293 (imposing requirements upon alienation of property); Canon 1295 (imposing limitations upon all transactions that could "worsen the patrimonial condition of a juridic person").  Accordingly, under Canon Law, while a juridic person may acquire property, any such acquisition is done on behalf of or for the benefit of the Church and, in the case of a diocese, such property is entrusted to the applicable diocesan bishop subject to the restrictions and dictates of Canon Law.  Canon 1276, § 1.

>    3.   State law preempts the Ordinance and the City lacks authority to usurp the Bishop's power to dispose of religious property.

Pennsylvania law has recognized for well over a century that "the canons of the Roman Catholic Church provide and require that the title to the property of the Roman Catholic congregation which is under the jurisdiction of the Roman Catholic Bishop of the diocese in

---

[10] "Under canon law, a sordid use is one that is 'detrimental to the good of souls,' including any use that involves '[t]he denunciation of the Catholic Church and the Catholic Faith, the desecration of Catholic objects of devotion and worship or even any disrespectful or casual treatment of such objects, and/or the proselytizing of Catholics.'" *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 84 n.2 (1st Cir. 2013) (quoting Roman Catholic Archbishop of Boston, *A Corporation Sole's Policy on the Sale of Church Buildings*, *available at* http://www.bostoncatholic.org/uploadedFiles/BostonCatholicorg/Parishes_And_People/Policyon SaleofChurch Buildings0711.pdf.)

ClarkHill\55770\416825\266377978.v1-4/5/22

which the congregation has its place of worship, must be in the ordinary, or in the present case, in the bishop of the diocese." *Krauczunas v. Hoban*, 70 A. 740, 742, 744 (Pa. 1908); *see also St. Peter's Roman Catholic Parish v. Urban Redevelopment Authority*, 146 A.2d 724, 726 (Pa. 1958) (addressing parish property, stating: "The bishop owns the property, in trust for the parish, and alone may dispose of it in accordance with the canons of the Roman Catholic Church."); *St. Matthew's Slovak Roman Catholic Congregation v. Wuerl*, 106 F. App'x 761, 766 (3d Cir. 2004) (referring to 10 P.S. § 81 as vesting control of religious property in the Bishop).

In this respect, the Act of June 20, 1935, 10 P.S. § 81, expressly vests ownership and control of property in church officials, which provides in relevant part:

> Whensoever any property, real or personal, has heretofore been or shall hereafter be bequeathed, devised, or conveyed to any ecclesiastical corporation, bishop, ecclesiastic, or other person, for the use of any church, congregation, or religious society, for or in trust for religious worship or sepulture, or for use by said church, congregation, or religious society, for a school, educational institution, convent, rectory, parsonage, hall, auditorium, or the maintenance of any of these, the same shall be taken and held subject to the control and disposition of such officers or authorities of such church, congregation, or religious society, having a controlling power according to the rules, regulations, usages, or corporate requirements of such church, congregation, or religious society, which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church, congregation, or religious society shall belong, but nothing herein contained shall authorize the diversion of any property from the purposes, uses, and trusts to which it may have been heretofore lawfully dedicated, or to which it may hereafter, consistently herewith, be lawfully dedicated [.]

Additionally, the City of Pittsburgh is organized pursuant to Home Rule Optional Plan, 53 Pa.C.S.A. §§ 2901, *et seq.* (the "Plan"). (SOF 34.) Under the Plan, the City "may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter." *Id.* § 2901. Therefore, the City's powers are expressly limited, and it is prohibited from exercising "powers contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of this Commonwealth." (SOF 37.) Moreover,

23

"[s]tatutes that are uniform and applicable in every part of this Commonwealth shall remain in effect and shall not be changed or modified by this subpart.  Statutes shall supersede any municipal ordinance or resolution on the same subject." *Id*. § 2962(c)(2).  The City's Home Rule Charter, Article 1 § 101, further limits the City's power, stating that the City "may perform any function and exercise any power not denied by the Constitution, the laws of Pennsylvania, or this charter."

10 P.S. § 81 preempts the Ordinance to the extent it is applied against a church property. Preemption is a judicially created doctrine based on the proposition that a municipality, as an agent of the state, cannot act in a manner that is contrary to state action in that area. *Duff v. Township of Northampton,* 532 A.2d 500 (Pa. Commw. Ct. 1987), *aff'd,* 550 A.2d 1319 (Pa. 1988).  The ultimate question in addressing any claim of preemption is whether the legislature intended its action to preclude the exercise of delegated police powers by any other municipality. *Id.* at 504. There is no dispute that the Commonwealth's General Assembly has the legislative authority to preempt local ordinances of home rule municipalities.  The source of this authority is the Pennsylvania Constitution, which provides: "A municipality which has a home rule charter may exercise any power or perform any function ***not denied***... by the General Assembly at any time." Pa. Const. art. 9, § 2 (emphasis added).[11]

---

[11] Municipalities do not have the authority to supersede state law. *See UGI Utilities, Inc. v. City of Reading Eyeglasses*, 179 A.3d 624 (Pa. Commw. Ct. 2017).  "Municipalities are creatures of the state and have no inherent powers of their own. Rather, they 'possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect.'" *Huntley & Huntley, Inc. v. Borough Council of Borough of Oakmont,* 964 A.2d 855, 862 (Pa. 2009) (quoting *City of Philadelphia v. Schweiker*, 858 A.2d 75 (Pa. 2004)); *UGI Utilities, Inc. v. City of Lancaster*, 125 A.3d 858, 863 (Pa. Commw. Ct. 2015) (*en banc*) (quoting *Huntley & Huntley, Inc.*); *PPL Electric Utilities Corp.*, 125 A.3d, 837, 844 (Pa. Commw. Ct. 2015) (quoting *Huntley*) *aff'd in part, rev'd in part on other grounds* by 214 A.3d 639 (Pa. 2019).  Even in those areas over which municipalities have been granted power to act, the state may preempt local legislation and regulation. *Hoffman Mining Company v. Zoning Hearing Board of Adams Township,* 32 A.3d 587, 593 (Pa. 2011); *Huntley & Huntley, Inc.,* 964 A.2d at 862.  Local ordinances cannot allow what state statute forbids and vice versa. *UGI*, at 629.

24

The General Assembly has enacted a pervasive statutory scheme regarding ownership of church property. As set forth at length herein*,* the disposition of church property lies entirely within Canon Law and at the sole discretion of the Bishop. 10 P.S. § 81; *see also St. Peter's Roman Catholic Par. v. Urban Redevelopment Auth. of Pittsburgh*, 198, 146 A.2d 724, 726 (Pa. 1958). 10 P.S. § 81 is a statute of general application which expressly grants **exclusive authority** to Bishop Zubik to dispose of church property and there is no exception to that authority for designation as a historic structure or otherwise. Thus, as a matter of law: (1) this area has been preempted and the Ordinance cannot usurp that authority, *see St. Peter's Roman Catholic Par. v. Urban Redevelopment Auth. of Pittsburgh*, 146 A.2d 724, 726 (Pa. 1958); *Canovaro v. Brothers of Order of Hermits of St. Augustine,* 191 A. 140 (Pa. 1937); (2) the Ordinance, which clearly contradicts a state statute of general applicability, violates both the Plan and Charter; and (3) the Ordinance is therefore an ultra vires act.[12]

Even further, it should be noted that the City is not even abiding by the express terms of the Ordinance through its enforcement attempts against the Diocese, thereby depriving the Diocese of due process as a matter of law. As an initial matter, the Ordinance provides that "[n]omination of a religious structure **shall only be made by the owner(s) of record of the religious structure**." (SOF 26, emphasis added.) The definition of "religious structure" under the Ordinance is: "[a]ny

---

[12] Under the doctrine of ultra vires, a political subdivision must limit itself to regulating the areas granted to it under its fundamental source of law-making authority and must not enact ordinances that conflict with State law. *See Bldg. Owners & Managers Ass'n of Pittsburgh v. City of Pittsburgh,* 603 Pa. 506, 985 A.2d 711, 715 (Pa. 2009). In this case, both the Pennsylvania Constitution and City's Charter deny the City the power to enforce the Ordinance. Moreover, the Ordinance directly conflicts with 10 P.S. § 81. As stated by the Supreme Court: "It is of course self evident that a municipal ordinance cannot be sustained to the extent that it is contradictory to, or inconsistent with, a state statute." *W. Pa. Rest. Assoc. v. Pittsburgh,* 77 A.2d 616, 620 (Pa. 1951) (even where the State has not preempted the field, local ordinances are invalid to the extent that they conflict with State law).

ClarkHill\55770\416825\266377978.v1-4/5/22

or all of the following: church, cathedral, mosque, temple, rectory, convent, or similar structure used as place of religious worship." § 1101.02(h). A review of City Council's legislative meeting discussing the amendment to the Ordinance reveals clear legislative intent that religious structures used at any time for worship during a religious organization's ownership are exempt from historic designation unless an owner nominates the structure[13]:

> At the urging of a coalition of religious organizations, Councilman Bob O'Connor introduced legislation to amend the nomination of religious structures. It provides that only the owner of record can nominate religious structures for historic designation. ... The O'Connor amendment removes the Mayor, City Council and congregations from the process of historic designation of religious structures and carves out a special exception for owners of religious structures that is not available to non-religious owners of historic structures.
>
> ....
>
> I want to make it clear that anybody from any church or synagogue can go and nominate their church or synagogue. The only difference is they would go to the owners, their priest, their rabbi or if they have a board of directors, they just go to them, they decide right there if it looks good. If it looks like it's the right thing to do, then guess what, after they agree to it it [*sic*] still has to go to the historic preservation, historic society, it has to come to Council and the Mayor signs it.
>
> So, it's just going in a little bit different direction. It's starting with the people who built and own the church. We've had testimony from priests, rabbis, ministers, different orthodox faith. So, I hope gentlemen and ladies you listen to them and trust them to make the right decision. They have open ears and open arms to make the right decision for their individual place of worship.[14]

The Church Building is held by Bishop Zubik, as Trustee of a Pennsylvania Charitable Trust. (SOF 7-8.) The Church Building was nominated to be designated a historic structure by Mark Wittman, a private individual who is not presently, nor has ever been, the owner of record

---

[13] It should also be noted here that the Church Building is not canonically closed because the Canonical appeal is pending. (SOF 58-61.)

[14] Available at:
https://pittsburgh.legistar.com/LegislationDetail.aspx?ID=638294&GUID=ED62B223-17FE-45FD-98C7-7CFF03F25CB7&Options=ID%7CText%7C&Search=%22Bill+1148%22&FullText=1.

26

of the Church Building. (SOF 62-66.) It is undisputed that the nomination of the Church Building for designation as a historic structure was ***not*** made by the owner of record. (SOF 67.)[15]

Further, once a nomination for designation is accepted, the Commission must make a recommendation to City Council after holding a public hearing, subject to specified criteria and procedures. (SOF 31.) On or about November 10, 2020, City Council held a hearing regarding the recommendation for designation of the Church Building as a "Historic Structure." (SOF 92.) The Ordinance states that "[t]he owner of any nominated Landmark shall be afforded the opportunity for reasonable examination and cross-examination of witnesses at public hearings on said nomination." (SOF 94.) The Diocese was not provided the opportunity to cross-examine or confront any adverse witnesses during City Council's hearing on the designation of the Church Building as a "Historic Structure." (SOF 95.) On or about November 10, 2020, the Diocese was only permitted to speak for three minutes to address the nomination of the Church Building as a "Historic Structure." (SOF 98.) Notably, this is the same amount of time allotted for ***anyone*** who

---

[15] To go one step further, a private person has no standing to initiate a legal process to prohibit the Bishop, who is the trustee of the Church Building, from disposing of the Church's property. *See St. Peter's Roman Catholic Par. v. Urban Redevelopment Auth. of Pittsburgh*, 394 Pa. 194, 146 A.2d 724, 726 (Pa. 1958) ("a member of a parish has no property right in his membership or any property right in church property save as a member; that his rights are governed by the laws of his denomination; and that the Roman Catholic canons and the decisions of the appropriate tribunals and officials of the Church control the issues raised in the case, unless those canons and decisions should contravene the law of the land.") (citing *Canovaro v. Brothers of Order of Hermits of St. Augustine*, 191 A. 140 (Pa. 1937); *Post v. Dougherty*, 191 A. 151 (Pa. 1937)). *See also Pagac v. Diocese of Pittsburgh*, 2020 WL 477209, at *3 (Pa. Comm. Ct., Jan. 30, 2020) (holding that parishioners lack standing "to interfere with the suppression of St. Agnes" and stating the parish "can neither confer upon the civil courts jurisdiction over an ecclesiastical matter nor cloak appellants in these cases with standing where none exists.") (citing *Croatian Roman Catholic Congregation of Holy Trinity Church, Ambridge, Beaver County, Pa. v. Wuerl*, 668 A.2d 1151, 1152 (Pa. Super. Ct. 1995)). In the present case, the parties lack standing to nominate and/or designate the Church Building as a historic structure pursuant to, *inter alia*, the Ordinance. The property at issue is held by Bishop Zubik, as Trustee of a Pennsylvania Charitable Trust. (SOF 7-8.) Pursuant to the foregoing authority, there is no standing for the City, or anyone else, to initiate legal process to force the Bishop to act one way or another with respect to the Church Building.

wants to speak.  § 1101.03(c)(2)(b); *see also* Rules of Procedure of the Historic Review Commission of the City of Pittsburgh, No. 308.[16]

This process was in clear violation of the Ordinance and further lacked any meaningful opportunity for the Diocese to confront the City or any other witnesses by virtue of the three-minute limitation.  Such a lack of opportunity to confront adversaries is in clear violation of due process rights for a fair hearing under the Fourteenth Amendment of the United States Constitution.[17]  It must be emphasized that not only is a deprivation of the Diocese's property rights at issue, but also its constitutional rights to freedom of religion and entanglement from the government.  These fundamental rights demand that the government afford due process and

---

[16] Available at: https://apps.pittsburghpa.gov/dcp/HRC_Rules_and_Procedures_2013.pdf.

[17] The Fourteenth Amendment doctrine of procedural due process prevents the government from depriving any individual of life, liberty or property without due process of law. *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984); *see generally* U.S. Const., Amend. XIV § 1.  Thus, the government is prohibited from depriving individuals of life, liberty, or property, unless it provides the process that is due. *Commonwealth v. Turner*, 80 A.3d 754, 763-64 (Pa. 2013). The basic elements of procedural due process are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. *Id.* at 764.  Application of procedural due process involves two questions: (1) whether there is a life, liberty, or property interest that the state has interfered with; and (2) whether the procedures attendant to that deprivation were constitutionally sufficient. *Id.*; *see also Hill v. Borough of Kutztown,* 455 F.3d 225, 233-34 (3d Cir. 2006).  The rights afforded under Article I, Section 1 of the Pennsylvania Constitution are coextensive with the federal due process clause of the 14th Amendment of the United States Constitution. *Pa. Game Comm'n v. Marich,* 666 A.2d 253, 255, n.6 (Pa. 1995) ("[t]he requirements of Article I, Section 1 of the Pennsylvania Constitution are not distinguishable from those of the 14th Amendment ... [and courts] may apply the same analysis to both claims.").

ClarkHill\55770\416825\266377978.v1-4/5/22

maintain a compelling justification before such rights are abrogated[18], and the City's actions must be examined with the highest degree of scrutiny.[19]

        4.        <u>Codified federal law, specifically RLUIPA, prohibits the City's conduct.</u>[20]

RLUIPA provides, in pertinent part:

> No government shall impose or implement a ***land use regulation*** in a manner that imposes a ***substantial burden*** on the ***religious exercise*** of a person, including a religious assembly or institution, ***unless the government demonstrates*** that imposition of the burden on that person, assembly, or institution--
> > (A) is in furtherance of a compelling governmental interest; and
> > (B) is the least restrictive means of furthering that compelling governmental interest.

---

[18] Moreover, the City's enforcement of the Ordinance as against the Diocese amounts to a regulatory taking. The "Takings Clause" of the Fifth Amendment of the United States Constitution provides: "[N]or shall private property be taken for public use, without just compensation." *Knick v. Twp. of Scott, Pennsylvania*, 204 L. Ed. 2d 558 (2019). The Supreme Court has recognized that "there are plainly a number of noneconomic interests in land whose impairment will invite exceedingly close scrutiny under the Takings Clause." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, n.8 (1992) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982)). One such noneconomic interest is the right to free expression of religion and worship. *See, e.g., Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1358 (11th Cir. 2013). The City's threatened actions are a regulatory taking prohibited as a matter of law because they interfere with a liturgical decision. *See, e.g., Keeler v. Mayor & City Council of Cumberland*, 940 F. Supp. 879, 887–88 (D. Md. 1996) (application of the historic zoning ordinance rendered church property economically useless and worked a regulatory taking).

[19] Additionally, Section 1 of the Fourteenth Amendment provides: "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To establish a violation of the Equal Protection Clause, it must first be shown that the defendants' actions result in similarly-situated individuals receiving disparate treatment. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). If it is shown that similarly-situated persons receive disparate treatment, and if that disparate treatment invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard governs, and the defendant's actions will be sustained only when they are narrowly tailored to serve a compelling government interest. *See Reno v. Flores*, 507 U.S. 292, 302 (1993). The City thus denied the Diocese the equal protection of the laws by entangling governmental interests with religious doctrine and depriving the Diocese of equal treatment and enforcement regarding the Ordinance.

[20] For the same reasons, the Religious Freedom Protection Act, 71 P.S. §§ 2402, *et seq*. is violated.

ClarkHill\55770\416825\266377978.v1-4/5/22

42. U.S.C. § 2000cc(a)(1) (emphasis added).  If the plaintiff "produces prima facie evidence to support a claim alleging a [RLUIPA] violation ... the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion."  *Id.*  § 2000cc–2(b).

### a.        The Ordinance is a "land use regulation."

RLUIPA defines "land use regulation," in pertinent part, as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land."  42. U.S.C. § 2000cc-5(5). It is undisputed that the Ordinance is such a land use regulation.  (SOF 36.)

### b.        Ownership of the Church Building, and decisions relating to the alteration of exterior religious symbols, is "religious exercise."

RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc–5(7)(A), and it specifically provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise."  *Id.* § 2000cc–5(7)(B).  Thus, it is unquestionable that the Diocese's use of the Church Building and its decisions as to the artifacts thereon is "religious exercise" within RLUIPA.  *See Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 93 (1st Cir. 2013).

### c.        The Ordinance imposes a substantial burden on the Diocese's religious exercise.

In the circumstances presented here—where there are no contested findings of fact, and where neither party argues that there are material issues of fact for trial—the court must view the question of whether a "substantial burden" exists as a question of law.  *Id.*  RLUIPA does not

30

define "substantial burden," but the background of the statute's enactment provides indication of Congress's intended meaning. *Id.* at 94. In this respect, RLUIPA's congressional record indicates the phrase "substantial burden" was intended to be interpreted in conjunction with the Supreme Court's usage of the phrase in the First Amendment context.[21] *Id.* at 101 (citation omitted).

Section 5(g) of RLUIPA states that "[t]his Act shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution." 42 U.S.C. § 2000cc–3(g). "The legislative history and the Act's Rules of Construction illustrate that 'substantial burden' should be interpreted broadly, but in line with prior Supreme Court precedent." *Washington v. Klem*, 497 F.3d 272, 278 (3d Cir. 2007). "The Supreme Court has defined 'substantial burden' in the Free Exercise Clause context, and several courts of appeals have looked to this line of cases to interpret what the phrase means for RLUIPA purposes." *Id.* In *Washington*, in an effort to "harmonize" the "substantial burden" jurisprudence in the context of prisoner rights[22], the Third Circuit adopted a "disjunctive test" as follows:

> For the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Id.* at 280.

The Diocese refers the Court to, and incorporates herein, the arguments set forth relating to the First Amendment. In sum, both elements of the disjunctive test are satisfied, as the City's

---

[21] The legislative history of RLUIPA indicates that the statute is to be interpreted by reference to the Religious Freedom Restoration Act ("RFRA"),42 U.S.C. § 2000bb-2000bb-4 and First Amendment jurisprudence. *See* 146 Cong. Rec. E1563-01.

[22] While it does not appear that the Third Circuit has adopted this particular test in the land use context, or any other test, there is no reason it would not apply to the instant matter.

ClarkHill\55770\416825\266377978.v1-4/5/22

insistence on continuing with the nomination process despite actual knowledge of clear violations of the City's own laws and the laws and Constitutions of both the United States and the Commonwealth of Pennsylvania puts the Diocese's religious liberties at risk, including the control and disposition of religious property, which rights are clearly and substantially burdened by the threatened historic designation.

> ### d. The City cannot satisfy its burden of demonstrating that the substantial burden on the Diocese is in furtherance of a compelling governmental interest.

As the Diocese satisfies its obligation to show that the Ordinance substantially interferes with its religious exercise, the burden shifts to the City to show that the Ordinance is in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest. *Washington*, 497 F.3d at 283 (citing 42 USC § 2000cc-1(a)). The compelling interest test has been extensively developed in Supreme Court jurisprudence. In articulating the high level of interest that must be shown by the government to substantiate a compelling interest, the Supreme Court stated, "[i]t is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)).

To be clear, as demonstrated previously, the City can offer no compelling government interest necessitating the severe deprivation of the Diocese's religious freedoms. As such, the Ordinance, as applied to the Diocese, violates RLUIPA.

**D.    Quinn violated 42 U.S.C. § 1983 as a matter of law and this Court should award the Diocese attorneys' fees.**

Under 42 U.S.C. § 1983, an individual may recover damages for violations of constitutional or federal rights by state actors. 42 U.S.C. § 1983. Liability under Section 1983 lies where a

ClarkHill\55770\416825\266377978.v1-4/5/22

plaintiff demonstrates that: "(1) the alleged wrongful conduct was committed by a person acting under color of state law; and (2) that the conduct deprived the person of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Nicini v. Morra,* 212 F.3d 798, 806 (3d Cir. 2000). Per the Supreme Court's decision in *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (2018), "local governing bodies (and local officials sued in their official capacities) can ... be sued directly under § 1983 for monetary, declaratory, and injunctive relief..." and like every other Section 1983 person, may be sued for constitutional deprivations. *See id* at 688-690.

Quinn is an employee of the City of Pittsburgh. (SOF 14.) In her capacity as such, on September 1, 2020, Christopher G. Ponticello, the General Counsel for the Diocese, sent an email to her and others and advised them that the Diocese and the Saint Mary of the Mount Parish, which through its Trustee, Bishop Zubik, is the owner of the Church Building, objected to the ongoing consideration of the Church Building for historic designation. (SOF 85-86.) Yet, on or about September 2, 2020, the Commission recommended that City Council approve the Church Building as a "Historic Structure" pursuant to City of Pittsburgh City Ordinance §1101.03(d)(1). (SOF 88.) Moreover, Quinn knows that the Diocese was not permitted to cross-examine her at the hearing by City Council on the designation. (SOF 96.)

It cannot be disputed that Quinn was acting under color of state law at all pertinent times hereto. Moreover, Quinn's actions have clearly deprived the Diocese of an array of constitutional rights through her enforcement of the Ordinance, particularly in avoidance of the Diocese's repeated objections thereto. As such, summary judgment should be granted in favor of the Diocese on Count VI.

Further, Section 1988 of Title 42 of the United States Code, relating to "Proceedings in vindication of civil rights," provides in pertinent part:

33

> In any action or proceeding to enforce a provision of sections 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, the Religious Freedom Restoration Act of 1993, the Religious Land Use and Institutionalized Persons Act of 2000, title VI of the Civil Rights Act of 1964, or section 12361 of Title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

42 U.S.C. § 1988.  The Diocese assert causes of action pursuant to Section 1983 and RLUIPA and

therefore is entitled to recovery of attorney's fees in the instant matter as a matter of law.

## IV.    **CONCLUSION**

For the foregoing reasons, the Plaintiffs request that this Honorable Court issue the

following relief:

(1) Declare the Ordinance unconstitutional on its face because it violates the Diocese's rights to free exercise of religion, due process and equal protection, which are guaranteed under the United States Constitution,  the Pennsylvania Constitution, and Pennsylvania statutes;

(2) Permanently enjoin the City from enforcing the Ordinance against the Diocese because it violates the Diocese's rights to free exercise of religion, due process and equal protection, which are guaranteed under the United States Constitution, the Pennsylvania Constitution, and Pennsylvania statutes; and

(3) Award the Diocese compensatory damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

Dated: April 6, 2022                                    Respectfully submitted,

34

ClarkHill\55770\416825\266377978.v1-4/5/22

CLARK HILL PLC

By: */s/ Allen M. Lopus*
   Allen M. Lopus
   Pa. I.D. No. 76544
   Neel Kapur
   Pa. I.D. No. 329518
   Ashley L. Buck
   Pa. I.D. No. 320537

   Firm ID. No. 282
   301 Grant St., 14th Floor
   Pittsburgh, PA 15219
   Telephone:  (412) 394-2447

*Counsel for David A. Zubik, Bishop of Pittsburgh, As Trustee, Roman Catholic Diocese of Pittsburgh, A Pennsylvania Charitable Trust and Saint Mary of the Mount Parish, A Pennsylvania Charitable Trust*

35

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** has been served upon counsel of record this 6th day of April, 2022, via the Court's CM/ECF service:

Michael Kennedy, Assistant City Solicitor
City of Pittsburgh, Department of Law
Federal Practice Group
313 City-County Building
414 Grant Street
Pittsburgh, PA 15219
Michael.kennedy@pittsburghpa.gov

*/s/ Allen M. Lopus*
Allen M. Lopus

36