## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID A. ZUBIK, BISHOP OF
PITTSBURGH, AS TRUSTEE, ROMAN
CATHOLIC DIOCESE OF PITTSBURGH, A
PENNSYLVANIA CHARITABLE TRUST
AND SAINT MARY OF THE MOUNT
PARISH, A PENNSYLVANIA
CHARITABLE TRUST,

           Plaintiffs,

       v.

CITY OF PITTSBURGH AND SARAH
QUINN,

           Defendants.

Civil Docket No. 2:20-cv-1809-WSH

### PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs, the Most Reverend David A. Zubik, Bishop of Pittsburgh ("Bishop Zubik"), the

Roman Catholic Diocese of Pittsburgh (the "Diocese"), and the Saint Mary of the Mount Parish

("Saint Mary Parish") (collectively, the "Diocese"), by and through their undersigned counsel,

Clark Hill PLC, respectfully submit this Reply in Support of their Motion for Summary Judgment.

The facts and legal grounds in support of the Diocese's Motion for Summary Judgment are set

forth in the Diocese's Memorandum of Law in Support and Joint Stipulation of Facts [ECF Doc.

Nos. 59, 60-61] (the Motion and Memorandum are collectively referred to herein as "Motion")

and Memorandum in Opposition to Defendants' Motion for Summary Judgment [ECF Doc. No.

70], which are incorporated herein by reference.[1]

---

[1] All definitions and capitalized terms herein are as defined in the Motion.

Defendants, City of Pittsburgh ("City") and Sarah Quinn ("Quinn") (collectively, the "City"), filed a Brief in Opposition to the Motion [ECF Doc. No. 71] ("Opposition") which requires certain rebuttals as set forth below.[2]

### I.     City Council Is Not Required to *Vote* on the Proposed Designation to Satisfy the Ripeness Inquiry.

The City misstates the relief Plaintiffs seek in this action by submitting to the Court that the Diocese is asking this Court to "specifically usurp the legislative responsibilities of the elected members of the Pittsburgh City Council." (Opposition, p. 1.) This is a far cry from the true relief sought in this action. The Diocese is asking this Court to declare the Ordinance unconstitutional and enjoin its enforcement. The City's ripeness argument focuses on the red herring that City Council has not yet voted on the proposed designation of the Church Building. That fact is completely irrelevant, however, and does not serve to bar a finding of ripeness.

As an initial matter, the nomination of the Church Building itself is unlawful, let alone City Council's vote on the designation, because the Ordinance is unconstitutional under the First, Fifth, and Fourteenth Amendments to the United States Constitution, as well as the Pennsylvania Constitution, and in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.* ("RLUIPA"); United States' civil rights law, 42 U.S.C. § 1983; the laws of the Commonwealth of Pennsylvania, including 53 Pa.C.S.A. § 2962 and 10 P.S. § 81; and

---

[2] To be clear, the Diocese moved for **full** summary judgment in the instant matter on, *inter alia, **all*** of its causes of action in the Complaint. The City completely fails to address, *inter alia*, the following arguments raised in the Motion: (1) the process used by the City lacked an opportunity for the Diocese to confront adversaries in clear violation of due process rights for a fair hearing under the Fourteenth Amendment of the United States Constitution (*see* ECF Doc. No. 1, Counts IV and V); (2) Quinn violated 42 U.S.C. § 1983 as a matter of law (*see id.*, Count VI); and (3) if this Court were to find that the Ordinance is constitutional, which is fervently disputed, the City must be enjoined from designating the Church Building in light of the rule of comity (*see generally id.*). Thus, summary judgment should summarily be granted in favor of the Diocese on these points. Further, to the extent any of the arguments in the Opposition are not expressly addressed herein, this should not be considered a concession by the Diocese of the same.

ClarkHill\55770\416825\267352996.v1-5/31/22

the City of Pittsburgh Historic Designation Ordinance, City of Pittsburgh, Pennsylvania Code of Ordinances § 1101.01, *et seq.*

Moreover, this matter is ripe for judicial review in light of: (1) the mere enactment of the Ordinance; (2) the fact that the Diocese's constitutional rights were infringed upon the instant the Church Building was nominated; and/or (3) the fact that without a ruling by this Court as to the constitutionality of the Ordinance, the Diocese's property is perpetually subjected to the Ordinance.

First, it is black letter law that a facial attack on the validity of an ordinance is immediately ripe. "'[F]acial' challenges to a regulation are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997); *see also Cnty. Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006) (noting that the finality requirement "does not apply … to *facial* attacks" on a zoning ordinance) (emphasis in original)). This applies with equal force to claims raised under RLUIPA.[3] *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287 (5th Cir. 2012) (noting that plaintiff's "facial challenges" under RLUIPA were "easily ripe").

Although the Diocese's facial challenges to the Ordinance suffice to satisfy any ripeness objection, the *Step-Saver* factors are met as well.[4] As to the first element, it is perplexing how the City argues that the parties' interests do not satisfy "adversity of interests" and further how the

---

[3] RLUIPA contemplates challenges to the "imposition," and not only the "implement[ation]" of land use regulations that violate its terms. *See* 42 U.S.C. § 2000cc(a).

[4] While the City spends much of its Opposition attempting to **factually** distinguish *Step–Saver Data Systems, Inc. v. Wyse Technology,* 912 F.2d 643 (3d Cir. 1990) from the instant case, it misses the mark by doing so. *Step-Saver* is a seminal case that sets forth limitations of ripeness in the context of, *inter alia*, federal declaratory judgment actions. *See generally id.* At no point in this litigation has the Diocese relied upon *Step-Saver* beyond expressing to the Court the factors that apply to a particular ripeness inquiry – factors that apply notwithstanding facts underlying a case.

3

City categorizes the Diocese as being merely "displeased" with the Ordinance.  (*See* Opposition, p. 4.)  In this case, there is not a mere threat of enforcement of the Ordinance; the Ordinance has been and is actively being enforced against the Diocese.[5]

Pursuant to the Ordinance, once a structure is ***nominated*** for designation as a "Historic Structure," ***no exterior alterations may be undertaken until a final determination of the designation has been made*** by Council, or until 120 days after Council's receipt of the recommendations of the HRC and Planning Commission, without the review and approval by the HRC and the issuance of a Certificate of Appropriateness.  (SOF 29.)  The City has already exercised its dominion and control over the Diocese's property by virtue of the mere ***acceptance*** of an otherwise invalid nomination and by ***submitting the Church Building for final historic designation*** in complete disregard of the requirements of the Ordinance itself, controlling United States and Canon Law, and 10 P.S. § 81.  Furthermore, the fact that the City intends to enforce the Ordinance is sufficient to satisfy adversity.  *See Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 593 (E.D. Pa. 2009) (while analyzing adversity, stating: "In the absence of an equivalent express disavowal, the Third Circuit generally concludes that there is a threat of enforcement and that the dispute is ripe for adjudication."), *aff'd,* 410 F. App'x 506 (3d Cir. 2011).

---

[5] It is equally peculiar and alarming that the City states that the Diocese was "aware of the process as it proceeded, and took steps to speak against the nomination at multiple points" (Opposition, p. 4), as if due process was actually afforded to the Diocese.  Notwithstanding that the Ordinance entitled the Diocese to "reasonable examination and cross-examination of witnesses at public hearings on said nomination" (SOF 94), the Diocese was ***not*** provided the opportunity to cross-examine or confront any adverse witnesses during City Council's hearing.  (SOF 95.)  A Diocese representative was only permitted to speak for three minutes to address the nomination of the Church Building.  (SOF 98.)  This is the same amount of time allotted for ***anyone*** who wants to speak.  § 1101.03(c)(2)(b); *see also* Rules of Procedure of the Historic Review Commission of the City of Pittsburgh, No. 308.  Publicly available at: https://apps.pittsburghpa.gov/dcp/HRC_Rules_and_Procedures_2013.pdf (last visited May 31, 2022).

Regarding the second element, the mere fact that all parties hereto concede that the matter before this Court is predominantly legal suffices to satisfy "conclusiveness." *See Tait, supra.* That aside, the City seemingly conflates the concept of conclusiveness with adversity of interests in that it submits to this Court yet again that a vote against the proposed designation would "create a scenario where no harm to these Plaintiffs would occur." (Opposition, p. 6.) The Diocese respectfully submits that it has briefed *ad nauseum* the harm that it has suffered and continues to suffer by virtue of the mere nomination of the Church Building, let alone the potential designation. Moreover, the Diocese is confounded at the City's repeated characterization – and reliance – on the misstatement that this is purely a "takings" case. (*See* Opposition p. 7.) To summarize the allegations made and relief sought in the Diocese's 131-paragraph, nine-count Complaint as being solely a "takings" case ignores the unique religious character of the building and the protected status of its owner. In any event, the Diocese has certainly alleged that the nomination, and any resulting designation, deprives the Diocese of its property such that, even if this were only a takings case, the concrete set of facts necessary to satisfy conclusiveness exists. (*See, e.g.,* ECF Doc. No. 70, pp. 23-36.)[6]

Finally, the third element is perhaps the most easily/clearly satisfied here, and the City cannot sincerely contend that it is not. To satisfy "utility," the Diocese need only show that the "parties' plans of action are likely to be affected" by the relief the Diocese seeks. *Tait,* 639 F.Supp.2d at 595. Surely, if this Court renders declaratory and/or injunctive relief in this action,

---

[6] The Opposition contains a separate and final section arguing that the proposed designation is not a taking without just compensation. (*See* Opposition, pp. 21-22.) In the interest of the Court's judicial resources, the Diocese will not reiterate its arguments here in light of the City's failure to raise any "new" matter. However, this Court should take note of the fact that the City relies upon a Pennsylvania case decided pursuant to Pennsylvania law to support its position that the City's actions are not a taking under the ***federal*** constitution. (*See* Opposition, p. 22 (citing *United Artists' Theater Circuit v. City of Phila.*, 535 Pa. 370 (1993).)

ClarkHill\55770\416825\267352996.v1-5/31/22

both the City and the Diocese's actions will be affected.  In fact, this Court's ruling would *determine* the parties' actions.  The City's attempt to distinguish *Presbytery of N.J. Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454 (3d Cir. 1994) is misguided at best.  Noticeably, the City does not contend that this matter is not subject to a relaxed ripeness standard.  Further, the City undermines its own argument by admitting that "[e]nforcement of an existing law is … a concrete concern."  (Opposition, p. 9, n.4.)  The *existence, in conjunction with the enforcement, of the Ordinance is squarely the concern in the case sub judice*.  As such, the utility factor is unquestionably met.

In sum, the City's argument that this matter is not ripe is futile, and this Court should proceed with disposing of the parties' respective summary judgment briefing for the reasons set forth in the Diocese's Motion.

**II.     The Ordinance and the City's Enforcement Actions, Including Designation of the Church Building as a "Historic Structure," Are Unconstitutional as a Matter of Law.**

As an initial matter, the City points to little or no authority in support of its contention that its actions and the Ordinance are constitutional, as the Opposition cites scant and inapposite supporting authority.  Nevertheless, the Diocese has briefed at length the numerous bases for this Court to find that the Ordinance and the City's actions in enforcing the Ordinance are unconstitutional, and the Diocese hereby incorporates by reference its Motion at ECF Doc. Nos. 61-62 as if the same were set forth at length herein.  To summarize, the Ordinance violates both the Establishment Clause and the Free Exercise Clause of the First Amendment of the United States Constitution, as well as Article I, Section 3 of the Pennsylvania Constitution because: (1) the City's use of the Ordinance to dictate what the Diocese can do with its religious property replaces the Diocese's will and judgment with that of the government; and (2) the requirement of subjugating its religious decisions to secular government creates a substantial burden on the

6

ClarkHill\55770\416825\267352996.v1-5/31/22

Diocese's free exercise of religion without any attendant compelling governmental interest. Additionally, the City's actions and expected actions violate the Fifth and Fourteenth Amendments of the United States Constitution by taking the Church Building without just compensation, including forcing the Diocese to preserve and maintain it into perpetuity and refusing to allow the Diocese to alter it in any way without the City's permission, and for the failure to provide the Diocese with appropriate due process of law.

A finding of unconstitutionality is only bolstered by the City's argument that the Ordinance "has a protection against unwanted historic designation" for religious property owners not enjoyed by others. (Opposition, p. 11.)[7] The Ordinance provides that "[n]omination of a religious structure *shall only be made by the owner(s) of record of the religious structure*." (SOF 26, emphasis added.) The definition of "religious structure" under the Ordinance is: "[a]ny or all of the following: church, cathedral, mosque, temple, rectory, convent, or similar structure used as place of religious worship." § 1101.02(h).[8] The Church Building is held by Bishop Zubik, as Trustee of a Pennsylvania Charitable Trust. (SOF 7-8.) The Church Building was nominated to be designated a historic structure by a private individual who is not presently, nor has ever been, the owner of record of the Church Building. (SOF 62-66.) It is undisputed that the nomination of the

---

[7] The Diocese here presents a rhetorical question for the City, which shows the inconsistencies in its Opposition: If the Ordinance provides alleged heightened protection and different treatment for religious owners, how can it be a neutral law of general applicability subject to rational basis review? (*See* Opposition, p. 11.)

[8] It should here be noted that the City misstates the Ordinance in its Opposition, as it states that "the owner of a structure *being used* as a place of worship" has these alleged protections. (Opposition, p. 11, emphasis added.) This misstatement supposes a present-tense use of a religious structure, which is in derogation of the express terms of the Ordinance as well as the legislative intent. (*See* ECF Doc. No. 61, pp. 25-26.) Moreover, a reading of the Ordinance to reflect that only the owner of a religious structure can nominate its property actually aligns with 10 P.S. § 81 in that it continues to permit the owner of religious property to maintain control of its property.

7

Church Building for designation as a historic structure was *not* made by the owner of record. (SOF 67.)  The City is not even abiding by the express terms of the Ordinance through its enforcement attempts against the Diocese, thereby depriving the Diocese of due process as a matter of law.

Further, the City's analysis as to the constitutionality of the Ordinance and City's actions wholly lacks both substance and authority in its baseless conclusion sentences that both are subject to rational basis review.  (*See* Opposition pp. 11-13.)[9]  In this respect, the City attempts to distinguish *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78 (1st Cir. 2013), relied upon by the Diocese in its Motion, by submitting to this Court that the subject Ordinance "does not … ban any type of conduct, let alone religious activity in particular." (Opposition, p. 13.)  This is fundamentally incorrect.  The Diocese, at the moment of *nomination*, is confronted with a choice between legal compliance, on the one hand, and religious beliefs and penalties, on the other hand.  The disposition of church property lies entirely within Canon Law and at the sole discretion of the Bishop.  10 P.S. § 81; *see also St. Peter's Roman Catholic Par. v. Urban Redevelopment Auth. of Pittsburgh*, 146 A.2d 724, 726 (Pa. 1958).  The Ordinance effectively bans the Diocese from practicing its religion by depriving the Diocese of its right to act in accordance with Canon Law.

A review of the ordinance in *Springfield* shows that it was analogous to the instant Ordinance in that the ordinance called for the commission to complete a preliminary report on a proposed historic district and then hold a public hearing.  If the commission approved the proposal, it transmits a final report and proposed ordinance to city council to vote on to approve the district. Once approved:

---

[9] Noticeably, the City does not provide any analysis whatsoever as to what governmental interest the Ordinance is rationally related to.

ClarkHill\55770\416825\267352996.v1-5/31/22

> "no building or structure within [the] district shall be constructed or altered in any way that affects exterior architectural features" unless the historical commission first issues a certificate of appropriateness, a certificate of non-applicability, or a certificate of hardship. *Id.* § 6. Violation of this provision is punishable by a fine of between ten dollars and five hundred dollars per day of violation. *Id.* § 13. The statute defines "altered" as "includ[ing] the words 'rebuilt', 'reconstructed', 'restored', 'removed' and 'demolished,' " and the word "constructed" as "includ[ing] the words 'built', 'erected', 'installed', 'enlarged', and 'moved.' " *Id.* § 5.

*Springfield,* 724 F.3d at 85 (quotations and citations in original). Oddly, the City concedes that the *Springfield* court **did** find that that ordinance was not "a law of general applicability." (Opposition, p. 13.) A review of *Springfield* shows that the exact rationale must apply to the instant case:

> As to the second issue, we do not view the Ordinance as a "neutral law of general applicability" in the sense that the Supreme Court used the term in *Smith.* Rather, the City, through the SHC and City Council, is vested with discretion to decide when to create a historic district. ***The strictures imposed as a result of historic district status do not apply automatically by statute to the general population, but apply once certain officials of the City decide that they will apply. Historic district or landmark ordinances are different from other types of zoning rules in that their entire purpose is to prevent only particular property owners in limited areas from changing the appearance of particular properties. In this sense, it can be said that the Ordinance is not "generally applicable*.***"

724 F.3d at 98 (internal citations omitted) (emphasis added). Here, too, the strictures of the Ordinance do not apply until the City determines they do. Thus, the only conclusion that properly can be drawn is that strict scrutiny applies to the Ordinance in this matter for the reasons set forth in the Diocese's Motion, and the Ordinance, a land use regulation, cannot substantially burden the Diocese's religious exercise. (*See* ECF Doc. No. 61); *see also Employment Div. v. Smith,* 494 U.S. 872 (1990).

9

### III.   The Ordinance Substantially Burdens the Diocese's Constitutional Rights because the City Usurps the Decision-Making of the Diocese.

It is telling that the City dedicates only one paragraph of its Opposition to its conclusion that the Ordinance does not substantially burden the Diocese.  In this one paragraph, the City misstates a fact that warrants correction – the Church Building is ***not*** and has not been closed to worship "for years."  (Opposition, p. 14.)  On or about June 16, 2017, Bishop Zubik issued a second Canonical Decree closing the Church Building for worship pursuant to Canon Law and procedures.  (SOF 44.)  An appeal of Bishop Zubik's Canonical Decree is ***currently pending*** before the Supreme Tribunal of the Apostolic Signatura of the Holy See.  (SOF 53.)  If that appeal is granted, the Church Building will not be closed for worship.

In addition, the City states that a historic designation of the Church Building "would have had the minimal effect of limiting how the Plaintiffs could alter the street facing façade of the church building."  (Opposition, p. 14.)  This significantly undermines the practical effect of the Ordinance.  All temporal goods which belong to the universal Church, the Apostolic See, or other public juridic persons in the Church are "ecclesiastical goods and are regulated by" Canon Law. Canon 1257, § 1.  "According to Roman Catholic canon law, when a church goes out of service for religious worship, the Bishop comes under an obligation to protect the religious ornamentation in and on the building so that it is not put to 'sordid' use." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 84 (1st Cir. 2013).  "Under canon law, a sordid use is one that is 'detrimental to the good of souls,' including any use that involves '[t]he denunciation of the Catholic Church and the Catholic Faith, the desecration of Catholic objects of devotion and worship or even any disrespectful or casual treatment of such objects, and/or the proselytizing of Catholics.'" *Springfield*, 724 F.3d at 84 n.2 (citation omitted).

10

Bishop Zubik decreed that the stained-glass windows, sacred items, non-sacred artifacts, and any work of some significance be removed from the Church Building to the extent possible for reuse at parishes receiving territory from St. John Vianney Parish.  (SOF 40.)  By virtue of the designation, the Bishop not only can no longer dispose of the Church Building, but also loses all control over the religious ornamentation of the Church Building.  The Church Building, and its external symbols, rooted in the sacred scriptures that provide the basis of the Roman Catholic faith, will be frozen in place indefinitely under government control.[10]

In fact, the Diocese is effectively required, per the Ordinance, to maintain the Church Building indefinitely.  Yet, upon issuing the Canonical Decree, Bishop Zubik noted that significant repairs were needed to make the Church Building safe for use and suitable for divine worship, and the lack of funds to pay for such necessary repairs.  (SOF 46.)  Thus, by designating the Church Building as a "Historic Structure," the Diocese loses all rights to use the Church Building and its ecclesiastical goods as it deems fit per Canon Law.

The existence of the Ordinance burdens the Diocese's religious practices and undermines its religious freedom.  The enforcement of the Ordinance is forcing the Diocese to choose between following Canon Law dictates setting forth limitations on how the property can be managed or complying with the Ordinance.  The Ordinance substantially burdens the Diocese's free exercise of religion in that the City would usurp the decision-making of the Diocese as it relates to its place of worship, which extends far beyond just the control of the appearance, placement, substance and subject matter of the religious symbols and sacred items on the exterior of the Church Building.

---

[10] Church symbols are by no means of insignificant value.  By way of example, a century-old artifact worth an estimated $2M was recently and unfortunately stolen from the St. Augustine Roman Catholic Church in Brooklyn, New York. *See* https://www.cbsnews.com/newyork/news/st-augustine-catholic-church-tabernacle-stolen-burglary-park-slope-brooklyn/ (last visited May 31, 2022).

ClarkHill\55770\416825\267352996.v1-5/31/22

To submit that the foregoing fundamental tenets of Canon Law are "fragile" (Opposition, p. 14) as contrasted with a substantial burden on the exercise of religion is to make a mockery of the separation of Church and state.

### IV.    Aesthetic Interests Are Not Compelling Governmental Interests.

It should first be noted that none of the authority cited by the City stands for the position that aesthetics constitutes a ***compelling governmental interest***.  Of course, that is because it does not.  *See Metromedia v. City of San Diego,* 453 U.S. 490, 511-12 (1981) (holding that the government's interest in protecting "traffic safety and aesthetics" cannot justify a content-based restriction on speech (which, like substantial burdens on religious exercise, requires a compelling governmental interest)).  The Supreme Court "has never determined that these interests [in aesthetics] are compelling."  *North Olmstead Chamber of Commerce v. City of North Olmstead,* 86 F. Supp. 2d 755, 767 (N.D. Ohio 2000), *clarification denied* 108 F. Supp. 2d 792 (N.D. Ohio 2000); *see also Loftus v. Township of Lawrence Park*, 764 F.Supp. 354, 361 (W.D. Pa.1991) ("we doubt that aesthetics or residential quietude is sufficiently compelling to ever justify a content-based restriction ... on freedom of expression"); *McCormack v. Township of Clinton,* 872 F. Supp. 1320, 1325 n.2 (D.N.J. 1994) (noting that "no court has ever held that [municipalities' interests in aesthetics and safety] form a compelling justification for a content-based restriction on political speech.").

Simply, the City's proclaimed interest in aesthetics does not trump the Diocese's fundamental rights pursuant to the United States Constitution, and contrary to the City's position, none of "the wording of the ordinance, case law [or] common sense" justify the "need" to deprive one's fundamental rights solely to ensure "harmonious outward appearances of structures."  (*See*

12

ClarkHill\55770\416825\267352996.v1-5/31/22

Opposition, pp. 15-16.)  Further, historic designation of the Church Building is indisputably not done for the safety, health, or welfare of the residents of the City of Pittsburgh.  (SOF 105.)

## V.   Preservation of the "Beauty of a Church" Cannot Withstand Strict Scrutiny Under the First Amendment.

The City cannot sincerely ask this Court to find that preservation of "the beauty" of the Church Building is an interest that outweighs the protection of the Diocese's free exercise of religion under the First Amendment.  Yet, this is the *sole* argument the City submits to this Court in asking this Court to find that the City has not infringed upon the Diocese's constitutional rights through the Ordinance and its enforcement efforts of the same.   (*See* Opposition, pp. 17-18.) Notably lacking from the City's Opposition is any evaluation of the Diocese's Motion and analysis as to *Lemon v. Kurtzman,* 403 U.S. 602 (1971).  To reiterate, the City's conduct amounts to an Establishment Clause violation because it fails at least two of the *Lemon* prongs: (1) the City cannot establish that the primary effect of its actions neither advanced nor inhibited religion; and (2) if allowed to stand, the Ordinance fosters an excessive entanglement between government and religion.  Thus, the Opposition must be summarily rejected.

Additionally, the requirement of subjecting its religious decisions to secular government oversight creates a substantial burden on the Diocese's free exercise of religion as set forth above and in the Motion.  In light of this, coupled with the fact that historic preservation is not a compelling government interest as briefed at length, it is irrefutable that the Ordinance cannot withstand strict scrutiny under the First Amendment.

## VI.   10 P.S. 81 Does Not Provide "Immunity" to the Diocese; It Preempts the Ordinance.

10 P.S. § 81 is mandatory and clear:  religious property *shall* "be taken and held subject to the control and disposition of" the "officers or authorities" of the religious body and controlled

13

"***according to the rules, regulations, usages, or corporate requirements of such church, congregation, or religious society***." (Emphasis added.) In cases involving the interpretation of a statute, courts are "guided by the provisions of the Statutory Construction Act, 1 Pa.C.S. § 1901 *et seq*." as follows:

> Under the Statutory Construction Act, the object of all statutory construction is to ascertain and effectuate the General Assembly's intention. *See* 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly"); *Hannaberry HVAC v. Workers' Compensation Appeal Bd. (Snyder, Jr.),* 575 Pa. 66, 834 A.2d 524, 531 (2003). ***Generally speaking, the best indication of legislative intent is the plain language of a statute*.**" *Commonwealth v. Gilmour Manufacturing Co.,* 573 Pa. 143, 822 A.2d 676, 679 (2003) (citations omitted). … The Act further provides that, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); *see also Scheipe v. Orlando,* 559 Pa. 112, 739 A.2d 475, 478 (1999).

*Sternlicht v. Sternlicht*, 583 Pa. 149, 876 A.2d 904, 909 (Pa. 2005) (emphasis added). As further set forth by the Pennsylvania Supreme Court: "Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words." *Id*.

Thus, 10 P.S. § 81 must be interpreted pursuant to its plain language in accordance with the foregoing rules of statutory interpretation. There is no room for interpretation or flexibility with respect to the control vested in religious bodies over the disposition of their property. The purported "authority" of local governments to engage in land use planning that the City relies upon in its Opposition (*see* Opposition, pp19-20) is irrefutably preempted by the Commonwealth statute. It is further undisputed that the City's powers are expressly limited, and the City is prohibited from exercising "powers contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of this Commonwealth." (SOF 37.) Thus, the preemption and *ultra*

14

*vires* acts by the City are starkly contrasted with what the City coins "immunity" from local zoning regulations.  (Opposition, p. 20.)[11]

WHEREFORE, the Diocese respectfully requests that this Honorable Court grant summary judgment in its favor and issue the following relief:

(1) Declare the Ordinance unconstitutional on its face because it violates the Diocese's rights to free exercise of religion, due process and equal protection, which are guaranteed under the United States Constitution, the Pennsylvania Constitution, and Pennsylvania statutes;

(2) Permanently enjoin the City from enforcing the Ordinance against the Diocese because it violates the Diocese's rights to free exercise of religion, due process and equal protection, which are guaranteed under the United States Constitution, the Pennsylvania Constitution, and Pennsylvania statutes; and

(3) Award the Diocese compensatory damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

Dated:  June 1, 2022                                      Respectfully submitted,


                                                         CLARK HILL PLC
                                                         By: */s/ Allen M. Lopus*
                                                              Allen M. Lopus
                                                              Pa. I.D. No. 76544
                                                              Neel Kapur
                                                              Pa. I.D. No. 329518
                                                              Ashley L. Buck
                                                              Pa. I.D. No. 320537

                                                              Firm ID. No. 282
                                                              301 Grant St., 14th Floor
                                                              Pittsburgh, PA 15219
                                                              Telephone:  (412) 394-2447

                                                         *Counsel for David A. Zubik, Bishop of*
                                                         *Pittsburgh, As Trustee, Roman Catholic*
                                                         *Diocese of Pittsburgh, A Pennsylvania*
                                                         *Charitable Trust and Saint Mary of the Mount*
                                                         *Parish, A Pennsylvania Charitable Trust*

---

[11] The City cursorily submits in one sentence that there is "no real conflict" between the Ordinance and 10 P.S. § 81.  The Diocese would argue that the conflict is self-evident, as set forth in this Reply and the Diocese's Motion.

15

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** has been served upon counsel of record this 1st day of June, 2022, via the Court's CM/ECF service:

Michael Kennedy, Assistant City Solicitor
City of Pittsburgh, Department of Law
Federal Practice Group
313 City-County Building
414 Grant Street
Pittsburgh, PA 15219
Michael.kennedy@pittsburghpa.gov

/s/Allen M. Lopus
Allen M. Lopus

ClarkHill\55770\416825\267352996.v1-5/31/22