## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID A. ZUBIK, *Bishop of* )
*Pittsburgh, as Trustee*, ROMAN )
CATHOLIC DIOCESE OF PITTSBURGH, )
*a Pennsylvania Charitable Trust*, and SAINT )
MARY OF THE MOUNT PARISH, )
*a Pennsylvania Charitable Trust*, )
                )
             Plaintiffs, )
                )
           v. )    Civil Action No. 20-1809
                )
CITY OF PITTSBURGH and )
SARAH QUINN, )
                )
            Defendants. )

### <u>MEMORANDUM OPINION</u>

This case involves important constitutional and statutory considerations implicated by a municipality's encumbrance of a religious institution's use of property for the purpose of religious exercise through application of a land-use ordinance to impose historic designation status on that property. Presently before the Court are the parties' cross-motions for summary judgment (Docket Nos. 60, 62). The Court has considered the motions, briefs (Docket Nos. 61, 63, 70, 71, 76, 77), the parties' Joint Stipulation of Facts (Docket No. 59), Defendants' Concise Statement of Material Facts (Docket No. 65), and Plaintiffs' Supplement (Docket No. 81). For the reasons expressed herein, the Court will **<u>grant in part and deny in part</u>** Plaintiffs' summary judgment motion. The Court will also **<u>grant in part and deny in part</u>** Defendants' summary judgment motion. As set forth herein, the City of Pittsburgh violated its own Ordinance and federal law when encumbering a Church Building owned by the Diocese of Pittsburgh.

## I.    **BACKGROUND**[1]

Plaintiffs Bishop David A. Zubik, the Roman Catholic Diocese of Pittsburgh, and Saint Mary of the Mount Parish (hereinafter collectively referred to as "the Diocese" unless otherwise specified) commenced this action on November 20, 2020, by filing a Complaint and Motion for Temporary Restraining Order and/or Preliminary Injunction.  (Docket Nos. 1, 2).   In the Complaint, the Diocese alleges that the City of Pittsburgh and its Historic Review Commission's Senior Preservation Planner Sarah Quinn (hereinafter collectively referred to as "the City" unless otherwise indicated) infringed upon its constitutional and statutory rights by attempting to designate St. John Vianney Church Building ("Church Building") as a historic structure pursuant to the City's Historic Designation Ordinance ("Ordinance").   The Diocese seeks declaratory, injunctive, and compensatory relief under the First, Fifth, and Fourteenth Amendments to the United States Constitution; the Pennsylvania Constitution;   the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq*.; 42 U.S.C. § 1983; the laws of Pennsylvania, including 53 Pa. Cons. Stat. § 2962 and 10 P.S. § 81; and the Ordinance itself, §§ 1101.01 *et seq*.

The Court granted the Diocese's Temporary Restraining Order ("TRO") and deferred ruling on the Motion for Preliminary Injunction on November 23, 2020 (Docket No. 8), as amended on November 24, 2020.  (Docket No. 13).[2]  The next day, the Diocese filed an Emergency

---

[1]    For the summation of the facts, the Court draws upon the Complaint, the Joint Stipulation of Facts, and the City's Concise Statement of Material Facts and Appendix of Record Material.  (Docket Nos. 1, 59, 64, 65).  With respect to "each cross-motion for summary judgment, the record must be viewed in the light most favorable to the nonmoving party."  *Tatel v. Mt. Lebanon Sch. Dist.*, No. CV 22-837, 708 F. Supp. 3d 603, 606 (W.D. Pa. Dec. 21, 2023).

[2]    That same day, the parties participated in a telephonic status conference regarding the motion for preliminary injunction and consented to the Order at Docket No. 13 remaining in effect until disposition of the pending motion for preliminary injunction.  (Docket Nos. 14, 15).

Motion for Preliminary Injunction (Docket Nos. 16, 17), the Court held a telephonic status conference on December 2, 2020, and the Court entered another order maintaining the injunctive relief set forth in its Amended Order at Docket No. 13 by consent of the parties. (Docket No. 20 ("ORDER indicating as follows: by consent of the parties, the Court's Amended Memorandum order shall remain in effect until disposition of the pending motion for preliminary injunction, during which time the parties will attempt to resolve the matter amicably or request a hearing date on the pending motion for preliminary injunction")).

The Court held periodic telephonic status conferences thereafter while the parties attempted settlement discussions. (Docket Nos. 21, 22, 26, 28, 30, 33). The Court eventually ordered the City to file a brief with supplemental affidavits in response to the Diocese's Emergency Motion for Preliminary Injunction by July 9, 2021 (Docket No. 36), and extended the deadline for the same by its order on July 1, 2021. (Docket No. 41). The City filed its brief opposing the Diocese's motion for preliminary injunction on July 16, 2021 (Docket No. 42), and the Court held a telephonic status conference to address the motion and opposition, the status of settlement discussions, and prospective case management on August 26, 2021. (Docket No. 48).

Then, also on August 26, 2021, this Court granted the Diocese's Emergency Motion for Injunctive Relief upon consent of the parties and without prejudice to reconsideration. (Docket No. 50). Pursuant to the Court's Order, the City was enjoined from "(i) voting on the designation of the [Church Building] as a historic structure; and (ii) designating the [Church Building] as a historic structure." (*Id.*). The Court also stayed "all timelines associated with the historic nomination process for the application at issue" at that time and prohibited either party from "alter[ing] the physical structure of the subject premises, not to include the installation of surveillance equipment if warranted." (*Id.*). The injunction has remained in place since that time,

3

and none of the parties have sought to terminate or modify it. The parties have since filed respective motions for summary judgment seeking determinations in their favor on the merits and have briefed their motions extensively.

### A. Parties to this action

The Roman Catholic Diocese of Pittsburgh is part of the Roman Catholic Church, which is subject to Canon Law, procedures, and doctrines. (Docket No. 59, ¶ 10). It and Saint Mary of the Mount Parish are separate Pennsylvania Charitable Trusts located in Pittsburgh, Pennsylvania. (*Id*. ¶¶ 1-3). Bishop Zubik is a Pittsburgh resident who serves as Trustee of both the Diocese of Pittsburgh and Saint Mary of the Mount Parish in his ecclesiastical role as Bishop of Pittsburgh. (*Id*. ¶¶ 5-6). The Church Building is in Pittsburgh and is owned by Bishop Zubik in his role as Trustee. (*Id*. ¶¶ 4, 6, 8). It has been owned by successive Bishops of Pittsburgh under Canon Law and as recognized under state law (10 P.S. § 81) since the 1800s. (*Id*. ¶ 7). The Church Building itself is a consecrated structure and is holy property pursuant to Catholic practice (*id*. ¶ 101), and it has objects affixed to it that the Church considers holy, including, but not limited to, statues and stained-glass windows (*id*. ¶ 102). The City of Pittsburgh is a municipality in Allegheny County, Pennsylvania that is organized pursuant to the Home Rule Option Plan codified at 53 Pa. C.S.A. § 2901. (*Id*. ¶ 13, 34). The Home Rule Charter and Optional Plans Law sets forth the scope, use, and limits of the City's municipal power. (*Id*. ¶¶ 34, 35 (citing 53 Pa. C.S.A. § 2961)).[3] Defendant Quinn is a Senior Preservation Planner for the City's Historic Review Commission ("HRC"), and she is a City of Pittsburgh employee. (*Id*. ¶ 14).

---

[3]    Municipalities are prohibited from "exercis[ing] powers contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of this Commonwealth." 53 Pa. C.S.A. § 2962(c)(2). (*Id*. ¶ 37).

### B.     The Church Building

The structure at the center of this dispute is the Church Building at 823 Climax Street, Pittsburgh, Pennsylvania, in Pittsburgh's Allentown neighborhood.  (*Id.* ¶ 4).  On or about January 23, 2016, Bishop Zubik issued a Decree closing the Church Building for worship, subject to appeal within the Roman Catholic Church.  (*Id.* ¶ 38; Docket No. 16-11 ("2016 Canonical Decree")).  Therein Bishop Zubik set out the rationale for closing the Church Building, which included: "(1) the financial situation of Saint John Vianney Parish [which] precludes the proper maintenance of the building, (2) the … [C]hurch [B]uilding requires over $1,000,000 of repair to keep it safe for normal operation, and (3) the status of parish finances are such that repair or maintenance are impossible due to over $3,000,000 of debt owed by the parish."  (2016 Canonical Decree at 2).  Bishop Zubik thus closed the Church Building for worship and relegated it to "profane but not sordid use in accord with the norms of [canon] law."  (*Id.*).  Therein, Bishop Zubik also decreed that the stained-glass windows, sacred items, non-sacred artifacts, and any work of some significance be removed from the Church Building to the extent possible for reuse at parishes receiving territory from Saint John Vianney parish, or for transmission to the Diocesan Archives for use by other ecclesiastical entities.  (*Id.*; *see also* Docket No. 59, ¶¶ 38-40).  In this decree, Bishop Zubik additionally indicated that appeal could be taken from the decree under Canon Law and procedures.  Certain parishioners exercised their appeal rights and the 2016 Canonical Decree was later nullified when the Congregation of the Clergy (a judicial entity of the Roman Catholic Church located in the Vatican city-state) accepted the appeal.  (Docket No. 59, ¶¶ 43, 50).

After this first decree was nullified, Bishop Zubik issued a second decree closing the Church Building on June 16, 2017.  (*Id.* ¶ 44; Docket No. 16-12 ("2017 Canonical Decree")).  The 2017 Canonical Decree indicated that Saint Mary of the Mount Parish had received the

Church Building according to canon 122.  (2017 Canonical Decree at 1).  The Pastor of Saint Mary of the Mount expressed "grave concern" over whether the parish could maintain the Church Building when it required significant repairs totaling $1,100,000. (*Id*. at 1-2).  Accordingly, Saint Mary of the Mount's Pastor had submitted a petition to relegate the Church Building to profane but not sordid use.  (*Id.* at 2).  Having received that petition, Bishop Zubik again laid out his rationale for closure of the Church Building, including that: Saint Mary of the Mount Parish lacked the resources to fund necessary repairs on the Church Building; there was no other available funding source for the repairs; and reallocation of other funds for necessary repairs would damage Saint Mary of the Mount's pastoral programs.  (*Id.*).  Upon the petition and a later letter from the Pastor of Saint Mary of the Mount confirming his petition, Bishop Zubik closed the Church Building, relegated it to profane but not sordid use,[4] and once again decreed that the "stained glass windows, sacred items, non-sacred artifacts and any work of some significance be removed to the extent possible and retained at the Diocesan Archives for use by other ecclesiastical entities" effective July 1, 2017.  (*Id.* at 3).

As with the 2016 Canonical Decree, the 2017 Canonical Decree also stated that it was

---

[4]      The phrase "profane but not sordid use" is found in the Code of Canon Law at 1983 Code c. 1222, § 1, which states that "[i]f a church cannot be used in any way for divine worship and there is no possibility of repairing it, the diocesan bishop can relegate it to profane but not sordid use."  The phrase indicates that church property may be put to a secular use, *i.e.*, uses other than for a Catholic worship service, but not to a use that is unbecoming, immoral, or offensive.  *See Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 84 (1st Cir. 2013) ("[A] sordid use is one that is 'detrimental to the good of souls,' including any use that involves 'the denunciation of the Catholic Church and the Catholic Faith, the desecration of Catholic objects of devotion and worship or even any disrespectful or casual treatment of such objects, and/or the proselytizing of Catholics.'" (quoting *Roman Cath. Archbishop of Boston, A Corp. Sole's Policy on the Sale of Church Bldgs.*, *available at* http://www.bostoncatholic.org/uploaded Files/BostonCatholicorg/Parishes_And_People/PolicyonSaleofChurch Buildings0711)); *see also Profane*, MERRIAM-WEBSTER UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/profane (last visited Feb. 6, 2025); *see also Sordid*, MERRIAM-WEBSTER UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/sordid (last visited Feb. 6, 2025).

subject to appeal in accordance with the prescriptions of law.  (*Id.*).  The 2017 Canonical Decree was appealed by parishioner Robert Kress, who requested revocation of the 2017 Canonical Decree on or about June 25, 2017.  (Docket No. 59, ¶ 48).  Bishop Zubik promptly denied his request, at which time Kress appealed to the Congregation of the Clergy.  (*Id.* ¶¶ 49-50).  Approximately one year later (on July 13, 2018), His Eminence Beniamino Cardinal Stella, sitting at the Congregation of the Clergy, denied Kress's appeal.  (*Id.* ¶ 51).  Kress appealed that decision to the Supreme Tribunal of the Apostolic Signatura of the Holy See in the Vatican City-State. (*Id.* ¶ 52).[5]  That appeal remained pending at the time that the Diocese filed its Complaint in the case before this Court.  (Docket No. 1, ¶ 27 ("The canonical appeal is currently pending before the Supreme Tribunal of the Apostolic Signatura of the Holy See … and no final decision has been made pursuant to the Roman Catholic Church's Canon Law.")).  That continued to be so until, on October 30, 2022, the Apostolic Signatura issued a decision that rendered the Church Building officially closed for worship, thus commencing the church-mandated closure process. (Docket No. 81, Plaintiffs' Supplement to Motion for Summary Judgment).  At that time—and presently—this Court's August 26, 2021, Order granting the Diocese's motion for a preliminary injunction upon the parties' consent prohibited and prohibits either party from altering the physical structure of the Church Building.  (Docket No. 50).

### C.    Nomination for designation as a "Historic Structure"

Pittsburgh's City Council is authorized to "designate Historic Structures, Historic Districts, Historic Sites and Historic Objects upon request or upon its own initiative" pursuant to Title 11 of

---

[5]    The Holy See is recognized by the United States as the supreme body of government of the Catholic Church and is a sovereign judicial entity under international law.  (*Id.* ¶¶ 54, 55).  The parties stipulate that the rule of comity requires that the United States and the Holy See mutually recognize each other's legislative, executive, and judicial acts.  (*Id.* ¶ 57).

the Ordinance, *see* Ord. § 1101.03(a).  (Docket No. 59, ¶ 17).[6]  The key participants in the designation of a particular site as a historic structure are: the nominator, the HRC, the Planning Commission ("PC"), and the City Council.  (*Id.* ¶¶ 29-32).  As a general matter, the nominator can be the Mayor, a member of the HRC, a member of the PC, a member of the City Council, the owner, "or any person presently residing in the City of Pittsburgh whom [sic] has established residency in the City of Pittsburgh for at least one (1) year prior to nomination," Ord. § 1101.03(a)(1).  (*Id.* ¶¶ 23, 24).  However, only the owner of record of a religious structure may serve as its nominator for a historic designation, Ord. § 1101.03(a)(1)(a)(7).  (*Id.* ¶¶ 25-27).

Upon nomination, "[n]o exterior alterations"—defined in Ord. § 1101.02(e) as "alteration of exterior architectural features which can be seen from a public street or way" including, *e.g.*, "the type and design of all windows, doors, lights, stair railings, and other fixtures"—are permitted. *Id.* § 1101.03(c)(1).  This limitation attaches two business days after the HRC mails a nomination notice to the owner of the structure and lasts "until a final determination about the designation has been made by [City] Council, or until the elapse of … 120 … days after [City] Council's receipt of the [HRC] and [PC]'s recommendations."  *Id.* § 1101.03(c)(1).[7]  If 120 days pass before the City Council holds a public hearing or makes a decision, its failure to act is "deemed approval" for historic designation if the HRC and PC made affirmative recommendations.  *Id.* § 1101.03(j)(3).

---

[6]    The Ordinance defines key terms and sets forth procedures for the nomination, designation, and alteration of historic properties.  As is relevant here, the term "Historic Structure" is "[a]nything constructed or erected, the use of which requires directly or indirectly, a permanent location of land, including walks, fences, signs, steps and sidewalks, which meets one (1) or more of the criteria for designation as listed in § 1101.04," *s e e* Ord. § 1101.02(a).  (*Id.* ¶¶ 19-20).  A "Religious Structure" is a  "church, cathedral, mosque, temple, rectory, convent, or similar structure used as a place of religious worship." *Id.* § 1101.02(h).  (*Id.* ¶¶ 21-22).

[7]    The Court indicated in its August 26, 2021, Order that "all timelines associated with the historic nomination process" are stayed for the duration of the preliminary injunction.  (Docket No. 50).

The nomination of a structure thus "puts the owner of the property *in the same position as if the nomination is finally approved*" though the condition is "only temporary." (Docket No. 77 at 2 (emphasis added)). The owner of a nominated structure may seek a Certificate of Appropriateness from the HRC to make alterations (other than demolition) during the pendency of a nomination. Ord. § 1101.03(c)(1).

In this matter, an individual resident of Pittsburgh, Mark Wittman,[8] nominated the Church Building for designation as a historic structure on April 13, 2020, and the HRC accepted the nomination. (Docket No. 59, ¶¶ 25-28, 63-68, 73-75). Accordingly, starting on or around April 15, 2020, the Church Building was, in effect, a historic structure and the Diocese was not permitted to make exterior alterations to it without a Certificate of Appropriateness. The parties stipulate that no compensation was provided to the Diocese upon nomination of the Church Building for designation as a "Historic Structure," nor is there any agreement for compensation in place should the Church Building ultimately be designated as such. (*Id.* ¶¶ 103, 104).

On June 25, 2020, after its nomination, the Diocese submitted a letter to the City opposing the nomination, and the General Counsel for the Diocese emailed Quinn and the City Solicitor to inform them that the Church Building was not canonically closed for worship and that its owner opposed nomination. (*Id.* ¶¶ 80-81). The HRC nevertheless proceeded to consider the nomination and, on September 2, 2020, voted to—and ultimately recommended approval of— the designation to the City Council pursuant to Ord. § 1101.03(d)(1). (*Id.* ¶¶ 87-88). After receiving the HRC's recommendation, the City Council advertised a public hearing on the matter and gave the Diocese notice that a public hearing would be held on November 10, 2020. (*Id.*

---

[8]    Wittman is a private individual, he is not a member of the Roman Catholic Clergy for the Diocese of Pittsburgh, he is not the owner of the Church Building, and he at no time acted as an agent for Bishop Zubik. (Docket No. 59, ¶¶ 64-73).

¶ 90).  The hearing proceeded as scheduled, but the Diocese was not afforded the opportunity to examine and cross-examine witnesses (*Id.* ¶ 95) despite the Ordinance providing an opportunity to do so.  Ord. § 1101.03(i)(2).  Instead, the Diocese was given three minutes to address the nomination.  (Docket No. 59, ¶ 98).

The City Council scheduled a final vote on the Church Building's nomination for designation as a historic structure for November 23, 2020, but the vote was stayed when the Diocese filed its Complaint and the Court entered a temporary restraining order and subsequent preliminary injunction.  (*Id.* ¶¶ 99-100).  Now, in their cross-motions for summary judgment, the parties have called upon the Court to decide on the record before it whether the nomination and HRC's recommendation to designate the Church Building as a historic structure, along with the process leading up to the City Council's scheduled vote, violated the Diocese's local, state, and federal statutory and constitutional rights.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  To withstand summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When considering a summary judgment motion, the Court may not weigh the evidence or make credibility determinations, but rather is limited to deciding whether there are any disputed issues that are both genuine and material.  *Id.* at 249.  This same standard applies when parties file cross motions for summary judgment.  *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008); *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016)

("When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." (internal quotation marks and citation omitted)).

In this matter, the parties represent that they do not dispute any material fact and that resolution of the Diocese's claims can be accomplished by summary judgment.  (Docket Nos. 61 ("In the present case, the parties have jointly submitted stipulated facts for this Court to consider; thus, all of the material facts are uncontroverted"), 63 ("The Parties to this case do not dispute any material fact.")).  The parties' having stipulated to the absence of any genuine factual disputes, the Court will proceed to evaluate the legal questions raised in the parties' summary judgment motions and briefs.

## III.    <u>DISCUSSION</u>

The issues presented in this case are myriad but, at the highest level of generality, the Diocese argues that it is entitled to summary judgment on all its claims and seeks: a declaration that the Ordinance is unconstitutional; a permanent injunction of the City's enforcement of the Ordinance against it; and compensatory damages and attorneys' fees.  The City opposes the Diocese's motion and also seeks summary judgment in its favor largely because, in its view, the Diocese's claims are not ripe, nor will they be until if and when the Church Building is designated as a historic structure by vote of the City Council.  The City further argues that even if the Church Building had been so designated, the Diocese would have to first seek relief for its claims in the Pennsylvania courts before presenting them here.  Substantively, the City argues that designation of the Church Building as a historic structure is a *de minimis* infringement on the Diocese's rights and a permissible regulatory encumbrance on the Diocese's exercise of control over its property.

11

The City also argues that the Diocese has not made out a case against Quinn in her official capacity, and that qualified immunity shields her from suit in her individual capacity.

The parties' arguments—about ripeness, abstention, immunity, and the merits of the substantive claims—are complex. The Court will attempt to bring organizational clarity to bear herein. The Court will first address the justiciability of claims. Next, the Court will address the Diocese's claim that the City violated its Ordinance regarding designation of historical structures. The Court will address that claim first because, as will become evident, the Court has determined it has jurisdiction over the Diocese's federal claims and therefore may consider the Diocese's state and local claims pursuant to its supplemental jurisdiction.[9] After addressing the Diocese's claim regarding violation of the Ordinance, the Court will address the Diocese's federal statutory claim, the state law claims, and, to the extent appropriate,[10] the Diocese's constitutional claims.

### A.    <u>Justiciability & Ripeness</u>

The first matter that the Court must address is whether the Diocese's claims are justiciable; specifically, whether they are ripe. In support of its motion for summary judgment, the City argues that none of the Diocese's claims are "ripe for adjudication because City Council has yet to decide whether they will designate [the Church Building] as a historic structure." (Docket No. 63 at 3-4).[11] Even if the City had not raised this issue for the Court's review, the

---

[9]    The Court exercises jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and exercises jurisdiction over the Diocese's nonfederal claims pursuant to 28 U.S.C. § 1367.

[10]    When possible, federal courts should base their decisions on non-constitutional rather than constitutional grounds. *New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 299 F.3d 235, 248 (3d Cir. 2002) (Alito, J., concurring); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."). The Court will exercise judicial restraint here where appropriate.

[11]    The Diocese argues that the City's summary judgment motion is silent with respect to most of its claims and thus argues that the City has not moved for summary judgment as to Count I (RLUIPA), Count II (1st Amendment Free Exercise and Establishment); Count III (14th Amendment Equal Protection); Count

Court would have started here pursuant to its "independent obligation" to assure itself that all requirements of subject-matter jurisdiction are met. *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3d Cir. 2016) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).

Article III, section 2 of the United States Constitution limits federal jurisdiction to actual "cases" and "controversies." U.S. Const. art. III, § 2. This case or controversy requirement "has engendered numerous justiciability doctrines that further define the limits of federal jurisdiction" including the "ripeness doctrine, which determines when a proper party may bring an action." *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411 (3d Cir. 1992) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) ("[R]ipeness is peculiarly a question of timing.")). The ripeness doctrine helps courts avoid the issuance of advisory opinions, *i.e.*, giving an "opinion advising what the law would be upon a hypothetical state of facts." *Tait v. City of Philadelphia*, 410 F. App'x 506, 508 (3d Cir. 2011) (quoting *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994)). To satisfy the case-or-controversy requirement, an action must present "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution." *Armstrong World Indus.*, 961 F.2d at 410 (quoting *Int'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987)).[12]

---

IV (14th Amendment Due Process); Count VIII (Violation of the City Ordinance); and Count IX (Declaratory Judgment Act). However, the Court disagrees insofar as the City has argued that *none* of the claims in the Diocese's Complaint are ripe and, if the Court were to agree with that assessment, it would dismiss all the Diocese's claims, albeit without prejudice.

[12] The ripeness doctrine has been characterized as both a constitutional requirement and a prudential limitation of federal jurisdiction. *Armstrong World Indus.*, 961 F.2d at 411 n. 12. *Compare Union Carbide Agric. Prods.*, 473 U.S. at 579-82 (constitutional requirement) *with Buckley v. Valeo*, 424 U.S. 1, 117-18 (1976) (per curiam) (prudential limitation).

For ripeness in the declaratory judgment context—which is present here where the Diocese is seeking declaratory and injunctive relief including a declaration that "the Church Building may not be designated a historic structure without the consent of Bishop Zubik, the Diocese, and/or the Parish; that the consideration process is impermissible at this time; and that any designation, notice, or other finding by Defendant City of Pittsburgh is unlawful" (Docket No. 1, ¶ 131)—the Court considers "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 135 (3d Cir. 2022) (quoting *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004)).[13]   This three-factor rubric of ripeness of declaratory judgment actions (adversity, conclusiveness, and utility) comes from *Step–Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647-50 (3d Cir. 1990).  A defect in one or two of the three factors may be sufficient to find that a declaratory judgment claim is not ripe for judicial action.  *AXIS Ins. Co. v. PNC Financial Services Group., Inc.*, 135 F. Supp. 3d 321, 325 (W.D. Pa. 2015) (citing *PSA, LLC v. Gonzales*, 271 Fed. App'x 218, 220 (3d Cir. 2008) (finding case to be unripe where there was sufficient adversity but neither conclusiveness nor utility) and *Home Ins. Co. v. Perlberger*, 900 F. Supp. 768, 772 (E.D. Pa. 1995) (finding utility met, but lack of conclusiveness determinative; and so deciding there was no need to assess adversity)).[14]

---

[13]    That a plaintiff primarily seeks declaratory relief does not lessen Article III's demand for an actual case or controversy.  *See Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153 (3d Cir. 1995); *Armstrong World Indus.*, 961 F.2d at 410 (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)) (holding that a "case or controversy" is a condition precedent to the proper exercise of judicial power by a federal court and the Declaratory Judgment Act cannot relax that constitutional requirement). That is, while "[m]any courts have recognized that applying the ripeness doctrine in the declaratory judgment context presents a unique challenge," *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000) (citing cases), "a declaratory judgment action, like any other action, must be ripe in order to be justiciable."  *Id.*

[14]    The same factors used to determine ripeness of declaratory judgment actions are applicable to determinations of the justiciability of actions for permanent injunctive relief. *Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 593 (E.D. Pa. 2009), *aff'd,* 410 F. App'x 506 (3d Cir. 2011).

For adversity of interest — the first *Step-Saver* factor — parties' interests will be found to be adverse where harm will result if the declaratory judgment is not entered. *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995). The Third Circuit has explained in its exposition of adversity that while "the action [in question] cannot be based on a contingency," the party seeking declaratory relief "need not wait until the harm has actually occurred to bring the action." *Id.* Adversity with respect to a future threat can thus be shown when a party "demonstrate[s that] the probability of that future event occurring is real and substantial[,]" that is, "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (cleaned up). *See AXIS Ins. Co.*, 135 F. Supp. 3d at 325 ("A plaintiff 'need not suffer a *completed* harm to establish adversity of interest between the parties[.]'") (citing *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009)).

For conclusiveness — the second *Step-Saver* factor — the Court considers the potential for "the legal status of the parties [to] be changed or clarified by the declaration" requested. *Travelers Ins.*, 72 F.3d 1155. There are two "facets" of conclusiveness: first, the potential to "definitively decide[]" the parties' rights in the declaratory judgment, and; second, that the "case rests upon a sufficiently solid factual foundation" as opposed to hypothetical factual scenarios. *Axis Ins. Co.*, 135 F. Supp. 3d at 327 (quoting *Step-Saver*, 912 F.2d at 649 n. 9). Accordingly, an "integral part of the conclusiveness inquiry is the necessity that the court be presented with a set of facts from which it can make findings." *Travelers Ins.*, 72 F.3d at 1155. That said, there are certain situations, *e.g.*, "where the question presented is predominately legal" where "a judgment declaring rights is appropriate" even absent a complete factual record. *Id.* (cleaned up).

Utility — the final *Step-Saver* factor — is "closely related" to conclusiveness. *Id.* A

court's assessment of the utility of a declaratory judgment is essentially an assessment of how much "practical help" the judgment will provide to the parties. *Id.*; *Tait*, 639 F. Supp. 2d at 592 (utility ensures any judgment received by the parties will be "'of some practical help to the parties' at the time when it is made" (quoting *Travelers Ins.*, 72 F.3d at 1155)). Utility springs from one of the "primary purposes" of the Declaratory Judgment Act, which is to "clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future," that is, that parties could "turn on the light" before stepping into the dark instead of stepping into the dark and hoping for the best. *Step-Saver*, 912 F.2d at 649 (quoting Congressman Gilbert's remarks, 69 Cong. Rec. 2108 (1928)).

The City contends that the Diocese's claims are not ripe and cannot ripen unless and until the City Council votes on the Church Building's designation as a historic structure. The City argues that the contingency of the vote stands in the way of ripeness, just as a contingency made the harm at issue in *Step-Saver* too speculative for that controversy to be ripe for adjudication. (Docket No. 71 at 3 (citing *Step-Saver*, 912 F.2d at 647)). However, having considered the characteristics of this dispute and the nature of the requested relief in light of the *Step-Saver* factors, the Court disagrees with the City's ripeness argument.

With respect to adversity, it is not necessary that the Diocese suffer a completed harm, *i.e.*, designation of the Church Building as a historic structure, before pursuing declaratory relief. *See AXIS Ins. Co.*, 135 F. Supp. 3d at 325. Nor must the Diocese establish "that the relevant injury"—historical designation—"is a mathematical certainty to occur." *Travelers Ins.*, 72 F.3d at 1154 (explaining that requiring mathematical certainty or completion of injury would "eviscerate the Declaratory Judgment Act and render the relief it was intended to provide illusory"). The injury of primary concern to the Diocese in this case is interference with its

16

religious exercise and use of church property, and while the City Council has not yet voted in favor of historic designation of the Church Building, which would definitively effect limitation of the Diocese's control, that vote was imminent prior to the Court's Order restraining it (Docket No. 8) and Order on the consent motion for emergency preliminary injunction. (Docket No. 50). The parties' stipulated facts reflect the same: the Church Building was nominated for designation as a historic structure; the nomination was reviewed by the HRC; the HRC voted to recommend approval of the nomination to the City Council; the City Council held a hearing on the recommendation for such designation on November 10, 2020; and a final vote on designation was scheduled for November 23, 2020, before that vote was stayed by the Diocese's filing of its Complaint and motion for TRO. While it is not mathematically certain that the injury complained of would occur, *Travelers Ins.*, 72 F.3d at 1154, it is the Court's determination that there is a sufficiently "real and substantial" future event in this matter "to warrant the issuance of a declaratory judgment." *AXIS Ins. Co.*, 135 F. Supp. 3d at 325 (quoting *Pittsburgh Mack*, 580 F.3d at 190).[15]

Not only that, but the Court observes that the undisputed record in this matter shows that the mere acceptance of the nomination of the Church Building by the HRC already impacted the

---

[15]    Under the Ordinance, the City Council *must* vote on the designation of a historic structure within 120 days of the Council's receipt of the HRC and PC's recommendation. Ord. § 1101.03(i)(4). If the City Council fails to render a decision within that time, then the nominated site is deemed approved if the HRC and the PC recommended approval (and deemed denied if either of the HRC or PC recommended against designation). *Id.* § 1101.03(j)(3)-(5). Presently, "all timelines associated with the historic nomination process" are stayed for the duration of the Court's preliminary injunction. (Docket No. 50). In its brief in opposition to the Diocese's summary judgment motion, the City proposes that the stay be lifted so that the City Council could proceed to a final vote. (Docket No. 71, at 2 n. 1). The City suggests a "no" vote would spare the resources of all involved. (*Id.* at 2). Despite making this argument, the City did not file a motion to terminate or modify the stay, which could have conserved resources as suggested. Moreover, it would have conserved resources if the City's officials, notably Quinn and the HRC, would have rejected or otherwise disavowed the nomination submitted by a non-owner of a religious structure as improper under the Ordinance, which is a failing the Court addresses *infra*.

17

Diocese because the Ordinance's application to the Church Building by nomination alone prohibits any exterior alterations without the HRC's approval.[16]  That is, because the Church Building has been nominated for historic designation and the HRC accepted that nomination and voted to recommend historic designation,[17]  the Diocese is subject to many of the same restrictions regarding its Church Building as if the historic designation process had been made final by a vote of City Council. (Docket No. 59, ¶ 29).[18]  The City's action in this regard effectively precludes the Diocese from unrestrictedly acting on the 2017 Canonical Decree, in which Bishop Zubik directed that "[i]n accordance with diocesan norms" certain items like stained-glass windows and significant works "be removed to the extent possible and retained ... for use by other ecclesiastical entities." (2017 Canonical Ordinance at 4).[19]  Accordingly, on this

_____

[16]     The parties have jointly stipulated that "once a structure is nominated … no exterior alterations may be undertaken until a final determination of the designation has been made by Council, or until 120 days after Council's receipt of the recommendations of the HRC and Planning Commission, without the review and approval by the HRC and the issuance of a Certificate of Appropriateness."  (Docket No. 59, ¶ 29 (citing Ord. § 1101.03(c)(1)(a)).

[17]     As indicated *supra* n. 15, Quinn and the HRC could have disavowed the City's pursuit of historic designation by rejecting the nomination or by recommending against its approval pursuant to an express provision of the Ordinance that unambiguously provides that nominations of a religious structure shall only be made by its owner, § 1101.03(a)(1)(a)(7), but Quinn and the HRC disregarded that requirement and the Diocese's objection to nomination and instead the HRC passed a preliminary motion to consider Mr. Wittman's proposed nomination and voted to recommend approval, leading the City Council to hold a public hearing and schedule a vote. (Docket No. 59, ¶¶ 82, 87, 88, 92, 93).

[18]     The Court acknowledges that its own Order prohibits exterior modifications of the Church Building at present, regardless of whether the nomination limited the Diocese.  However, even if the Court were to eliminate any time during which the Court's Order prevented the Diocese's unencumbered use or disposition of the Church Building from the Court's consideration of present hardship inflicted on the Diocese, it is still the case that the Diocese was affected by the nomination within days of the nomination (April 2020) until initiation of this suit approximately seven months later (November 2020).

[19]     The Court also observes that the Diocese's asserted due process injury—premised in part on the Diocese being denied an "opportunity to cross-examine or meaningfully dispute or halt the historical structure designation process in clear violation of the procedural due process rights" (Docket No. 1, ¶ 105), is a harm independent from and not contingent upon the City Council's final vote on historic designation of the property.

record, the Court concludes that the Diocese presents real, non-hypothetical legal controversies that affect the Diocese in a concrete manner and provide factual predicates for adjudication. The prospect that such harm to the Diocese will be "completed" or otherwise made final by an affirmative vote of the City Council is real, substantial, and sufficiently immediate for the Court to find there is adversity. *Tait*, 639 F. Supp. 2d at 593-94.

Turning to conclusiveness, the Court notes that the facts are largely stipulated to by the parties (Docket No. 59), and the crux of this case is the legality of the City's acceptance of the Church Building's nomination as a historic structure and the procedural irregularities that occurred as the matter advanced toward a vote despite the Diocese's objection to the incursion on its religious exercise through use of the property. "Predominantly legal questions," as opposed to questions based on hypothetical facts, "are generally amenable to a conclusive determination in a preenforcement context." *AXIS Ins. Co.*, 135 F. Supp. 3d at 327 (quoting *Pittsburgh Mack Sales & Serv., Inc.*, 580 F.3d at 191). Here, it is undoubtedly the case that predominantly legal questions are the focus. For example, one of the questions presented is whether the Church Building's designation as a historic structure would violate the City's Ordinance, state law regarding church property, or RLUIPA. There is no need for further factual development to resolve a legal question about whether designation of the Church Building as a historic structure is lawful. Accordingly, the conclusiveness factor weighs in favor of adjudicating this dispute on the merits and resolving the parties' legal status with respect to each other.

Considering the last *Step-Saver* factor, utility, the Court finds that this factor also weighs in favor of ripeness. A judgment delineating the parties' rights with respect to each other at this juncture will no doubt affect the parties' actions. *See AXIS Ins. Co.*, 135 F. Supp. 3d at 329. Indeed, the parties' next steps would be directly affected by the outcome of this Court's decision,

regardless of what that outcome might be: either the City would be free to continue its pursuit of the Church Building's designation as a historic structure, or the City would be compelled to terminate the historic designation process at least in relation to the current nomination. Either way, the road ahead would be clear, that is, a decision would achieve one of the main purposes of the Declaratory Judgment Act which is to facilitate parties' "responsible decisions about the future." *Step-Saver Data Sys., Inc.*, 912 F.2d at 649-50. Accordingly, the Court finds that this third factor weighs in favor of a determination that the parties' dispute is ripe. Having thus determined that all three *Step-Saver* factors — adversity, conclusiveness, and utility — favor ripeness of this action, the Court will proceed to the merits. *See Travelers Ins.*, 72 F.3d at 1154 ("If we are satisfied that all three elements are present, the declaratory judgment action is ripe.").[20]

## B. Violation of the Ordinance (Count VIII)

In the eighth count of its Complaint, the Diocese alleges that the City violated the Ordinance which requires that the nomination of a religious structure "only be made by the owner(s) of record of the religious structure." (Docket No. 1, ¶ 120 (citing Ord. § 1101.03(a)(1)(a)(7))). To that end, the Diocese avers and argues that the Church Building is a "religious structure" as defined in Ord. § 1101.02(h) and Bishop Zubik did *not* nominate the Church Building for designation as a historic structure, yet Quinn, the HRC, and the City Council took up the nomination for consideration, continued to pursue it, all the while encumbering the Diocese's use of the property. (Docket No. 1, ¶¶ 120-25). On top of the impropriety in the

---

[20]    The Court's satisfaction with ripeness under the refined *Step-Saver* rubric is sufficient to satisfy the Court that the fundamental considerations of ripeness are satisfied more generally. *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 342 n. 9 (3d Cir. 2001) (explaining that the *Step-Saver* factors are a "distillation" of the factors relevant to the ripeness inquiry more broadly). To the extent any individual cause of action may be unripe, the Court will address the matter on a count-by-count basis herein.

nomination, the Diocese also argues that it was denied the opportunity to examine and cross examine witnesses at the City Council's public hearing despite being entitled to such an opportunity under the Ordinance. (Docket No. 61 at 27). The parties stipulate that the Diocese was only permitted to speak for three minutes to address the nomination at the City Council hearing that occurred on November 10, 2020. (Docket No. 59, ¶ 98). And the parties further stipulate that the Ordinance "states that '[t]he owner of any nominated Landmark shall be afforded the opportunity for reasonable examination and cross-examination of witnesses at public hearings on said nomination,'" but that at the November 10, 2020, hearing, the Diocese was "not provided the opportunity to cross-examine or confront any adverse witnesses during [the hearing]." (*Id.* ¶¶ 94-95).

While such blatant non-adherence would appear to spell the end of the parties' debate concerning the City's violations of its own Ordinance in this matter, the City raises a question of whether this Court ought to abstain from weighing in on this dispute because the Diocese would have recourse to the Pennsylvania courts to address the issue.[21] That is, the City argues that

---

[21] Scattered in the briefing, there also is what appears to be some suggestion by the City that whether the Church Building was finally closed to religious worship affects whether it is/was a "religious structure" under the Ordinance. (*See* Docket No. 71 at 14, 18 ("Plaintiffs … have indicated that the Church Building is not a place of worship, albeit an appeal is pending …."); Docket No. 77 at 12 n. 2 ("Section 1101.03(a)(1)(7) provides that the nomination of a religious structure may only be made by the property owner. 1101.02(h) generally defines a religious structure as one being used as a place of religious worship.")). In the parties' joint stipulations of fact, they agree that "*If* the Church Building is a 'Religious Structure' … then the Church Building may only be nominated for designation … by the owner(s) of record," and "*If* the Church Building is a 'Religious Structure' … then the Church Building is not eligible for designation as a Historic Structure … without the consent of the owner of record." (Docket No. 59, ¶¶ 27-28 (emphases added)). In response to the City's characterizations, the Diocese responds that the City misstates the Ordinance as it relates to religious structures: "It should here be noted that the City misstates the Ordinance in its Opposition, as it states that 'the owner of a structure ***being used*** as a place of worship' has these alleged protections. This misstatement supposes a present-tense use of a religious structure, which is in derogation of the express terms of the Ordinance as well as the legislative intent." (Docket No. 76 at 7, n. 8 (citations omitted)).

The parties' allusion to a potential, yet far from fully developed, disagreement regarding whether the Church Building is a religious structure seems to the Court to be immaterial for purposes of their cross-

*Younger* abstention, the doctrine outlined in *Younger v. Harris*, 401 U.S. 37 (1971), applies in this case. Pursuant to *Younger* abstention, if there is a pending state proceeding that is judicial in nature that implicates important state interests, and there is adequate opportunity in the state proceedings for the plaintiff to raise its constitutional challenges, then the federal courts should abstain from intervening. *Younger* abstention applies in circumstances where a plaintiff seeks "prospective injunctive relief" despite ongoing state proceedings, *Shallenberger v. Allegheny Cnty.*, No. 2:20-CV-00073-NR, 2020 WL 1465853, at *5 (W.D. Pa. Mar. 26, 2020), and dictates that "in certain circumstances, district courts must abstain from exercising jurisdiction over a particular claim where resolution of that claim in federal court would offend principles of comity by interfering with an ongoing state proceeding." *Wattie-Bey v. Att'y Gen.'s Off.*, 424 F. App'x 95, 96-97 (3d Cir. 2011) (quoting *Lazaridis v. Wehmer*, 591 F.3d 666, 670 (3d Cir. 2010) (per curiam)).

*Younger* abstention must be understood in its proper context, *i.e.*, in light of the federal courts' "virtually unflagging" obligation to decide cases if there is jurisdiction. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The Supreme Court reiterated the limited application of *Younger* abstention in *Sprint* after the doctrine seemed to expand unfettered for years. Originally,

---

motions in light of the parties' mutual acknowledgment that at the time of nomination the Church Building was not closed to religious worship, particularly as an appeal of the 2017 Canonical Decree was pending. (Docket No. 59, ¶¶ 44, 53, 56, 58). Additionally, the text of the Ordinance lays plain that the Church Building is a religious structure. The full definition of a religious structure under the Ordinance is: "Any or all of the following: church, cathedral, mosque, temple, rectory, convent, or similar structure used as [a] place of religious worship." Ord. § 1101.02(h). Pursuant to this definition, the phrase "used as place of religious worship" clearly modifies "similar structure," as opposed to the specifically enumerated religious structures listed earlier in the definition (churches, cathedrals, mosques, temples, rectories, and convents). *See Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752, 760 (Pa. 2008) ("This interpretation is consistent with the last antecedent rule of statutory construction, which advises that a proviso usually is construed to apply only to the provision or clause immediately preceding it."). Reading the Ordinance's definition of religious structure thus, and in light of the parties' agreement that there are not any genuine issues of material fact present, the Court is satisfied that the Church Building is a religious structure under the Ordinance and the Court will evaluate the parties' arguments accordingly.

*Younger* abstention was limited insofar as "the Supreme Court held that, absent extraordinary circumstances, a federal court cannot enjoin an ongoing state-court *criminal* proceeding." *Borowski v. Kean Univ.*, 68 F.4th 844, 849 (3d Cir. 2023) (emphasis added). The Supreme Court thereafter expanded the principles of *Younger* to "two other types of state-level proceedings: quasi-criminal civil enforcement actions and civil lawsuits with orders that are uniquely in furtherance of a state court's ability to perform its judicial functions." *Id.* Thus, *Younger*'s scope wherein the exceptional circumstance exists to justify the federal courts' abstention "arise[s] only where the federal action interferes with … (1) 'ongoing state criminal prosecutions' (as in *Younger* itself); (2) 'certain civil enforcement proceedings' (such as the nuisance action in *Huffman*[22]); and (3) 'civil proceedings involving certain orders … uniquely in furtherance of the state courts' ability to perform their judicial functions' (such as state court civil contempt proceedings)." *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 136-37 (3d Cir. 2014) (quoting *Sprint*, 571 U.S. at 78). Quasi-criminal civil enforcement proceedings that trigger *Younger* are typically characterized by *inter alia*, the initiation of an action against the federal plaintiff. *Id.* (quoting *Sprint*, 571 U.S. at 79).

The City presents its argument for *Younger* abstention by invoking the factors outlined in *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982); *ACRA Turf Club*, 748 F.3d at 134 (explaining that *Middlesex* expanded abstention to state administrative proceedings). (Docket No. 63 at 7). The three prongs of *Younger* abstention under *Middlesex* are: (1) that there is a pending state judicial proceeding; (2) important state interests are implicated therein; and (3) there is "adequate opportunity" for the federal plaintiffs to assert constitutional challenges in the state proceeding. *ACRA Turf Club*, 748 F.3d at 134 (quoting *Middlesex*, 420

---

[22]    *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975).

U.S. at 432). The City argues that these three factors are present here and, therefore, that abstention would only be *improper* if state proceedings were brought on in bad faith or for harassment or other extraordinary circumstances existed to justify continued federal proceedings. (Docket No. 63 at 7 (quoting *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989))). The City's argument in this regard is not that the historic designation process before the City Council itself is a state judicial proceeding but that the availability of review of a decision forthcoming from that body would be reviewable in state court, that the important state interest of land use restrictions is implicated, and that, under Pennsylvania law, an agency decision like that of the City Council[23] is reviewable in Pennsylvania courts where the Diocese could protect its constitutional rights.

Considering the City's argument, it is important to bear in mind that though *Younger* was expanded in *Middlesex*, the Supreme Court has limited the expansion of the *Younger* doctrine with respect to decisions that are "essentially … legislative task[s]," even when state court review is available. *ACRA Turf Club*, 748 F.3d at 135 (discussing *New Orleans Pub. Serv., Inc. v.*

---

[23]    Whether the City Council's actions and prospective vote on the Church Building's designation as a historic structure is a judicial action is somewhat difficult to discern from the briefing. The City refers to the City Council's decision as a "legislative process," but under Pennsylvania law a municipal body acts as an administrative body when it applies ordinances to specific situations rather than establishing rules of general application. *N. Point Breeze Coal. v. City of Pittsburgh*, 431 A.2d 398, 400 (Pa. Commw. Ct. 1981). Under Pennsylvania law, the City is a "Government agency," which is defined as "[a]ny Commonwealth agency *or any political subdivision or municipal or other local authority*, or any officer or agency of any such political subdivision or local authority." 2 Pa. C.S. § 101 (emphasis added). Accordingly, its decisions are reviewable pursuant in Pennsylvania courts pursuant to 2 Pa. C.S. § 752. *N. Point Breeze Coal.*, 431 A.2d at 400-01 ("Pittsburgh City Council, like Pittsburgh's zoning board, unquestionably is a local agency within the terms of law when it acts administratively."). It therefore appears that the Diocese would have the opportunity to assert a violation of its constitutional rights before the Pennsylvania courts if a vote on the historic designation of the Church Building did not go its way. 2 Pa. C.S. § 754(b) ("[T]he court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant[.]"). An adverse decision from the Pennsylvania Court of Common Pleas would be appealable as of right to the Commonwealth Court, as pointed out by the City in its opening brief in support of its motion. (Docket No. 63 at 9 (citing 42 Pa. C.S. § 762(a)(4)(ii)).

*Council of City of New Orleans*, 491 U.S. 350, 367-68 (1989) ("*NOPSI*")).  In *NOPSI* the Supreme Court stated that "there is no doctrine that the *availability* or even the pendency *of state judicial proceedings excludes the federal courts*."  *Id.* (quoting *NOPSI*, 491 U.S. at 373) (emphases added).  And in *Sprint*, the Supreme Court emphasized the limiting nature of its decision in *NOPSI* and faulted the appellate court for overreliance on the *Middlesex* factors for a case that had been initially adjudicated before the state utilities board.  *ACRA Turf Club*, 748 F.3d at 136-37 (discussing *Sprint*, 571 U.S. at 80).  The Supreme Court explained in *Sprint* that *Middlesex* was not a stand-alone test; rather, it applies to the second type of proceedings to which *Younger* applies, *i.e.*, in the quasi-criminal context.  *Id.*  If the *Middlesex* factors were relied on beyond that context, then *Younger* would cover "virtually all parallel state and federal proceedings … where a party could identify a plausibly important state interest."  *Id.* (quoting *Sprint*, 571 U.S. at 81).

The Diocese argues that the *Younger* abstention doctrine has no application here because it does not meet the *Younger* criteria[24] and, even if it did, there are extraordinary circumstances that would prevent its application.[25]  The Diocese argues that the City's interference with and

---

[24]    The Diocese also argues that though the City does not argue the HRC and/or City Council proceedings are the relevant state proceedings, they seem to be the only proceedings that could be counted as such in the *Younger* analysis and that they do not implicate important state interests nor have they provided an opportunity for the Diocese to raise federal claims. (Docket No. 70 at 15).  However, the Court interprets the City's *Younger* argument as an argument that the state court appellate review of the yet-made City Council decision would be the relevant state proceedings for purposes of the *Younger* analysis.

[25]    One of the extraordinary circumstances that the Diocese cites is the application of international comity. (Docket No. 61 at 20 n. 8).  But the Court is unconvinced by the Diocese's argument that the City must be enjoined from designating the Church Building as a historic structure because of international comity.  The Third Circuit recently addressed principles of international comity in *Vertiv, Inc. v. Wayne Burt PTE, Ltd.*, 92 F.4th 169 (3d Cir. 2024), albeit with a focus on comity with respect to foreign bankruptcy proceedings.  Therein the Third Circuit explained that "[c]omity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another." *Vertiv, Inc.*, 92 F.4th at 176 (quoting *Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971)).  The "contours" of comity are not exact; rather, the goal of international comity is "maintaining amicable working relationships between nations, a 'shorthand for good neighbourliness, common courtesy and

_____

mutual respect between those who labour in adjoining judicial vineyards.'" *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) (quoting *British Airways Bd. v. Laker Airways Ltd.*, [1984] E.C.C. 36, 41 (Eng. C.A.)). Its application is discretionary. *Vertiv*, 92 F.4th at 176 (reviewing district courts' extension or denial of comity for abuse of discretion).

International comity generally dictates that "a domestic court normally will give effect to executive, legislative, and judicial acts of a foreign nation." *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187, 191 (3d Cir. 1994) (quoting *Remington Rand v. Business Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987)). Where the foreign proceeding in question is an act of a foreign court, the courts have described the specific comity at issue as "adjudicatory comity," pursuant to which domestic courts decide whether to engage in "a discretionary act of deference to a foreign court." *Vertiv*, 92 F.4th at 176 (citing *Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014)). When considering adjudicatory comity, courts consider whether a matter would be "more appropriately adjudged elsewhere." *Id.* (quoting *Mujica*, 771 F.3d at 599). However, the principle does not arise when foreign proceedings are merely speculative— "[a]djudicatory comity arises only when a matter before a United States court is pending in or has resulted in a final judgment from a foreign court—that is, when there is or was a 'parallel' foreign proceeding." *Id.* If there is a parallel proceeding, then "the United States court … reviews the procedures and the system of laws in the foreign court and assesses whether the foreign proceedings are likely to (or likely did) result in the impartial administration of justice." *Id.* And, in any event, "a court may deny comity to a foreign legislative, executive, or judicial act if it finds that the extension of comity 'would be contrary or prejudicial to the interest' of the United States." *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 393 (3d Cir. 2006) (quoting *Somportex*, 453 F.2d at 440).

The Diocese points out—correctly—that the United States recognizes that the Vatican is a sovereign foreign state with which the United States has had diplomatic relations since 1984. *Am. United for Separation of Church & State v. Reagan*, 786 F.2d 194, 197-98 (3d Cir. 1986) ("The State of the City of the Vatican is a territorial sovereignty[.]"). And the Diocese argues that the appeal of Bishop Zubik's Canonical Decree to the Apostolic Signatura was before a legitimate and recognized judicial body; therefore, the City would be violating rules of comity to engage in a vote to designate the Church Building as historic. (Docket No. 61 at 20 n. 8). The Diocese further argues that if this Court allows the City to move forward with the planned vote for historic designation, the Court would, effectively, be put in a position to supersede the Vatican's authority. (*Id.*). The Apostolic Signatura issued a decision on October 30, 2022, that rendered the Church officially closed for worship thus initiating the church-mandated closure process. (Docket No. 81). And, as pointed out by the Diocese, the City has not offered a response to its argument that the City must be enjoined from designating the church as historic on account of comity. (Docket No. 76 at 2 n. 2). Nonetheless, in the Court's view, the Diocese's invocation of adjudicatory comity is not an appropriate fit insofar as the courts are generally confronted with comity as a basis for withholding their own exercise of jurisdiction rather than being asked to enjoin state administrative action on the basis of comity. It is the Court's determination — based on the very limited argument before it — that application of comity in this case is inappropriate because the Diocese has not shown that the proposed City Council proceeding and the decision closing the Church Building for worship issued by the Apostolic Signatura are parallel proceedings. Though tension could arise between the Apostolic Signatura's decision and the City's decision, it does not seem to be that the Apostolic Signatura's affirmance of the 2017 Canonical Decree stands in impossible contradiction to the proposed historic designation of the Church. *Gross*, 456 F.3d at 393 ("Unless foreign law either requires a foreign entity 'to act in some fashion prohibited by the law of the United States,' or makes 'compliance with the laws of both countries ... impossible,' a court need not abstain based on principles of international comity." (quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798–99 (1993))). Thus, the Court is unpersuaded that principles of international comity dictate the

taking of property in violation of fundamental rights is such a circumstance that would warrant avoiding *Younger* abstention. Ultimately, having considered the City and the Diocese's arguments, it is the Court's decision that even considering the possibility that the Diocese could have pursued state court review of an ultimate determination of the Church Building's historic designation, that possibility would neither be in furtherance of the state courts' judicial function nor would it be quasi-criminal (and, of course, not purely criminal). This case therefore does not fall within the ambit of *Younger*, and the Court need not consider whether extraordinary circumstances would permit going around *Younger* to get to the merits of this case. *Younger* is no barrier in the first place.

Accordingly, this Court's abstention pursuant to *Younger* is *not* appropriate. And, as the Court suggested above, in light of the parties' stipulations as to the irregularities of the nomination of the Church Building for historic designation and the violations of the process guaranteed by the Ordinance, there are no further fact questions to resolve with respect to this claim that the City violated its own Ordinance with respect to the Church Building and the Court can grant summary judgment in the Diocese's favor. The Court will therefore issue a declaration that the City's application of the Ordinance to the Church Building has violated the Ordinance, and the Court will permanently enjoin the City's consideration of this improper nomination along with its concomitant encumbrances already imposed on the Diocese's use of the Church Building.

### C.    Violation(s) of the Religious Land Use and Institutionalized Persons Act of 2000 (Count I)

The Diocese contends the City's Ordinance and its application to the Church Building

---

outcome of the motions pending before it or the Court's decision on whether it should abstain from the dispute.

violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[26] RLUIPA

contains two separate provisions, one pertaining to protection of land use as religious exercise,

42 U.S.C § 2000cc, and the other pertaining to the protection of the religious exercise of

institutionalized persons, 42 U.S.C. § 2000cc-1.  The Diocese's claim against the City implicates

the land use provision at 42 U.S.C. § 2000cc, which provides that "[n]o government shall impose

or implement a land use regulation in a manner that imposes a substantial burden on the religious

exercise of a person … unless the government demonstrates that imposition of the burden … is

in furtherance of a compelling governmental interest; and … is the least restrictive means of

furthering that compelling governmental interest."  *Id.* § 2000cc(a)(1)(A)-(B).[27]

Here, it is undisputed that the City is a municipality and that Quinn is a municipal official

or otherwise a person acting under color of state law; and further, the parties expressly agree that

---

[26]    RLUIPA "is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens" after the Supreme Court held in *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872 (1990), that the First Amendment's Free Exercise Clause does not necessitate showing a compelling interest to enforce an otherwise valid law of general application that burdens religious conduct. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). *Smith* obviated the need for the Government to justify by a compelling state interest the enforcement of valid laws of general application that impose a substantial burden on religious exercise as set forth in cases such as *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981).  Notably, the Supreme Court in *Smith* stated that the political branches could grant a higher degree of protection for religious exercise through legislative accommodation. 494 U.S. at 890. Accepting that invitation, Congress first sought to restore the "compelling governmental interest" standard by enacting the Religious Freedom Restoration Act ("RFRA"), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*, which prohibits the Government from substantially burdening a person's exercise of religion, even if the burden results from a rule of general applicability, unless the Government shows that the burden is in furtherance of a compelling interest and is the least restrictive means of furthering that compelling governmental interest. The Supreme Court subsequently found RFRA to be unconstitutional as applied to the States because it exceeded Congress' remedial powers under the Fourteenth Amendment. *City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997). Thereafter, Congress enacted RLUIPA pursuant to its power under the Spending and Commerce Clauses. *Cutter*, 544 U.S. 715.

[27]    "For the purposes of RLUIPA, 'government' includes any official of a 'State, county, municipality, or other governmental entity created under the authority of a State,' as well as any other person 'acting under color of State law.'"  *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007) (citing 42 U.S.C. § 2000cc-5(4)(A)).  RLUIPA defines "land use regulation" to include "a … landmarking law, or the application of such a law, that limits or restricts a claimant's use … of land."  42 U.S.C. § 2000cc-5(5).

the Ordinance is a land use regulation (Docket No. 59, ¶ 36). Additionally, the Diocese's use of the Church Building according to Canon Law constitutes religious exercise pursuant to 42 U.S.C. § 2000cc-5(7)(A) because RLUIPA defines "religious exercise" as the "exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.*, and specifically provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise." *Id.* § 2000cc-5(7)(B). Accordingly, the questions before the Court are whether the Diocese's religious exercise was/is substantially burdened and, if so, whether the City has a compelling interest achieved by least restrictive means to justify the burden.

> 1. *Whether the Ordinance imposes a substantial burden on religious exercise*

The parties' dispute is largely focused here, on whether the Ordinance imposes a substantial burden on the Diocese's religious exercise. The Diocese argues that the City's acceptance of a non-owner nomination, the HRC's subsequent recommendation of historic designation to the City Council, and the City Council's impending vote on historic designation, has and will burden the Diocese with the City's oversight of disposition of church property including relics and artifacts, and will burden the Diocese with delay, uncertainty, and expense in seeking permission to control its disposition of church property, all of which imposes a substantial burden on the Diocese's religious exercise. (Docket No. 61 at 17). The City counters that the historic designation has a "minimal effect of limiting how [the Diocese] could alter the street facing façade," "does nothing to prevent services, interior alterations, or transfer of ownership of the property, and does not restrict religious beliefs. (Docket No. 71 at 14). In assessing whether there is a substantial burden, the Diocese bears the burden of persuasion that the City's Ordinance or its application thereof to the Church Building imposes a "substantial

burden" on its religious exercise.   42 U.S.C § 2000cc-2(b).   *See Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 94 (1st Cir. 2013).

As indicated above, the provision of RLUIPA that is applicable in this matter is Section 2000cc wherein Congress has forbidden the government from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution" absent a compelling government interest furthered by least restrictive means.   *Id.* § 2000cc(a)(1).   RLUIPA does not define "substantial burden," and the Supreme Court has not provided a definition.   For purposes of the institutionalized persons provision of RLUIPA, 42 U.S.C. § 2000cc-1, the Third Circuit defined what constitutes a "substantial burden" in *Washington v. Klem*, 497 F.3d 272, 279-80 (3d Cir. 2007).   Accordingly, to address the parties' dispute in this matter over whether the Ordinance imposes a substantial burden on the Diocese, the Court first seeks to discern the meaning of "substantial burden" for purpose of Section 2000cc based on the text of the statute and guided by the Third Circuit's decision in *Washington*.

In *Washington*, the Third Circuit fashioned a "substantial burden" standard under RLUIPA's provision on religious exercise of institutionalized persons at Section 2000cc-1 in accord with RLUIPA's text and legislative history.   *Washington* involved a Pennsylvania Department of Corrections policy that limited the amount and variety of permissible inmate property for security, hygiene, and safety reasons.   In that case, an inmate contended that the policy interfered with his religious ritual of reading four different Afro-centric books per day and, to determine whether there was a substantial burden, the Third Circuit examined the Supreme Court's Free Exercise Clause jurisprudence that existed before the Supreme Court's decision in *Smith*, 494 U.S. 872, relying on such precedents because Senators Hatch and Kennedy, principal

30

sponsors of RLUIPA, indicated in a joint statement on the Congressional Record that "the term … substantial burden on religious exercise … should be interpreted by reference to Supreme Court jurisprudence."  146 CONG. REC. S7774, 7776 (July 27, 2000) (cited in *Washington*, 497 F.3d at 278).[28]  Accordingly, drawing upon *Sherbert*, 374 U.S. 398,[29] and *Thomas*, 450 U.S. 707, and examining decisions from other courts of appeals,[30] the Third Circuit adopted a "disjunctive test" for determining when a substantial burden exists in the context of a prison policy's imposition on an institutionalized person's religious exercise under Section 2000cc-1 as follows:

> For the purposes of RLUIPA, a substantial burden exists where:
>
> 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available … versus abandoning one of the precepts of his [or her] religion in order to receive a benefit; OR
>
> 2) the government puts substantial pressure on an adherent to substantially modify his [or her] behavior and to violate his beliefs.

*Washington*, 497 F.3d at 280.

---

[28]    The Third Circuit in *Washington* relied upon this excerpt of RLUIPA's legislative history despite noting "limitations inherent in most legislative history as a tool for use in statutory interpretation," 497 F.3d at 278 (citing *Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546, 568 (2005) (describing criticisms of legislative history in statutory interpretation)), while also noting that other portions of RLUIPA's legislative history unrelated to the definition of "substantial burden" previously had been cited approvingly by the Supreme Court in *Cutter*, 544 U.S. at 716, 723, 725-26 (applying 42 U.S.C. § 2000cc-1).

[29]    The Third Circuit noted that its articulated definition is "narrower than the dictum in footnote six of *Sherbert* and the negative implication of *Lyng [v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988)], but is still broad enough to accurately reflect the statute's plain text and to effect its purpose." *Washington*, 497 F.3d at 280.  *See Sherbert*, 374 U.S. at 405 n. 6 (citing cases "for examples of conditions and qualifications upon governmental privileges and benefits which have been invalidated *because of their tendency to inhibit constitutionally protected activity*." (emphasis added)).

[30]    The Third Circuit examined cases from the First, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits, *Washington*, 497 F.3d at 279 n. 5 (citing cases), and stated that the standard enunciated by the Fifth Circuit in *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) (applying 42 U.S.C. § 2000cc-1 to an institutionalized person), is the proper standard because it "incorporates the holdings of both *Sherbert* and *Thomas*, while also requiring that the burden on religious exercise actually be substantial." *Id*. at 279 n. 7.

Though the Third Circuit's substantial burden standard as announced in *Washington* is consistent with the statutory text found in Section 2000cc-1 (the institutionalized persons provision) as well as extant Supreme Court Free Exercise jurisprudence pre-*Smith,* 497 F.3d at 281 ("[t]he straightforward test we adopt today [is] derived directly from Supreme Court precedent . . . [and] respects the text and purpose of RLUIPA"), there is some incongruity when attempting to apply it to the land-use provision of RLUIPA at Section 2000cc. The awkwardness of applying the definition of substantial burden developed for the institutionalized persons provision in a land-use-regulation case is not unlike the awkwardness the First Circuit noted when it attempted to apply *Sherbert*—a case involving religious practice and obtaining unemployment benefits—to a land-use case in *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 94-95 (1st Cir. 2013). Therein, the First Circuit noted the absence of a definition of "substantial burden" in the land-use-regulation context and explained that the definition of "substantial burden" in cases like *Sherbert* are premised upon individuals' choices between free religious exercise and government benefits that do "not accurately describe the situation in religious land use disputes." *Id.* at 95 (citing *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 348-49 (2d Cir. 2007)). In RLUIPA land-use disputes, the focal statutory provision defining "religious exercise," which includes "the use, building, or conversion of real property," 42 U.S.C. § 2000cc-5(7)(A) and (B), is plainly applicable to RLUIPA's land-use provision at Section 2000cc, but it was not relevant to, and thus not analyzed in *Washington* when the Third Circuit fashioned the "substantial burden" standard for RLUIPA's institutionalized persons provision. And *Washington* relied upon a key *datum* of legislative history for discerning the meaning of the term "substantial burden" in relation to a government's imposition on incarcerated persons' religious exercise, the object of the imposition in that case. Here, the object of the

imposition is different, in fact broader,[31] because it includes the "use, building or conversion of real property for the purpose of religious exercise" so the operative standard for "substantial burden" must, perforce, be interpreted contextually in relation to that object. So, the meaning of "substantial burden" may need to take on a formulation that accounts for textual differences when, as here, 42 U.S.C. § 2000cc-5(7)(B) applies.

In cases such as this, where the statute itself does not define a term, the Supreme Court instructs that it be interpreted "in accord with the ordinary public meaning … at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).[32] Here, the relevant statutory provision, 42 U.S.C. § 2000cc(a)(1), provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a *substantial burden* on the religious exercise of a person, including a religious assembly or institution[.]" (emphasis added). The term "substantial burden" must, of course, be read and understood within the context of the language and design of the statute as a whole. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Accordingly, this provision must be read in conjunction with RLUIPA's statutorily provided definitions found at 42 U.S.C. § 2000cc-5 and rules of construction found at 42 U.S.C. § 2000cc-3. Notably, the grammatical object of the substantially burdensome land use regulation befalls the "religious

---

[31]    RLUIPA's definitional scope "reveals Congress's intent to expand the concept of religious exercise contemplated both in decisions discussing the precursory RFRA … and in traditional First Amendment jurisprudence." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003) (citations omitted). RLUIPA expressly provides that the term "'religious exercise' includes *any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added).

[32]    The Supreme Court went on to state that "only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Id.* at 654-55 (citing *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019)).

exercise" of a person, religious assembly, or institution, so RLUIPA's definition of "religious exercise" supplies a key textual understanding of the term "substantial burden." Such "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. §2000cc-5(7). Finally, Congress instructs courts to construe RLUIPA "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).[33]

Mindful of the foregoing definitions, instructions, and canons, and following the methodology used by the Third Circuit in *Washington* to interpret RLUIPA in accordance with the statutory text and relevant legislative history, the Court turns to the ordinary meaning of the undefined statutory terms "substantial" and "burden" in relation to such imposition on the use of real property for the purpose of religious exercise. The word "burden" has been defined as "to load, encumber, oppress, lay a burden on, tax (memory, conscience, resources, etc.)." *Burden*, OXFORD ENGLISH DICTIONARY (2d ed. 1989), https://www.oed.com/oedv2/00029539 (last visited Feb. 7, 2025). *See Burden*, BLACK'S LAW DICTIONARY 223 (12th ed. 2024) ("[s]omething that hinders or oppresses," and, with respect to property, "an encumbrance"); *see also Burden*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/burden (last visited Feb. 7, 2025) ("something that weighs down,

---

[33]     This statutory interpretive directive to construe RLUIPA's protection of religious exercise broadly "to the maximum extent permitted by … the Constitution" is consistent with the Third Circuit's observation in *Washington* that RLUIPA's legislative history similarly counsels that the term substantial burden on religious exercise "should be interpreted by reference to Supreme Court jurisprudence." 146 CONG. REC. S7774, 7776 (July 27, 2000) (cited by *Washington*, 497 F.3d at 278). As noted in *Smith*, Congress or state legislatures may enact laws that provide *more* protection for religious liberty than is required by the Constitution, 494 U.S. at 890, and RLUIPA does just that.

oppresses, or causes worry").  Summarizing these definitions of "burden," the Court notes it is something that hinders, oppresses, or encumbers the use or value of land.  The word "substantial" has been defined as "important" or "significantly great."  *Substantial*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1174 (10th ed. 1993).  *See Substantial*, OXFORD ENGLISH DICTIONARY (2d Ed. 1989), https://www.oed.com/oedv2/00241089 (last visited Feb. 7, 2025) ("Of ample or considerable amount, quantity, or dimensions.  More recently also in a somewhat weakened sense, esp. 'fairly large'."); *see also Substantial, Adj. 1.5*, OXFORD ENGLISH DICTIONARY, https://doi.org/10.1093/OED/1064826432 (last visited Feb. 7, 2025) ("of an action or measure … having weight, force, or effect; effective, thorough").[34]    Applying the ordinary meaning of "substantial" and "burden," the First Circuit has explained that "substantial burden" does not encompass "*any* land use restriction on a religious organization," but it neither requires a showing that the burden imposed by a land-use regulation is "disabling" in order to be substantial.  *Roman Cath. Bishop of Springfield*, 724 F.3d at 96.

Indeed, upon review of these definitions, it appears that the best reading of the term "substantial burden," particularly in relation to a governmental imposition on the use of real property, based upon the words, context, and appropriate canons, is something that significantly or considerably hinders, restricts, impairs, or encumbers the use (or building or conversion) of such property for the purpose of religious exercise.  *See Cath. Healthcare Int'l Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 449 (6th Cir. 2023) (defining "substantial burden" to mean "some degree of severity" and to be "more than an inconvenience," and determining that a township's special land-use permit requirements imposed a substantial burden on the religious exercise of a

---

[34]    "'[S]ubstantially' suggests 'considerable' or 'specified to a large degree.'"  *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 491 (1999), *overturned due to legislative action* (2009) (interpreting provisions of the ADA and quoting Webster's Third New International Dictionary 2280 (1976)).

religious organization's plan to create a prayer trail with Stations of the Cross and stone mural on its wooded property because it would suffer substantial delay, uncertainty, and expense due to the imposition of the regulation);[35] *Civil Liberties for Urban Believers*, 342 F.3d at 761 (stating that a "land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise – including the use of real property for the purpose thereof within the regulated jurisdiction generally – effectively impracticable").[36]

---

[35]     The Sixth Circuit "has identified several factors that [it finds] helpful in determining whether a land-use regulation has imposed a substantial burden on a religious institution: (1) whether the religious institution has a feasible alternative location from which it can carry on its mission; (2) whether the religious institution will suffer substantial delay, uncertainty, and expense, due to the imposition of the regulation; and (3) whether a plaintiff has imposed a burden upon itself." *Cath. Healthcare Int'l Inc*., 82 F.4th at 452 (J. Clay, concurring) (internal quotations omitted) (citing *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1004 (6th Cir. 2017)).

         The First Circuit, in *Roman Cath. Bishop of Springfield*, fashioned a "functional approach" applying its own factors to the facts of a particular case, namely: (1) "whether the regulation at issue appears to target a religion, religious practice, or members of a religious organization because of hostility to that religion itself"; (2) "whether local regulators have subjected the religious organization to a process that may appear neutral on its face but in practice is designed to reach a predetermined outcome contrary to the group's requests"; and (3) "whether the land use restriction was imposed on the religious institution arbitrarily, capriciously, or unlawfully."  724 F.3d at 95-97 (citation omitted).  While these factors, compared to the Sixth Circuit's factors, seem detached from the text of RLUIPA, if the Court were to consider the First Circuit's factors, it would be particularly attentive to the parties' jointly stipulated facts that indicate irregularity in the nomination of the Church Building.  Specifically, that though the Ordinance only permits nomination of a religious structure for historic designation by the owner(s) of record, an explicitly unqualified individual nominated the Church Building in this instance and the nomination was accepted notwithstanding the improper nomination.  The denial of procedural protections available under the Ordinance (*e.g.*, the opportunity for cross-examination), would also tend to show a substantial burden on religious exercise according to the First Circuit's factors.

[36]     *But see Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (stating that "a 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.  Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct"); *Church of Universal Love & Music v. v. Fayette Cnty*., No. CIV. A. 06-872, 2008 WL 4006690, at *6 (W.D. Pa. Aug. 26, 2008) (finding no reason not to apply the Third Circuit's definition of "substantial burden" for institutionalized persons "across all sections of RLUIPA").

Here, the undisputed evidentiary record reflects significant and material encumbrances imposed on the Diocese's use of the Church Building by application of the City's Ordinance that took effect when the HRC accepted a citizen's nomination to designate it as a historic structure and then recommended approval of the designation to the City Council. By the express terms of the Ordinance, the City precluded the Diocese from demolishing or making any exterior alterations to the Church Building beginning two business days after the HRC mailed notice of the nomination, here April 13, 2020, meaning the Diocese no longer could make any "alteration of exterior architectural features which can be seen from a public street or way" including "the type and design of all windows, doors, lights, stair railings, and other fixtures[.]" Ord. §§ 1101.02(e) and 1101.03(c)(1). At this point, even before the impending vote by City Council, the Diocese was not permitted to demolish the Church Building nor permitted to make alterations to any exterior architectural features unless it received the HRC's approval. Ord. § 1101.03(c)(1). Of notable consequence, the Diocese has been and remains precluded from removing stained glass windows and other sacred fixtures for reuse by its other parishes or ecclesiastical entities (*i.e.*, by religious assemblies, institutions, or persons per 42 U.S.C. § 2000cc(a)(1)) despite the Diocese's long-standing stated intention of doing so upon completion of the canonical appeal at the Apostolic Signatura of the Holy See[37] pursuant to Bishop Zubik's 2017 Canonical Decree.

---

[37]    In seeking to minimize the burden placed on the Diocese, the City incorrectly contends that the Church Building "has been closed to worship *for years*." (Docket No. 71 at 14) (emphasis added). Rather, at the time the HRC accepted the nomination and recommended designating the Church Building as a historic structure, Bishop Zubik's most recent Canonical Decree was the subject of a then-pending appeal at the Apostolic Signatura, the outcome of which could have reversed his decision and caused the Church Building to be reopened as it had been before. (*See* Docket No. 1, ¶¶ 22, 27). Consequently, the Church Building was not fully and finally closed pursuant to the Roman Catholic Church's Canon Law and doctrines until the Apostolic Signatura issued its decision on October 30, 2022, long after the City imposed encumbrances on the Diocese's use of the Church Building due to its impending historic designation. It is also noteworthy that, for periods when such ecclesiastical property goes out of service for religious worship, "[a]ccording to Roman Catholic canon law, . . . the Bishop comes under an obligation to protect the religious ornamentation in and on the building so that it is not put to 'sordid' use." *Roman Cath. Bishop of Springfield*, 724 F.3d at 84. "Under canon law, a sordid use is one that is 'detrimental to the good of souls,'

The City effectively supplanted the Diocese's control over the external religious ornamentation and symbols affixed to the Church Building.  By doing so, the City hindered, restricted, or encumbered the Diocese's religious use of its stained-glass windows and other sacred fixtures of the Church Building.  Contrary to the City's argument, these encumbrances impose more than a "minimal effect of limiting how the Diocese could alter the street facing façade" of the Church Building.  (Docket No. 71 at 14).  The City's example that the Diocese was unconstrained from transferring ownership of the Church Building (*see id.*) actually crystalizes the extent of the encumbrance because, while the Diocese may sell the Church Building, the Diocese may not sell the Church Building *sans* its sacred features to the extent such features are encompassed within any street-facing façade of the Church Building despite the Diocese's determination that such features are to be re-*used* by its faith community elsewhere.  Rather, these governmental impositions *totally prohibit* the Diocese from reusing property like stained-glass windows and other fixtures of religious devotion and worship.  This prohibition imposes a significant and material encumbrance upon the Diocese's use of its property for the purpose of religious exercise such that it imposes a "substantial burden" within the meaning of 42 U.S.C. § 2000cc(a)(1) and is not made any less so by the City's overture that the Diocese may ask for governmental permission before using its own property for the purpose of religious exercise.

In attempting to minimize the import of the burden it has placed on the Diocese's religious

---

including any use that involves '[t]he denunciation of the Catholic Church and the Catholic Faith, the desecration of Catholic objects of devotion and worship or even any disrespectful or casual treatment of such objects, and/or the proselytizing of Catholics." *Id.* at 84 n. 2 (citation omitted); 1983 Code of Canon Law, c. 1222; *see also* Nicole Stelle Garnett & Patrick E. Reidy, *Religious Covenants*, 74 FLA L. Rev. 821 (2022); *see also supra* n. 4.  Indeed, exercising stewardship of the Church Building in such a way as to prevent it from "sordid uses" is in itself a "use … of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc-5(7)(B).

use of the Church Building, the City miscomprehends the breadth of RLUIPA's robust religious liberty protections by contending that the restrictions it imposed upon the Diocese here do not restrict any of the Diocese's beliefs nor prevent its services but merely affects its ability to change the appearance of its Church Building. (Docket No. 71 at 14). In the City's view, such imposition is a minimal one, and the City notably asserts that a "basic tenet of the faith cannot be so fragile as to be substantially burdened by a requirement to keep the appearance of their building as it has appeared since its construction." (*Id.*). However, RLUIPA protects persons and their faith communities and institutions from impositions on their religious exercise—in this case, carried out through use of real property, 42 U.S.C. § 2000cc-5(7)(B)—regardless of whether the exercise at issue is compelled by, or central to, a system of religious belief and regardless of whether the imposing government considers the faith of the person or community at issue too "fragile" to merit statutory protection. *See* 42 U.S.C. § 2000cc-5(7)(A). The Court cannot conceive of a more misguided enterprise than to entertain defenses to RLUIPA or First Amendment claims premised on the purported sturdiness or fragility of the tenets of a plaintiff's faith. The City's argument in this regard improvidently invites the Court to determine what *really matters* to religious assemblies, institutions, and adherents. The City misses the point. The test for a RLUIPA violation is not whether a land use regulation has substantially burdened a compulsory tenet of a person's faith (whether sturdy or fragile) but whether the land use regulation substantially burdens a person's use of property for religious exercise. It is not for the courts to determine whether an aspect of religious exercise is basic or central to a particular faith. *See Biel v. St. James Sch.*, 911 F.3d 603, 620 (9th Cir. 2018) (Fisher, J. dissenting) (admonishing courts against entangling themselves in evaluations of what a church "really believes" and "how important [a] belief is to the church's overall mission" (quoting *Hosanna-Tabor Evangelical*

*Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 206 (2012) (Alito, J., concurring))), r*ev'd and remanded sub nom. Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020)).

For the foregoing reasons, and based on the undisputed factual record, the Diocese has shown as a matter of law that the City imposed a substantial burden on its use of the Church Building for the purpose of religious exercise.

        2.      *Whether the City had a compelling reason to impose a substantial burden on the Diocese and furthered it by least restrictive means*

Because the Diocese has carried its burden to show a substantial burden, the City must demonstrate that its imposed burden furthers a compelling governmental interest in the least restrictive means possible. 42 U.S.C. § 2000cc-2(b); *Washington*, 497 F.3d at 283. The City seems to suggest (in arguments that are commingled with Constitutional arguments) that its interest here is to "enhance the quality of life by preserving the character and desirable aesthetic features of a city." (Docket No. 71 at 15). The purposes of historic designation in the Ordinance are found in Section 1101.01(b), and among them one reason given for the Ordinance's historic preservation powers is that the City seeks "to preserve and restore the qualities of the City … relating to its history, culture, and traditions," "to preserve and restore harmonious outward appearance of structures," and "to afford the City … the opportunity to acquire or arrange for the preservation of designated districts or structures," among other things. As the Diocese points out, the Ordinance achieves these ends by historic designation, which is enforced with penalties such as fines and imprisonment. *See* Ord. § 1101.10 (Penalties for Non-Compliance). The City cites *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 129, 138 (1978), wherein the Supreme Court held that historic designation of New York's Grand Central Terminal was not a 5th Amendment "taking," for support. However, as noted, *Penn Cent.* is a takings case and merely states that "preserving structures and areas with special historic, architectural, or cultural

significance is an entirely permissible governmental goal," *id.* 129, that is, the case stands for the proposition that governments may enact land-use restrictions that preserve the character and desirable aesthetic features of a city unto enhancement of residents' quality of life. The City's reliance on *Knights of Columbus, Council No. 94 v. Lexington*, wherein the First Circuit determined that aesthetic preservation qualified as a *significant* governmental interest for purposes of intermediate scrutiny of a free speech challenge to a content-neutral regulation, 272 F.3d 25, 32 (1st Cir. 2001), likewise only supports the City's argument to the extent that it shows the City's purpose—preserving structures for historical and aesthetic reasons—is a permissible one. In this case, unlike in *Knights of Columbus*, it is incumbent on the City—which has imposed a substantial burden—to provide a *compelling reason* that is achieved by *least restrictive* means.

In the First Amendment context, preservation and beautification of cities have not been found to be "interests of the highest order" that would satisfy strict scrutiny if narrowly tailored. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (*McDaniel v. Paty*, 435 U.S. 618, 626 (1978)); *WR Prop. LLC v. Twp. of Jackson*, No. CV173226MASDEA, 2021 WL 1790642, at *12 (D.N.J. May 5, 2021) ("Given this high bar, courts have held that 'aesthetics,' traffic, and 'community character' are normally not compelling interests." (quoting *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 418-420 (S.D.N.Y. 2015)). For instance, in *Keeler v. Mayor & City Council of Cumberland*, the court found that the City had failed to "assert[] that historic preservation is a compelling interest of government" where "Courts and commentators are apparently unanimous in opining that it is not. 940 F. Supp. 879, 886 (D. Md. 1996) (citing, *inter alia*, *First Covenant Church v. City of Seattle*, 840 P.2d 174, 185 (Wash. 1992) (en banc) ("The possible loss of significant architectural elements is a price we must accept to guarantee the paramount right of religious freedom.").

Ultimately, in *Keeler*, the court held "as a matter of law, that the City's refusal to grant the Church a Certificate of Appropriateness for the demolition of its monastery impermissibly violate[d] the Church's right to the free exercise of religion protected by the First Amendment" such that the Church was "entitled to summary judgment" on that claim. *Id.* at 886-87.[38]

Considering the City's argument against a finding in the Diocese's favor with respect to the RLUIPA claim, the Court ultimately agrees with the Diocese that on this record there is no compelling government interest in the City's exercise of control over the Church Building, nor is the City's pursuit of historic designation of the Church Building the least restrictive means of achieving its stated interests. The City's failure in this latter regard is underscored by the fact that the Ordinance, by express design, uses a less restrictive means of achieving its goals of aesthetic and historical preservation by requiring religious landowners to be the nominators of their own structures. Despite the protection afforded owners of religious structures in the Ordinance, Ord. § 1101.03(a)(1)(a)(7), the City ignored that requirement and instead encumbered the Diocese's use of the Church Building for the purpose of religious exercise. The Ordinance, as written, seeks to accomplish its goals of preserving urban aesthetics in a way that avoids imposing land-use restrictions on religious exercise without consent, but here failed to honor that less restrictive means of accomplishing its goals.[39] The Court has thus determined not only that the Ordinance's application to the Church Building was substantially burdensome on the

---

[38]    The Court acknowledges that in *Keeler* there was a denial of a certificate of appropriateness that perhaps made that case more evidently ripe. But the Court has already addressed ripeness and is satisfied that the requirements thereof are satisfied for the Diocese's RLUIPA claim.

[39]    On the face of the Ordinance, religious structures may only be nominated for historic designation upon consent of the owner of said structure. Ord. § 1101.03(a)(1)(a)(7). For that reason, to the extent that the Diocese has framed its challenges to the Ordinance as facial, the Court rejects such claims. This case undeniably arises from the City's failure to act according to a thoughtful process for historic designation that, by design, avoids unconsented to restrictions of property use for the purpose of religious exercise.

Diocese's religious exercise, but also that the City cannot carry its burden to show a compelling interest and least restrictive means on the record before the Court. Accordingly, the Court will grant the Diocese's motion for summary judgment with respect to its RLUIPA claim on liability, and will award declaratory and injunctive relief[40] enjoining the City's consideration of the Church Building's current nomination for historic designation.[41]

###    D.    Violations of Pennsylvania Statutory Law (Count VII)

The Diocese alleges in its Complaint that should the City designate the Church Building as a historic structure, the City will be violating Pennsylvania law by acting beyond the powers granted by Pennsylvania statute (prohibited by 53 Pa. Cons. Stat. § 2962), insofar as 10 P.S. § 81 completely vests the power to control church property in the Bishop or other appropriate religious

---

[40]    Regarding the Diocese's request for compensatory damages (Docket No. 60 at 2), the Court notes that the Supreme Court has determined that the States have not waived their sovereign immunity to suits for damages under the RLUIPA. *Sossamon v. Texas*, 563 U.S. 277, 288 (2011). In the absence of any briefing from the parties on damages, it's the Court's determination that monetary damages other than attorneys fees, *see* 42 U.S.C. § 1988(b), are unavailable with respect to the RLUIPA claim.

[41]    Because the Court has determined that the Diocese is entitled to summary judgment on its RLUIPA claim, the Court will not reach the claim asserted by the Diocese under the First Amendment and the parallel provisions of the Pennsylvania Constitution because "RLUIPA is broader than the First Amendment." *Robinson v. Superintendent Houtzdale SCI*, 693 F. App'x 111, 117 (3d Cir. 2017); *Guru Nanak Sikh Soc'y v. Cnty. of Sutter*, 326 F. Supp. 2d 1140, 1162 (E.D. Cal. 2003) ("Under the prevailing constitutional jurisprudence, the Free Exercise Clause is less protective of religious freedom than RLUIPA" so "because plaintiff's claims do succeed under RLUIPA, there is no need for the court to consider whether they also succeed under the lower level of scrutiny afforded by the Free Exercise Clause" particularly "given [courts'] overarching obligation to avoid the resolution of constitutional questions to the extent possible."), *aff'd sub nom. Guru Nanak Sikh Soc. v. Cnty. of Sutter*, 456 F.3d 978 (9th Cir. 2006). The Diocese's First Amendment claim was predominantly framed as a Free Exercise claim. To the extent it was also framed as an Establishment Clause claim, the Diocese failed to argue how the City's actions violated the Establishment Clause given the Supreme Court's abandonment of *Lemon. Kurzman,* 403 U.S. 602 (1971). *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535–36 (2022) ("In place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"). Therefore, not only is it unnecessary for the Court to reach the Diocese's Establishment Clause claim but the Diocese's argument for summary judgment on that claim is so sparse as to be forfeited. *See Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) (arguments raised in passing are considered forfeited). Not all the Diocese's constitutional claims are addressable on narrower grounds; therefore, the Court addresses herein certain other constitutional claims asserted by the Diocese.

authority.  Essentially, the Diocese is arguing that 10 P.S. § 81 preempts the City's attempt to exercise control over the Church Building by historic designation.  (Docket No. 1, ¶¶ 113-118). With respect to this state-law claim, the parties agree on a few things, including that the City is organized pursuant to the Home Rule Charter and Optional Plans Law, codified at 53 Pa C.S.A. § 2901, and is thus subject to the limits of municipal power articulated at 53 Pa. C.S.A. § 2961. Accordingly, the City may not exercise powers "contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of this Commonwealth."  *Id.* § 2962(c)(2).  The parties stipulate that the Church Building itself is a consecrated structure and is holy property according to Catholic practice and that the objects affixed thereto (*e.g.*, stained-glass windows) are also holy.  (Docket No. 59, ¶¶ 10-20, 101-05).

10 P.S. § 81 states (generally), that for any real or personal property that has been or will be conveyed to an "ecclesiastical corporation,"  for church use, such property:

> shall be taken and held subject to the control and disposition of such officers or authorities of such church … having a controlling power according to the rules, regulations, usages, or corporate requirements of such church … which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church … shall belong[.]

The statute goes on to say that:

> nothing herein contained shall authorize the diversion of any property from the purposes, uses, and trusts to which it may have been heretofore lawfully dedicated, or to which it may hereafter, consistently herewith, be lawfully dedicated … provided, [a]ll charters heretofore granted for any church … without incorporating therein the requirement that the property, real and personal, of such corporation, shall be taken, held, and enure subject to the control and disposition as herein provided, but which are in other respects good and valid, and shall be in all respects as good and valid, for all purposes, as if the said requirement had been inserted therein when the said charters were originally granted; and the title to all property,

44

real and personal, heretofore bequeathed, devised, or conveyed to
such church … or which may have heretofore been granted or
conveyed by such corporation, shall be firm and stable forever, with
like effect as though the said requirements had been contained in the
charter of such corporation when the same was originally granted:
Provided, [t]hat all property, real and personal, held by such existing
corporation, shall enure, and be taken and held, subject to the control
and disposition as herein provided, with like effect as though such
provision had been inserted in the charter of such corporation when
originally granted, any other or different provision therein
notwithstanding.

*Id.*  Courts in the Commonwealth of Pennsylvania have interpreted 10 P.S. § 81 in cases where

they have been called on to determine whether "members of a Roman Catholic parish lack standing

to challenge the suppression or dismemberment of a parish."  *Pagac v. Diocese of Pittsburgh*, No.

1350 C.D. 2018, 2020 WL 477209, at *2 (Pa. Commw. Ct. 2020) (citing cases for support of its

determination that parishioners lacked standing to interfere with the suppression and merger of a

church).

Here, the Diocese interprets 10 P.S. § 81 as granting the Bishop exclusive authority over

church property without exception, thus precluding the City from exercising its municipal

authority to designate the Church Building as a historic structure or to otherwise interfere with the

Bishop's exclusive control of the property.  The Diocese argues that this preemption of any

regulation of the Church Building pursuant to 10 P.S. § 81 is "a matter of facial invalidity as

applied to the Diocese in light of … a state statute that expressly governs ownership and disposition

of church property such as the Church Building."  (Docket No. 70 at 22).  The Diocese thus argues

that 10 P.S. § 81 totally preempts the disposition of church property which is subject to regulation

by Canon Law at the sole discretion of the Bishop because municipalities organized under a home

rule charter may only exercise powers that are *not denied* by the Commonwealth's General

Assembly.  (*Id.* (citing *St. Peter's Roman Cath. Par. v. Urb. Redevelopment Auth. of Pittsburgh*,

146 A.2d 724 (Pa. 1958)). The Diocese's argument is that the statute "must be interpreted pursuant

to its plain language" and that the plain language dictates that the City may not engage in land use

planning contrary to 10 P.S. § 81. (Docket No. 76 at 14). The Diocese consequently asks the

Court to declare the Ordinance to be in violation of, *inter alia*, Pennsylvania statute, and to

permanently enjoin the City from enforcing the Ordinance against the Diocese. (*Id.* at 15).

The City responds that it has authority to engage in land use planning over property owned

by religious institutions such as the Diocese, and points out that the cases relied on by the Diocese

for this claim largely relate to instances wherein parishioners challenged their churches' use of

property. (Docket No. 71 at 19-20). The City argues that those cases are "easily distinguishable

compared to a municipality utilizing a facially neutral section of a zoning ordinance in an effort to

protect the … real property within its borders." (*Id.* at 21). The City argues there is no conflict

among the City's "historical preservation zoning code sections and 10 P.S. 81." (*Id.*).[42]

Having considered the parties' arguments, the Court finds that though 10 P.S. § 81 places

control of church property in the hands of church authorities pursuant to their religious canons,

there is no precedential authority that it preempts the Ordinance and its mechanisms for

designating religious and other structures as historic structures. That is, the Court rejects the

Diocese's argument that 10 P.S. § 81 totally preempts the Ordinance with respect to religious

---

[42]    As the Court determined more generally *supra*, the Diocese's assertion of a violation of
Pennsylvania law is ripe at this time. Ripeness of an action for declaratory and injunctive relief is
determined pursuant to the *Step-Saver* factors, which are (1) "the 'adversity of the interest' between the
parties to the action"; (2) "'conclusiveness' of the declaratory judgment"; and (3) "'the practical help, or
utility' of the declaratory judgment." *Travelers Ins.*, 72 F.3d at 1154. As for the alleged violation of state
law, the parties' interests are adverse insofar as nomination and the imminent prospect of historic
designation by the City Council means that harm will result without a declaratory judgment. The Court has
been presented with a "concrete set of facts" for this claim such that its adjudication of the parties' dispute
will not produce an advisory opinion. And for utility, the Court is satisfied that a declaratory judgment will
be "of some practical help to the parties." *Id.* at 1156.

structures. Preemption prohibits municipal action that is "contrary to the state" without prohibiting complementary regulation by local government. *See Duff v. Northampton Twp.*, 532 A.2d 500, 503-04 (Pa. Commw. Ct. 1987) ("[L]ocal legislation cannot permit what a state statute or regulation forbids or *prohibit what state enactments allow*. Beyond such manifest conflicts with state policy, our cases establish that a municipality is precluded from exercising its power in an area which the state has preempted." (emphasis in original)), *aff'd*, 550 A.2d 1319 (Pa. 1988); *UGI Utilities, Inc. v. Reading*, 179 A.3d 624, 629 (Pa. Commw. Ct. 2017) ("State law preempts local ordinances in three situations: 1) where there is a preemption clause expressly restricting local regulation; 2) where the state law is intended to occupy the entire field and permit no local regulation; and 3) where the ordinance conflicts with state law either because compliance with both is impossible or because the ordinance stands as an obstacle to the execution of the full purposes of the state law.").

Although the Diocese argues that 10 P.S. § 81 preempts the Ordinance, it does not appear to the Court that 10 P.S. § 81 has been invoked ever before to defeat historic designation of a church property. The cases cited by the Diocese in support of its position generally pertain to congregants who challenged disposition of church property by church leaders. *See e.g.*, *St. Peter's Roman Cath. Par.*, 146 A.2d at 726 (explaining that members of a parish had no right to challenge the Bishop's decisions about disposition of church property); *Canovaro v. Bros. of Ord. of Hermits of St. Augustine*, 191 A. 140, 146 (Pa. 1937). Moreover, the Ordinance, as a local law, carefully avoids contradicting 10 P.S. § 81 by vesting exclusive right to nominate a religious structure in the "owner(s) of record of the religious structure." Ord. § 1101.03(a)(1)(a)(7). Thus, 10 P.S. § 81 and the Ordinance are not in opposition, but are in fact complementary as the latter provides for—in this case—the Bishop's determination of whether nomination for historic

47

designation would be appropriate, rather than permitting parishioners or others to make that determination. While the Pennsylvania Home Rule Charter law prohibits a municipality from exercising powers contrary to or in limitation or enlargement of the "powers granted by statutes which are applicable in every part of this Commonwealth," 53 Pa. C.S.A. § 2962(c)(2), it does not appear that 10 P.S. § 81 limits the application of land use regulations with respect to church properties in Pennsylvania. As the City points out, if 10 P.S. § 81 operated thus, it would oddly result in affording religious entities that own property with blanket exclusion from local zoning regulations. (Docket No. 63 at 10). For these reasons, the Court will deny the Diocese's motion for summary judgment as to its Pennsylvania state-law claim, grant the City's motion for summary judgment as to the same, and dismiss the Diocese's state-law claim at Count VI.

### E.    Constitutional Claims:  Due Process (Count IV)

The Diocese has alleged and argues that the City's actions toward designating the Church Building as a historic structure and the steps it has taken so far in pursuit of that historic designation deprived it of due process in violation of the Fourteenth Amendment.[43] As indicated above, the Diocese alleges that the way in which the City is imposing and implementing the Ordinance with respect to the Church Building violates the Ordinance itself (§ 1101.03(a)(1)(a)(7)) and, in this count, that it deprived it of due process. The Diocese highlights being denied the opportunity to confront the City or any witnesses at the public hearing where it was given a mere three minutes to speak. (Docket No. 61 at 28). In support of its motion for summary judgment, the City largely relies on its argument against ripeness of the Diocese's claims. For many of the same reasons

---

[43]    The Diocese also argues that the Ordinance is unconstitutionally vague and that the attempted designation of the Church Building as a historic structure is arbitrary. However, those arguments are too under-developed in the briefing for the Court to address and resolve them. *See Higgins*, 62 F.4th at 763 (forfeiture).

discussed *supra* with respect to ripeness more generally, the Court is satisfied that this claim is also ripe.

Section 1 of the Fourteenth Amendment to the United States Constitution provides that: "[n]o State … shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Evaluation of an alleged denial of the Fourteenth Amendment's guarantees requires a two-step analysis wherein: the Court "first must ask whether the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property'; and, if protected interests are implicated, [the Court] then must decide what procedures constitute 'due process of law.'" *Robb v. City of Philadelph*ia, 733 F.2d 286, 292 (3d Cir. 1984).

In this case the deprivation of the interest at stake involves both liberty and property. Encumbrances imposed by the acceptance and processing of the nomination for designation of the Church Building as a historic structure is alleged to have occurred without procedures that constitute due process of law. The parties agree that the Ordinance states that the owner of any nominated historic structure will be "afforded the opportunity for reasonable examination and cross-examination of witnesses at public hearings on said nomination," and they agree that the Diocese was "not provided the opportunity to cross-examine or confront any adverse witnesses during City Council's hearing on the designation of the Church Building as a 'Historic Structure'" on November 10, 2020. (Docket No. 59, ¶¶ 94-95). For purposes of the Court's analysis, the Court accepts those stipulated facts and assumes that the interests at stake fall within the Fourteenth Amendment's protective scope. The question, then, is whether the process by which the City has sought to encumber the Diocese's interests constituted constitutionally adequate due process of law. To that end, "[i]t is the general rule that due process 'requires some kind of a hearing *before*

the State deprives a person of liberty or property.'"  *Johnson v. Morales*, 946 F.3d 911, 921 (6th

Cir. 2020) (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original)).  As the

City indicates in its brief in opposition to the Diocese's motion for summary judgment, the process

for churches to be designated as historic structures requires that a church may only be nominated

for designation by its owner, and that a process ensues after wherein nomination is followed by

review, public input, and a vote by the HRC and then City Council, which generally requires an

affirmative vote of six council members for designation.  (Docket No. 71 at 9-10).

While the Court is, as indicated above, convinced on the record currently before it that the

Diocese was denied what it was owed under the Ordinance, the Court is not prepared to say as a

matter of law that the process the Diocese received to date was *constitutionally* inadequate.  Courts

in this Circuit have explained that the availability of judicial mechanisms under state law to

challenge decisions like the historic designation in question here, *e.g.*, permitting decisions,

constitutes "adequate due process."  *Kapish v. Advanced Code Grp.*, No. 3:15CV278, 2015 WL

5124143, at *6 (M.D. Pa. Sept. 1, 2015); *Bello v. Walker*, 840 F.2d 1124, 1128 (3d Cir. 1988),

*overruled on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d

392 (3d Cir. 2003).  It does not appear to the Court that there is any basis for deciding that the

Fourteenth Amendment requires that the Diocese have an opportunity to confront witnesses,

though the Diocese repeatedly cites its lack of such an opportunity as the prime example of how it

was denied due process of law.  (Docket No. 70 at 17).  The opportunity to confront witnesses is

surely an entitlement under the Ordinance, but the City's flagrant and unexplained failure to

comply with the terms of its Ordinance does not necessarily prove that the City deprived the

Diocese of due process of law under the Fourteenth Amendment.  The Diocese does not proffer

any controlling case law to establish otherwise.  For that reason, the Court will deny the Diocese's

motion for summary judgment on its procedural due process claim.  And, having determined that the Diocese's procedural due process claim fails as a matter of law on the stipulated factual record, the Court will further grant the City's motion for summary judgment as to this claim because there are no disputed material facts and the City is entitled to judgment as a matter of law.[44]

### F.    Constitutional Claims: Regulatory Taking in Violation of the Fifth and Fourteenth Amendments (Count V)

At Count V of its Complaint, the Diocese has alleged that nomination and designation of the Church Building as a historic structure constitutes a regulatory taking of property.  The Diocese argues that: "The City's threatened actions are a regulatory taking prohibited as a matter of law because they interfere with a liturgical decision" (Docket No. 61 at 29 n. 18), *i.e.*, fair use of the property, without just compensation.[45]    The City, for its part, acknowledges that the facts underlying this dispute constitute "a form of a takings case."  (Docket No. 71 at 7).  In support of

---

[44]    The Court notes that the Diocese appears to have asserted its claim that the City denied it constitutionally adequate process directly under the Fourteenth Amendment of the Constitution, as opposed to raising this (and other) constitutional claims against the City pursuant to 42 U.S.C. § 1983.  (Docket No. 1 at 15-16).  Some courts have determined that constitutional claims against state actors *must* be vindicated via Section 1983.  *Rogin v. Bensalem Twp.*, 616 F.2d 680, 686-87 (3d Cir. 1980) ("It is now settled that cities and other municipal bodies … are 'persons' within the meaning of § 1983.  Therefore, it would be a redundant and wasteful use of judicial resources to permit the adjudication of both direct constitutional and § 1983 claims where the latter wholly subsume the former."); *Pauk v. Bd. of Trustees of City Univ. of New York*, 654 F.2d 856, 865 (2d Cir. 1981) ("Moreover, when § 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available."); *Chase v. City of Portsmouth*, No. CIV.A. 2:05CV446, 2005 WL 3079065, at *10 (E.D. Va. Nov. 16, 2005) (addressing an equal protection claim: "a plaintiff must use Section 1983 as a vehicle to enforce causes of action implied directly from the Constitution"); *Cappel v. State Dep't of Nat. Res.*, 905 N.W.2d 38, 49 (Neb. 2017) ("Therefore, 42 U.S.C. § 1983 provided the Cappels with the exclusive remedy to obtain damages for alleged violations of procedural and substantive due process under the U.S. Constitution.").  *But see Lewis v. City of Aurora*, 916 F.2d 715 (7th Cir. 1990) ("When the defendant is a state actor, § 1983 and direct litigation may be interchangeable, the choice between them may be adventitious." (quoting *Bieneman v. City of Chicago*, 864 F.2d 463, 469 (7th Cir. 1988))).

[45]    The Diocese adds that it would be impossible to justly compensate it for a taking in this case because no compensation could adequately recompense it for the infringement of religious liberties imposed by the nomination and impending designation.  (Docket No. 1, ¶ 99).

its motion for summary judgment, the Diocese argues that the City's enforcement of the Ordinance against the Church Building is a regulatory taking in part because it has a noneconomic interest in free expression of religion and the City's threatened actions will interfere with a liturgical decision. (Docket No. 61 at 29 n. 18).  The City protests that any takings claim is not yet ripe, and further argues that its threatened actions do *not* constitute a taking without just compensation because localities may impose restrictions on property that are "substantially related to the promotion of the general welfare" where the property holder is not denied "reasonable beneficial use" thereof. *Penn Cent. Transp. Co.*, 438 U.S. at 138.  Because questions of finality and ripeness for takings claims are somewhat complex due to recent developments in takings case law—*e.g.*, *Knick v. Twp. of Scott*, 588 U.S. 180 (2019)—the Court herein will specify its earlier ripeness analysis with respect to the takings clause claim.

The parties argue that the Court's assessment of ripeness for a takings claim is guided by *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985).  In *Williamson Cnty.* the Supreme Court held that "a property owner whose property has been taken by a local government ha[d] not suffered a violation of his Fifth Amendment rights— and thus [could not] bring a federal takings claim in federal court—until a state court [had] denied his claim for just compensation under state law."  *Knick*, 588 U.S. at 184 (citing *Williamson Cnty.*, 473 U.S. at 172).  But in *Knick* the Supreme Court determined that the state-litigation requirement created a Catch-22 for an individual whose property had been taken by a local government, overruled *Williamson Cnty.*, and decided that a "property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time."  *Id.* at 185.  The Court held that "someone whose property has been taken by a local government has a claim under § 1983

for a 'deprivation of a right secured by the Constitution' that he may bring upon the taking in federal court." *Id.* at 194. That said, in *Knick*, the Supreme Court did not overrule the part of *Williamson Cnty.* that demands finality for a takings claim. *See id.* at 188 ("*Knick* does not question the validity of this finality requirement, which is not at issue here.").

"Th[is] finality requirement is relatively modest" and "[a]ll a plaintiff must show is that 'there is no question about how the "regulations at issue apply to the particular land in question."'" *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 478 (2021) (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997)). The City argues that: (a) the Diocese's takings claim is "not ripe if Plaintiff 'did not seek compensation through the procedures the State has provided for doing so'" (Docket No. 71 at 21 (citing *Perano v. Twp. of Tilden*, No. 09-00754, 2010 U.S. Dist. LEXIS 36781 (E.D. Pa. Apr. 12, 2010))); and (b) the Diocese's takings claim is "not ripe until the government entity charged with implementing the regulations has reached a final decision[.]" (Docket No. 71 at 21 (citing *Williamson Cnty.*, 473 U.S. at 186)). The first part of that argument is foreclosed by *Knick*, and the City appears to provide next to no support for its finality argument. Assuming for the sake of argument that the acceptance of the Church Building's nomination for designation is a sufficiently final decision resulting in a regulatory taking, the Court will evaluate whether the Diocese can prevail at summary judgment on its argument that the City's encumbrances of its property constitutes a regulatory taking.[46]

---

[46] The Court notes there is some question about whether regulatory takings may be remediated by declaratory relief in light of Chief Justice Roberts's rejection of injunctive relief to prevent a taking in *Knick*. *See Cnty. of Butler v. Wolf*, No. 2:20-CV-677, 2020 WL 2769105, at *4 (W.D. Pa. May 28, 2020) ("Here, the declaratory relief sought by Plaintiffs—that the [Defendant's] business shutdown orders effectuated an unconstitutional taking—would be the functional equivalent of injunctive relief. The Supreme Court's decision in *Knick* forecloses such relief."). However, in this matter the Diocese has also sought compensatory damages, and not just declaratory relief. Therefore, the Court treats the rest of its analysis as premised upon interpreting the Diocese's regulatory takings claim as one for damages,

Other than seizures of property, regulatory burdens may be so intense as to constitute a taking.  *Taverna v. Palmer Twp.*, No. 5:20-CV-0812-JDW, 2020 WL 5554387, at *10 (E.D. Pa. Sept. 16, 2020) (quoting *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017)).  A government regulation constitutes a taking when it either "denies all economically beneficial or productive use of land," or potentially when it "impedes the use of property without depriving the owner of all economically beneficial use" considering the "economic impact of the regulation on the claimant … the extent to which the regulation has interfered with distinct investment-backed expectations and … the character of the governmental action."  *Id.* (quoting *Murr*, 582 U.S. at 393).  The Diocese argues that "[u]pon [the Church Building's] nomination, the Diocese was no longer permitted to alter its property in any way" and because the "Church Building is unfit for use" the Diocese cannot "use [it] as a place of worship, nor can it obtain the religious artifacts and items attached thereto, which cannot be put to 'sordid use' per Canon Law."  (Docket No. 70 at 24).

The question presented by the Diocese's argument is whether this alleged loss of use is so severe as to deprive the Diocese of all "economically beneficial and productive use of land."  *LXR RS V, LLC v. Mun. of Norristown*, No. 2:19-CV-01397-JDW, 2019 WL 4930157, at *3 (E.D. Pa. Oct. 7, 2019).  The courts lack a "precise formula" to make that determination, and instead must perform an "ad hoc, factual inquir[y] into the circumstances of [any] particular case."  *Id.* (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224 (1986)).  The Diocese argues that the interest at stake, *i.e.*, the right that has been and will continue to be infringed on, is the noneconomic right to freedom of religious expression and interference in liturgical decisions. (Docket No. 70 at 23-24 (citing *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d

---

notwithstanding the allegation in the Diocese's Complaint that no "just compensation [is] possible" with respect to the City's incursion on its religious liberties.  (Docket No. 1, ¶ 99).

1349, 1358 (11th Cir. 2013) and *Keeler*, 940 F. Supp. at 887-88).  In response, the City argues that its Ordinance and the application thereof does not constitute an unconstitutional taking if it "substantially advances legitimate state interests" and does not impair "economically viable use of … land." (Docket No. 71 at 19).  In support of its argument, the City again points to the Supreme Court's decision in *Penn Cent. Transp. Co.*, 438 U.S. at 129 and argues that land-use restrictions for aesthetic enhancement do not constitute a taking under the Fifth Amendment.  The City additionally argues that the only restrictions on the Diocese in this matter is that it must seek prior approval before changing the exterior of the Church, just like any other owner of a property that is designated as a historic structure.  And, from the nomination process itself, the City argues that the only limitation that Plaintiffs have endured to date is that they have not in the interim been permitted to alter the exterior of the Church Building on that portion of the Church that is viewable from a public street or right of way.  The City further notes that the Diocese could have requested a Certificate of Appropriateness if it required an exception to the limitations imposed by the Church Building's nomination.

The guiding principle of the courts' takings jurisprudence is the idea that the "Fifth Amendment's guarantee is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Cent. Transp. Co*, 438 U.S. at 123-24 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). In *Penn Cent.* the Supreme Court reviewed "several factors" of "particular significance" in determining when a taking has occurred.  *Id.* at 124-25.  In that discussion, the Supreme Court acknowledged that land-use regulations were frequently upheld even though they can "destroy[] or adversely affect[] recognized real property interests." *Id.*  The Court explained that zoning laws were the "classic example" of such regulations and that courts have found the imposition of land-

use regulations through zoning to be "permissible governmental action even when prohibiting the most beneficial use of property." *Id.* The Court further explained in that case where landmark designation prevented development of the historic Penn Terminal, such restriction had not interfered with Penn Central's "primary expectation concerning the use of the parcel" and did not prevent Penn Central from a "reasonable return" on investment. *Id.* at 136. In that case, the Supreme Court largely determined there had not been a taking though the plaintiffs were rebuffed in their desired capitalization on air rights above the Terminal. *Id.* at 137. *Penn Cent.* and similar cases restate the regulatory takings standard that indicates that such a taking is only unconstitutional if it "amounts to a taking 'where regulation denies all economically beneficial or productive use of land.'" *Keeler*, 940 F. Supp. at 888 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992)). We can compare *Penn Cent.* with *Keeler* to understand the contours where, in *Keeler*, the court in that matter determined there had been a taking where a church that was part of a historic district sought and was refused a certificate of appropriateness to demolish a monastery that would have cost more than $2,000,000 to repair because the application of the historic zoning ordinances to the church made the property "economically useless." *Id.*

The challenging distinction in this case is that, on this record, it is difficult to tell whether the Diocese has been denied all economically viable use of the Church Building.[47] Regardless of

---

[47]    In *Keeler*, the Court examined the record and explained that there were indicia that the city's building engineer wrote to the reverend of the church to say that the owner of the church building was required to immediately perform protective maintenance that would have cost the Church upwards of $2,000,000. *Keeler*, 940 F. Supp. at 888. That demand was economically infeasible for the church, putting the church in a bind where it could not afford to keep its building in a manner compliant with the City's requirements, nor could it demolish it and use the property. *Id.* Those facts are meaningfully more specific than the stipulated facts here for purposes of the takings analysis. In this case, the parties stipulated that 2016 and 2017 Canonical Decrees closing the church (prior to appeals) indicated the stained-glass windows and work of some significance was to be removed from the Church Building (Docket No. 59, ¶ 40) and that if the Diocese *were* to try to make the Church Building suitable for use it would be too expensive due to lack of funds to make necessary repairs (*id.* ¶ 46). Without more, those facts and similar facts in the record, with all inferences construed in the City's favor, do not demonstrate to the Court that the City's acceptance

whether the Ordinance and its application to the Church Building constitutes a violation of the Diocese's free exercise of religion and other statutorily and constitutionally protected rights (notably, the substantial burden on the use of the Church Building for the purpose of religious exercise found unlawful under RLUIPA), the current record does not allow the Court to determine at this juncture that the encumbrances imposed by virtue of nomination for historic designation interfere with any economically viable use of the Church Building. Unlike in *Keeler*, the record here does not reflect what exactly the Diocese wished to do beyond acting on the 2017 Canonical Decree indicating how stained-glass windows and various sacred objects in the Church Building ought to be handled and potentially redistributed. Because the regulatory-taking analysis is fact-focused and ad hoc, *see LXR RS V, LLC*, 2019 WL 4930157, at *3, a fact-sparse record for the takings claim in this case makes it impossible for the Court to determine whether there has been a deprivation sufficient to constitute a regulatory taking. Therefore, the Court will deny the Diocese's motion for summary judgment on its regulatory takings claim, and will grant the City's cross-motion for summary judgment with respect to the regulatory takings claim because the Diocese has failed to adduce evidence it could rely on to prove its claim at a trial. *S.E.C. v. Hughes Cap. Corp.*, 124 F.3d 449, 452 (3d Cir. 1997).

### G.    Constitutional Claims: Violation of the 14th Amendment's Guarantee of Equal Protection (Count III)

At Count III, the Diocese has alleged that the City's action against a religious structure — the Church Building — without consent of the owner in violation of Ord. § 1101.03(a)(1)(a)(7) of the Ordinance and without a meaningful opportunity to dispute the process threatens to violate the Diocese's right to equal protection under the law in violation of the Fourteenth Amendment.

---

of the Church Building's nomination deprived the City of all reasonable use of the Church Building as a matter of law.

(Docket No. 1, ¶¶ 88-91).  The Diocese's claim against the City is that the threat of discrimination is present in the "adoption, enforcement and application" of the City's "ordinances."  *Id.*

The precise contours of this equal protection claim are somewhat challenging to discern. In its opening brief, the Diocese relegates its equal protection argument to a footnote and articulates the claim as follows: the Equal Protection Clause prohibits disparate treatment of similarly situated individuals (Docket No. 61 at 29 n. 19 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)); any disparate treatment involving a fundamental right like religion is subject to strict scrutiny (*id.*); and the City therefore denied equal protection of the laws to the Diocese when it entangled governmental interests with religious doctrine and failed to give the Diocese "equal treatment and enforcement regarding the Ordinance" (*id.*).  Given the Diocese's scant articulation of this claim, the City understandably provides very little response to it.  Given the parties' sparse treatment of this claim, the Court will also be brief in evaluating it.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne*, 473 U.S. at 439 (cleaned up).  To state a claim for violation of the Fourteenth Amendment's guarantee of equal protection, a "plaintiff must allege some minimum facts plausibly suggesting that: (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."  *Morales v. Beard*, No. CIV.A. 07-1527, 2008 WL 5706003, at *6 (W.D. Pa. Dec. 2, 2008), *report and recommendation adopted as modified*, No. CIV.A. 07-

1527, 2009 WL 586604 (W.D. Pa. Mar. 6, 2009) (citing *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)).

Based on the Complaint, the stipulated evidentiary record, and the parties' arguments—which primarily consist of the aforementioned footnote in the Diocese's opening brief and the City's blanket ripeness argument as to all the Diocese's claims—the Court cannot award summary judgment in the Diocese's favor because it has neither identified direct evidence of discriminatory intent nor identified a comparator. The Diocese has alleged that the Church Building's nomination was improper under the terms of the Ordinance, but has not pointed to evidence proving its treatment was based on impermissible considerations like religion or another constitutionally protected category, and even though the Diocese has pointed to what could be seen as actions by the City that indicated the City flagrantly ignored the Diocese's rights under the Ordinance, as well as its protestations that the Church Building's nomination was unlawful, the Diocese has not proffered evidence sufficient to show maliciousness or bad-faith intent by the City to injure it. Nor has the Diocese identified evidence in the record showing that it was treated differently from a similarly situated party. That failing "dooms [its] equal-protection claim." *Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022). Accordingly, the Court cannot grant summary judgment on this record for the Equal Protection Clause violation alleged by the Diocese.[48] Additionally, because the Diocese has not identified any evidence in the record that it can rely on to prove a violation of the Equal Protection Clause if this claim is tried, the Court will grant the

---

[48]     The Court here flags the same issue as it did *supra* in note 44, that is, that the Diocese asserted this claim directly under the Fourteenth Amendment in its Complaint. (Docket No. 1 at 15). Other courts have found this to be improper. *See, e.g.*, *Chase*, 2005 WL 3079065, at *10 ("[A] plaintiff must use Section 1983 as a vehicle to enforce causes of action implied directly from the Constitution. Bringing an Equal Protection Clause challenge outside the auspices of Section 1983, as the plaintiffs did here, is improper.").

City's cross-motion for summary judgment with respect to this claim. *Hughes Cap. Corp.*, 124 F.3d at 452.

### H.  Constitutional Claims: Violation of Civil Rights by Quinn pursuant to 42 U.S.C. § 1983 (Count VI)

The Diocese alleges that Quinn, in her official capacity as Senior Preservation Planner for the HRC and an employee of the City, was made aware of the procedural and substantive defects in the process by which the Church Building was being subject to nomination and designation, but under color of law willfully persisted in infringing upon the Diocese's religious liberties in violation of the Ordinance, state law, and the U.S. Constitution. (Docket No. 1, ¶¶ 107-12). Specifically, Quinn's alleged conduct in this regard is that: she was made aware on or about June 25, 2020, by email that the Church Building was not closed for religious worship and that the Church Building's owners did not submit the nomination for historic designation and in fact opposed the nomination (Docket No. 1, ¶ 33); despite being made aware of the unlawfulness of the Church Building's nomination, she nonetheless recommended (with the rest of the HRC) that the nomination be approved by the City Council (*id.* ¶ 49); and she, acting under color of state law, "knowingly and continuously ignored the expressed intent of the Church Building's owner" (*id.* ¶ 53). The parties further stipulate that the Diocese was not given an opportunity to cross examine Quinn at the public hearing on November 10, 2020. (Docket No. 59, ¶ 96). Based on those facts, the Diocese alleges that Quinn deprived it of its right to free exercise of religion, its right to due process, its right to equal protection under the law, and its right to control its own religious property.

To begin with, to the extent that the Diocese pursues a Section 1983 claim against Quinn in her official capacity the Diocese has not adequately explained a basis for this Court to grant its summary judgment motion under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658

(1978), which does not permit *respondeat superior* liability of a municipality for injuries inflicted by its employees. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). On the record before the Court and based on the Diocese's arguments, the Diocese has not proven as a matter of law, at this time, that Quinn was a policymaker such that the City should be held liable for her "individual decision-making." *Porter v. City of Philadelphia*, 975 F.3d 374, 384-85 (3d Cir. 2020) (explaining that "unendorsed actions, without more, do not become municipal policy or give rise to municipal liability").

To the extent that the Diocese is suing Quinn in her individual capacity, Quinn seeks qualified immunity and on this record the Court agrees that she is entitled to it. Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted). A right is "clearly established" if "every reasonable official would have understood that what he [or she] is doing violates that right." *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There must be "existing precedent" that "placed the statutory or constitutional question beyond debate." *Id.* And the "clearly established" right/law in question may not be "define[d] … at a high level of generality." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The Diocese argues that Quinn is not entitled to qualified immunity because the City admits that "***a senior planner employed by a City should generally be on notice of the religious protections provided by the Constitution and federal law***." (Docket No. 70 at 27-28). However, the Court is not convinced that concession makes the Diocese's case with respect to overcoming the qualified immunity protections potentially available to Quinn.

Quinn's unexplained violations of the Ordinance were flagrant, but whether her conduct contributed to violations of RLUIPA or the U.S. Constitution is less clear.  It is not at all evident to the Court that the specific federal statutory and/or constitutional violations at issue in this case are clearly established by Supreme Court precedent, precedent in the Third Circuit, "or a robust consensus of cases of persuasive authority in the Courts of Appeals that could clearly establish a right for purposes of qualified immunity."  *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020) (quoting *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017)).  This Court's discussion, *supra*, distinguishing the meaning of "substantial burden" under 42 U.S.C. § 2000cc in this case with this Circuit's definition of substantial burden in the context of an institutionalized person under 42 U.S.C. § 2000cc-1 in *Washington v. Klem*, and the within survey of divergent standards across various circuit courts, demonstrate the lack of the requisite robust consensus.  While it is clear that Quinn disregarded the Ordinance, even the Diocese seems to struggle to define with specificity which federal rights Quinn is alleged to have violated: "Quinn's actions clearly deprived the Diocese of an array of constitutional rights through her continued enforcement of the Ordinance, particularly in complete disregard of the Diocese's repeated objections thereto, and with deliberate knowledge of the inability of the Diocese to develop its defenses at the hearing."  (Docket No. 70 at 28).

Accordingly, the Court will grant the City's motion for summary judgment as to the claims against Quinn.  The Court notes the Diocese has had an opportunity to develop its evidence and arguments in support of a showing that only an unreasonable person in Quinn's shoes would not have been aware that her conduct violated the Diocese's constitutional and RLUIPA rights.  The Diocese has not done so, and at this point the Court will exercise its discretion to prevent Quinn

from being "subjected to unnecessary and burdensome … trial proceedings." *Crawford-El v. Britton*, 523 U.S. 574, 597-98 (1998).

IV.    <u>**CONCLUSION**</u>

For the reasons set forth above, the Diocese's Motion for Summary Judgment is <u>**granted in part and denied in part**</u>, and the City's Motion for Summary Judgment is <u>**granted in part and denied in part**</u>.  The Court having determined that the Diocese is entitled to judgment as a matter of law on its claim that the City violated the Ordinance (Count VIII) by accepting an improper nomination of a religious structure and denying the Diocese the procedural protections afforded under the Ordinance, and its claim that by its application of the Ordinance to the Church Building the City imposed a substantial burden on the Diocese's use of property for the purpose of religious exercise without a compelling governmental interest pursued by least restrictive means in violation of RLUIPA (Count I), the Court will declare that the City's actions violated the Ordinance and RLUIPA.  The Diocese's claims at Count II—violation of the Free Exercise/Establishment Clauses and parallel provisions of the Pennsylvania Constitution—are <u>**dismissed as moot**</u>.

The Court will also permanently enjoin the City from designating the Church Building as a historic structure pursuant to the now-pending nomination before the City Council, and the City shall be further enjoined from accepting nomination of the Church Building by any individual other than those authorized under the Ordinance and other applicable state law to nominate a religious structure (the owner(s) of the Church Building, *i.e.*, Bishop Zubik or his successor).  The injunctive relief in this matter, which is narrowly tailored to the declaratory relief, is warranted considering that: the Court has determined that the City violated its Ordinance and, in doing so, violated RLUIPA; the Diocese has been subject to irreparable injury by its unlawful nomination; other remedies appear to be inadequate; the balance of hardships warrants a permanent injunction;

and the public interest will not be disserved by the same. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

For those claims that the Court has resolved in the City's favor (Counts III, IV, V, VI, VII), the claims will be **dismissed with prejudice**. The Court will order counsel for the parties to meet and confer and file a joint statement advising the Court as to whether the Court's ruling today resolves this case, as set forth in detail in the accompanying Order.

An appropriate Order will follow.

<div align="right">

*/s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

</div>

Dated: February 11, 2025

cc/ecf:  All counsel of record